**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAPITOL RECORDS, INC., a Delaware corporation; BMG MUSIC, a New York general partnership; ATLANTIC RECORDING CORPORATION, a Delaware corporation; UMG RECORDINGS, INC., a Delaware corporation; WARNER BROS. RECORDS INC., a Delaware corporation; VIRGIN RECORDS AMERICA, INC., a California corporation; SONY BMG MUSIC ENTERTAINMENT, a Delaware general partnership; and MOTOWN RECORD COMPANY, L.P., a California limited partnership, | Civil Action No.: |

                              Plaintiffs,

                v.

JOHN DOE,

                              Defendants.

---

## DECLARATION OF JONATHAN WHITEHEAD IN SUPPORT OF MOTION FOR LEAVE TO TAKE IMMEDIATE DISCOVERY

I, Jonathan Whitehead, have personal knowledge of the facts stated below and, under penalty of perjury, hereby declare:

1.      I am Vice President and Counsel for Online Copyright Protection for the Recording Industry Association of America, Inc. ("RIAA"), where I have been employed for over 6 years. My office is located at 1330 Connecticut Avenue, N.W., Washington, DC 20036. I submit this declaration in support of Plaintiffs' Motion for Leave to Take Immediate Discovery.

2.     This declaration is based on my personal knowledge, and if called upon to do so, I would be prepared to testify as to its truth and accuracy.

## The RIAA's Role in Protecting Its Member Recording Industry Companies From Copyright Infringement

3.     The RIAA is a not-for-profit trade association whose member record companies create, manufacture, and/or distribute approximately ninety percent of all legitimate sound recordings produced and sold in the United States. The RIAA's member record companies comprise the most vibrant national music industry in the world. A critical part of the RIAA's mission is to assist its member companies in protecting their intellectual property in the United States and in fighting against online and other forms of piracy. All of the Plaintiffs in this action are members of the RIAA.

4.     The RIAA investigates the unauthorized reproduction and distribution of copyrighted sound recordings online. As Vice President and Counsel for Online Copyright Protection, I am responsible for formulating and implementing online strategies for the RIAA, including investigations into the online infringement of copyrighted sound recordings of all kinds.

## The Internet and Music Piracy

5.     The Internet is a vast collection of interconnected computers and computer networks that communicate with each other. It allows hundreds of millions of people around the world to communicate freely and easily and to exchange ideas and information, including academic research, literary works, financial data, music, movies, graphics, and an unending and

ever-changing array of other data. Unfortunately, the Internet also has afforded opportunities for the wide-scale piracy of copyrighted sound recordings and musical compositions. Once a sound recording has been transformed into an unsecured digital format, it can be copied further and distributed an unlimited number of times over the Internet, without significant degradation in sound quality.

6.      Much of the unlawful distribution of copyrighted sound recordings over the Internet occurs via "peer-to-peer" ("P2P") file copying networks or so-called online media distribution systems. The most notorious example of such a P2P system was Napster, which was enjoined by a federal court. In addition, there are many other P2P networks, including KaZaA, eDonkey, iMesh, Grokster, and Gnutella, that continue to operate and to facilitate widespread copyright piracy. The major recording companies are currently engaged in litigation against KaZaA and Grokster. At any given moment, millions of people illegally use online media distribution systems to upload or download copyrighted material.

7.      P2P networks, at least in their most popular form, refer to computer systems or processes that enable Internet users to: (1) make files (including audio recordings) stored on a computer available for copying by other users; (2) search for files stored on other users' computers; and (3) transfer exact copies of files from one computer to another via the Internet. P2P networks enable users who otherwise would have no connection with, or knowledge of, each other to offer to each other for distribution and copying files off of their PCs, to provide a sophisticated search mechanism by which users can locate these files for downloading, and to provide a means of effecting downloads.

8.    The major record companies generally have not authorized their copyrighted sound recordings to be copied or distributed in unsecured formats by means of P2P networks. Thus, the vast majority of the content that is copied and distributed on P2P networks is unauthorized by the copyright owner – that is, the distribution violates the copyright laws.

9.    The scope of online piracy of copyrighted works cannot be underestimated. Retail sales – the principal revenue source for most record companies – declined 7% in 2000, 10% in 2001, and 11% in 2002. The RIAA member companies lose significant revenues on an annual basis due to the millions of unauthorized downloads and uploads of well-known recordings that are made available on the Internet by infringers who, in virtually all cases, have the ability to maintain their anonymity to all but the Internet Service Provider ("ISP") they use to supply them with access to the Internet.

10.    In contrast to the terrible harm to copyright owners, ISPs likely benefit from P2P networks. Those who would unlawfully upload and download copyrighted music often use large amounts of bandwidth (because music files are so large). The infringers thus tend to subscribe to services, such as DSL and cable modems, that are far more expensive than ordinary telephone services. One publication recently estimated that 50-70 percent of the bandwidth of cable broadband network was being used for P2P file copying. See Alan Brezneck, "Service Control Vendors vie for MSO Business," *Cable Datacom News* (March 1, 2003).

11.    The persons who commit infringements by using the P2P networks are, by and large, anonymous to Plaintiffs. A person who logs on to a P2P network is free to use any alias (or computer name) whatsoever, without revealing his or her true identity to other users.

Thus, Plaintiffs can observe the infringement occurring on the Internet, but do not know the true names or mailing addresses of those individuals who are committing the infringement.

## The RIAA's Identification of Copyright Infringers

12.     In order to assist its members in combating copyright piracy, the RIAA conducts searches of the Internet, as well as file-copying services, for infringing copies of sound recordings whose copyrights are owned by RIAA members. A search can be as simple as logging onto a P2P network and examining what files are being offered by others logged onto the network. These searches generally result in the identification of specific Internet Protocol ("IP") addresses from which infringers are making unauthorized copies of sound recordings available to the public. An IP address is a unique identifier that, along with the date and time, specifically identifies a particular computer or server using the Internet. An IP address also allows the RIAA to use publicly available databases to ascertain, in general terms, the ISP that provides the infringer with access to the Internet.

13.     The RIAA engages in a painstaking process to determine whether a person is infringing. That process relies on human review of evidence supporting the allegation of infringement. For each suspected infringer, the RIAA reviews a listing of the music files that the user has offered for upload by others from his or her computer in order to determine whether they appear to be copyrighted sound recordings. The RIAA also downloads copyrighted sound recordings from these users, and listens to them in order to confirm that they are, indeed, illegal copies of sound recordings whose copyrights are owned by RIAA members. The RIAA also downloads and stores other evidence, such as metadata accompanying each file being disseminated that demonstrates that the user is engaged in copyright infringement.

14.    The RIAA frequently has used the subpoena processes of Federal Rule of Civil Procedure 45 and the Digital Millennium Copyright Act ("DMCA") to obtain the names of infringers from ISPs. (Individuals only can gain access to the Internet after setting up an account with, or subscribing to, an ISP.) The RIAA typically has included in their subpoenas to ISPs an IP address and a date and time on which the RIAA observed use of the IP address in connection with allegedly infringing activity. In some instances, providing the IP address alone to the ISP has been enough to enable the ISP to identify the infringer. Providing the date and time further assists some ISPs in identifying infringers, especially ISPs that use "dynamic IP addressing" such that a single computer may be assigned different IP addresses at different times, including, for example, each time it logs into the Internet.[5] Once provided with the IP address, plus the date and time of the infringing activity, the infringer's ISP quickly and easily can identify the computer from which the infringement occurred (and the name and address of the subscriber that controls that computer), sometimes within a matter of minutes.

15.    Since 1998, the RIAA and others have used subpoenas thousands of times to learn the names, addresses, telephone numbers, and e-mail addresses of infringers for the purpose of bringing legal actions against those infringers. During a recent litigation with Verizon (an ISP) relating to the DMCA subpoena process, Verizon conceded that, as an alternative to the DMCA process, Plaintiffs could file "John Doe" lawsuits and issue Rule 45 subpoenas to ISPs to obtain the true identities of infringing subscribers.

---

[5] ISPs own or are assigned certain blocks or ranges of IP addresses. An ISP assigns a particular IP address in its block or range to a subscriber when that subscriber goes "online."

### The RIAA's Identification of the Infringers in This Case

16.     In the ordinary course of investigating online copyright infringement, the

RIAA became aware that Defendant was offering files for download on various P2P networks.

The user-defined author and title of the files offered for download by Defendant suggested that

many were copyrighted sound recordings being disseminated without the authorization of the

copyright owners.  The RIAA downloaded and listened to a representative sample of the music

files being offered for download by Defendant and was able to confirm that the files Defendant

was offering for distribution were illegal copies of sound recordings whose copyrights are owned

by RIAA members.  The RIAA also recorded the time and date at which the infringing activity

was observed and the IP address assigned to Defendant at the time.  See Complaint Exhibit A.

The RIAA could not, however, determine the physical location of the user or their identity.  The

RIAA could determine that the Defendant was using Cogent Communications, Inc.'s service to

distribute and make available for distribution the copyrighted files.

17.     The RIAA also has collected for Defendant a list of the files Defendant

has made available for distribution to the public.  Exhibit 1 to this Declaration contains such a

list for the Defendant referred to in the Complaint.  This list shows over a thousand files, many

of which are sound recording (MP3) files that are owned by, or exclusively licensed to,

Plaintiffs.

### The Importance of Expedited Discovery in This Case

18.     Obtaining the identity of copyright infringers on an expedited basis is

critical to stopping the piracy of RIAA members' copyrighted works.

19.    First, every day that copyrighted material is disseminated without the authorization of the copyright owner, the copyright owner is economically harmed. Prompt identification of infringers is necessary in order for copyright owners to take quick action to stop unlawful dissemination of their works and minimize their economic losses.

20.    Second, infringement often occurs with respect to sound recordings that have not yet been distributed publicly. Such infringement inflicts great harm on the initial market for new works. New recordings generally earn a significant portion of their revenue when they are first released, and copyright piracy during a recording's pre-release or early release period therefore deprives copyright owners of an important opportunity to reap the benefits of their labor.

21.    Third, without expedited discovery Plaintiffs have no way of serving Defendant with the complaint and summons in this case. Plaintiffs do not have the Defendant's name or address, nor do they have an e-mail address for Defendant.

22.    Fourth, and perhaps most critically, service providers have different policies pertaining to the length of time they preserve "logs" which identify their users. ISPs keep log files of their user activities for only limited periods of time – which can range from as short as a few days, to a few months – before erasing the data they contain. If an ISP does not respond expeditiously to a discovery request, the identification information in the ISP's logs may be erased, making it impossible for the ISP to determine the identity of the infringer and eliminating the copyright owner's ability to take action to stop the infringement.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on May 19, 2005 in Washington, DC.

Jonathan Whitehead

**Exhibit 1**

**Kazaa - [Search]**

File View Player Tools Actions Help

Web | New search | My Kazaa | Theater | Search | Traffic | Shop | Tell-A-Friend

| Username | Filename | Artist | Size | Media Type |
|---|---|---|---|---|
| hbergeron@KaZaA | Sopranos Theme - Woke Up This Morning.mp3 | Theme | 4,352KB | Audio |
| hbergeron@KaZaA | 02-Woke up this morning and you find yourself dead.mp3 | Jimi Hendrix | 11,368KB | Audio |
| hbergeron@KaZaA | world class wrecking crew-surgery.mp3 | world class wrecking crew | 9,446KB | Audio |
| hbergeron@KaZaA | mario williams,carl thomas- remix (1).mp3 | mario williams,carl thomas | 4,053KB | Audio |
| hbergeron@KaZaA | korean-Kim-sun i lib eheading.wmv | Unknown | 599KB | Video |
| hbergeron@KaZaA | Lil Romeo - Lil Soldiers Need Love To.mp3 | Lil Romeo | 2,398KB | Video |
| hbergeron@KaZaA | corey ft.mp3 | Corey Ft., Lil Romeo | 3,539KB | Audio |
| hbergeron@KaZaA | lilbow wow--my baby itcterromeo.mp3 | lilbow wow | 3,532KB | Audio |
| hbergeron@KaZaA | Cajun Playboys--Bosco Stomp.mp3 | Cajun Playboys | 5,631KB | Audio |
| hbergeron@KaZaA | 12 - Sina Nordenstam - Little Star.mp3 | Romeo_Juliet | 8,568KB | Audio |
| hbergeron@KaZaA | (Lil Wayne)-500 Degreez.wma- | A | 1,801KB | Audio |
| hbergeron@KaZaA | b.mp3 | Juvenile | 5,820KB | Audio |
| hbergeron@KaZaA | Stronger.mp3 | Brittney Spears | 2,390KB | Audio |
| hbergeron@KaZaA | Avril Lavigne - Easy.mp3 | Avril Levine | 3,838KB | Audio |
| hbergeron@KaZaA | Brittney Spears-- Autumn Goodbye.mp3 | Brittney Spears | 1,966KB | Audio |
| hbergeron@KaZaA | Avril Lavigne-Let-Go-Naked_[13].mp3 | Avril Lavigne | 4,077KB | Audio |
| hbergeron@KaZaA | 07-usher_ft.mp3 | Usher ft.joe budden | 4,238KB | Audio |
| hbergeron@KaZaA | Avril Lavigne-Let-Go-Unwanted_[6].mp3 | Avril Lavigne | 4,316KB | Audio |
| hbergeron@KaZaA | Avril Lavigne--Let Go--1t--Nobody's Fool.wma | Avril Lavigne | 1,892KB | Audio |
| hbergeron@KaZaA | Avril Lavigne-Let Go-Too Much to Ask_[12].mp3 | Avril Lavigne | 4,402KB | Audio |
| hbergeron@KaZaA | under my skin_TAKE IT_avril lavigne.mp3 | Avril Lavigne | 1,741KB | Audio |
| hbergeron@KaZaA | 06-freak out-avril lavigne-Under My Skin.mp3 | Avril Lavigne | 1,297KB | Audio |
| hbergeron@KaZaA | killer.under.my.skin_AVRIL_LAVIGNE.mp3 | Avril Lavigne | 1,958KB | Audio |
| hbergeron@KaZaA | TOGETHER_UNDER.MY.SKIN_AVRIL.LAVIGNE.mp3 | Avril Lavigne | 1,093KB | Audio |
| hbergeron@KaZaA | 08 AVRIL LAVIGNE forgotten under my skin.mp3 | Avril Lavigne | 4,506KB | Audio |
| hbergeron@KaZaA | Luther Van Dross - Killing Me Softly.mp3 | Luther Vandross | 5,199KB | Audio |
| hbergeron@KaZaA | Young Blood2 feat Lil Jon = Danni\ (d).mp3 | Lil John. | 4,698KB | Audio |
| hbergeron@KaZaA | lil Jon - diamonds.mp3 | Lil John. | 2,636KB | Audio |
| hbergeron@KaZaA | Brittney Spears- Everytime (1).mp3 | Brittney Spears | 4,622KB | Audio |

**Kazaa - [Search]**

File   View   Player   Tools   Actions   Help

Web | My Kazaa | Theater | Download | New search | Search | Traffic | Shop | Tell A Friend

Q Search   Q search field

| User | Filename | Artist | Size | Media Type |
|---|---|---|---|---|
| hbergeron@KaZaA | Britney Spears - Everytime 1(1).mp3 | Britney Spears | 4,622KB | Audio |
| hbergeron@KaZaA | Juvenile - Back That Thing Up.mp3 | Juvenile | 3,158KB | Audio |
| hbergeron@KaZaA | Juvenile feat. Hot Boyz - Ha (Remix).mp3 | Juvenile | 4,152KB | Audio |
| hbergeron@KaZaA | Holiday Inn.mp3 | Chingy, Snoop Doggy Do... | 4,933KB | Audio |
| hbergeron@KaZaA | Shaggy - KRS, Madlion - Eh Yo.mp3 | MAD Lion | 3,642KB | Audio |
| hbergeron@KaZaA | Shaggy - Angel.mp3 | Shaggy | 3,850KB | Audio |
| hbergeron@KaZaA | Shaggy - Mr. Bombastic.mp3 | Shaggy | 3,850KB | Audio |
| hbergeron@KaZaA | (17) Usher - Follow Me.wma | Usher | 2,099KB | Audio |
| hbergeron@KaZaA | Shaggy - It Wasn't Me.mp3 | Shaggy | 5,338KB | Audio |
| hbergeron@KaZaA | Hot-97-Remix.mp3 | Nelly feat. P Diddy and Usher | 2,906KB | Audio |
| hbergeron@KaZaA | 11_-_Track11.mp3 | Twista | 2,485KB | Audio |
| hbergeron@KaZaA | Ludacris- Stand Up (Dirty)(1).mp3 | Ludacris | 5,263KB | Audio |
| hbergeron@KaZaA | Theodis Ealey - Stand Up 1 in 1 1.mp3 | Theodis Ealey | 4,154KB | Audio |
| hbergeron@KaZaA | Theodis Ealey - Stand Up In It-Club Mix_ (3).mp3 | Theodis Ealey | 2,788KB | Audio |
| hbergeron@KaZaA | theodis ealey - Old time blues.mp3 | Theodis Ealey | 5,223KB | Audio |
| hbergeron@KaZaA | love in the mouth.WAV | Unknown | 56,868KB | Audio |
| hbergeron@KaZaA | Ani Difranco 06 - Evolve.mp3 | Ani Difranco | 1,738KB | Audio |
| hbergeron@KaZaA | Gin Blossoms - Cajun song.mp3 | Gin Blossoms | 2,755KB | Audio |
| hbergeron@KaZaA | Cajun_Zydeco_Classics_-_Alligator_Stomp.mp3 | 3 | 2,086KB | Audio |
| hbergeron@KaZaA | Doug Kershaw - Cajun Joe .mp3 | 3 | 2,030KB | Audio |
| hbergeron@KaZaA | Cajun Buckwheat Zydeco- Ya Ya.mp3 | Buckwheat Zydeco | 3,367KB | Audio |
| hbergeron@KaZaA | Charlie Daniels Band - Ragin' Cajun.mp3 | Cajun-Buckwheat Zydeco | 3,498KB | Audio |
| hbergeron@KaZaA | Cajun Boogie-Queen - Doug Kershaw.mp3 | Doug Kershaw | 2,496KB | Audio |
| hbergeron@KaZaA | Cajun Music - Beausoleil - Bayou Boogie.mp3 | Beausoleil | 2,266KB | Audio |
| hbergeron@KaZaA | Music - Cajun Country - Doug Kershaw - Diggy Diggy Lo m.... | 3 | 2,211KB | Audio |
| hbergeron@KaZaA | Freddie Fender - Lovin' Caj (1).mp3 | Freddy Fender | 2,494KB | Audio |
| hbergeron@KaZaA | (Hank-Williams)-Cajun Baby.wma | Hank Williams Jr. | 2,528KB | Audio |
| hbergeron@KaZaA | Cajun - Joel Sonnier - Big Mamou.mp3 | Jo-El Sonnier | 2,304KB | Audio |
| hbergeron@KaZaA | Johnny Rebel - Cajun KKK (complete).mp3 | Johnny Rebel | 1,389KB | Audio |

Kazaa - [Search]

Web | View | Player | Tools | Actions | Help

New search | My Kazaa | Theater | Search | Traffic | Shop | Tell A Friend | Download

| User | Filename | Artist | Size | Media Type |
|---|---|---|---|---|
| hbergeron@KaZaA | Johnny Rebel - Cajun KKK (complete).mp3 | Johnny Rebel | 1,389KB | Audio |
| hbergeron@KaZaA | Jo-El Sonnier - Evangeline.mp3 | Jo-El Sonnier | 2,757KB | Audio |
| hbergeron@KaZaA | 14. That Was My Love.mp3 | Ani Difranco | 1,000KB | Audio |
| hbergeron@KaZaA | Ani Difranco - Used To You.mp3 | Ani Difranco | 3,181KB | Audio |
| hbergeron@KaZaA | ani difranco - cloud blood (live).mp3 | 3) | 4,094KB | Audio |
| hbergeron@KaZaA | Ani Difranco - The mango girls - Tangled up in blue (live)... | 3) | 3,396KB | Audio |
| hbergeron@KaZaA | Don't Nobody Know.mp3 | Ani Difranco | 1,528KB | Audio |
| hbergeron@KaZaA | Ani Difranco - Crime for Crime.mp3 | ani difranco | 5,344KB | Audio |
| hbergeron@KaZaA | Ani Difranco - DS - O My My.mp3 | Ani Difranco | 1,628KB | Audio |
| hbergeron@KaZaA | Ani Difranco - Both Hands (acoustic).mp3 | 3) | 2,820KB | Audio |
| hbergeron@KaZaA | Ani Difranco - 12 - Raindrck.mp3 | Ani Difranco | 1,672KB | Audio |
| hbergeron@KaZaA | Ani Difranco - Grey.mp3 | Ani Difranco | 5,178KB | Audio |
| hbergeron@KaZaA | Ani Difranco - Revelling.mp3 | Ani Difranco | 4,864KB | Audio |
| hbergeron@KaZaA | ani difranco - imagine (live).mp3 | Ani Difranco | 4,716KB | Audio |
| hbergeron@KaZaA | ani difranco - i loved you.mp3 | Ani Difranco | 3,578KB | Audio |
| hbergeron@KaZaA | Ani Difranco - Grey.mp3 | Ani Difranco | 3,500KB | Audio |
| hbergeron@KaZaA | 01 - Five Minutes Of Funk.mp3 | ani difranco | 3,714KB | Audio |
| hbergeron@KaZaA | 01 - Jam On It.mp3 | 3 | 6,096KB | Audio |
| hbergeron@KaZaA | 01 - If I Ruled The World.mp3 | 3 | 1,680KB | Audio |
| hbergeron@KaZaA | 01 - Kurtis Blow - The Breaks.mp3 | Whodini | 4,506KB | Audio |
| hbergeron@KaZaA | 'Yellow Moon'.mp3 | Whodini | 3,714KB | Audio |
| hbergeron@KaZaA | 01 I Drove All Night.wma | Kurtis Blow | 5,776KB | Audio |
| hbergeron@KaZaA | (09) Faith Hill - Stronger.mp3 | The Neville Brothers | 3,787KB | Audio |
| hbergeron@KaZaA | (1007)Smooth Jazz - Slash - Spanish Guitar-Obsession Con... | Faith Hill | 4,959KB | Audio |
| hbergeron@KaZaA | (1166)Smooth Jazz - Saxaphone - Romantic Sax .mp3 | JAZZ | 3,476KB | Audio |
| hbergeron@KaZaA | (1170)Sade - Smooth Operator (Extended Smooth Jazz Ve... | Jazz | 2,712KB | Audio |
| hbergeron@KaZaA | (910)miles davis - freedom jazz dance.mp3 | JAZZ | 8,296KB | Audio |
| hbergeron@KaZaA | (Chopin) Prelude 4 - Guitar.mp3 | Miles Davis | 6,824KB | Audio |
| hbergeron@KaZaA | (Dream Boy Dream Girl).mp3 | chopin | 3,875KB | Audio |
| | | Cynthia and Johnny O | 2,028KB | Audio |

# Kazaa - [Search]

File    View    Player    Tools    Actions    Help

Web | My Kazaa | Theater | Search | Traffic | Shop | Tell A Friend

New search | Download | Search | Search field

| User | Filename | Artist | Size | Media Type |
|---|---|---|---|---|
| hbergeron@KaZaA | Dream Boy-Dream Girl).mp3 | Cynthia and Johnny O. | 2,028KB | Audio |
| hbergeron@KaZaA | _AudioTrack 08.mp3 | Kooba | 4,318KB | Audio |
| hbergeron@KaZaA | 01-r_kelly-ignition_(remix)_(1)_(1).mp3 | R. Kelly | 2,840KB | Audio |
| hbergeron@KaZaA | 03-1-Last Goodbye.mp3 | Jeff Buckley | 5,388KB | Audio |
| hbergeron@KaZaA | 2 Find MP3 8.2.0.exe | Unknown | 729KB | Software |
| hbergeron@KaZaA | ACB MP3 converter.exe | Unknown | 499KB | Software |
| hbergeron@KaZaA | Adobe PhotoShop 7.1 crack.exe | Unknown | 285KB | Software |
| hbergeron@KaZaA | All Editor 3.0b.exe | Unknown | 627KB | Software |
| hbergeron@KaZaA | Auction Sentry (new).exe | Unknown | 388KB | Software |
| hbergeron@KaZaA | Audiolabel CD Labeler 3.0 (+crack).exe | Unknown | 593KB | Software |
| hbergeron@KaZaA | Battlefield 1942 Pack4 (crack+bloodpatch).exe | Unknown | 380KB | Software |
| hbergeron@KaZaA | BearShare 5.1.1.exe | Unknown | 764KB | Software |
| hbergeron@KaZaA | CC Generals Pack2 (new patch).exe | Unknown | 251KB | Software |
| hbergeron@KaZaA | Complete UK music Database 1.2.exe | Unknown | 610KB | Software |
| hbergeron@KaZaA | DivX edit (new).exe | Unknown | 456KB | Software |
| hbergeron@KaZaA | DvD Rip guide (+tools) s00rm.exe | Unknown | 679KB | Software |
| hbergeron@KaZaA | Easy CD Creator Software Update.exe | Unknown | 781KB | Software |
| hbergeron@KaZaA | FlashRip (keygen).exe | Unknown | 319KB | Software |
| hbergeron@KaZaA | FreeRip 4.30.exe | Unknown | 661KB | Software |
| hbergeron@KaZaA | Gene Stream 3.2.4.exe | Unknown | 644KB | Software |
| hbergeron@KaZaA | Gothic 2 (in-patch).exe | Unknown | 166KB | Software |
| hbergeron@KaZaA | Hacker Tutorial (by ph3Akz).exe | Unknown | 507KB | Software |
| hbergeron@KaZaA | Half-Life keygen (+hogc hack).exe | Unknown | 490KB | Software |
| hbergeron@KaZaA | HL keys (working).exe | Unknown | 524KB | Software |
| hbergeron@KaZaA | I.G.1. 2 (new crack).exe | Unknown | 148KB | Software |
| hbergeron@KaZaA | (Snipe) 1.5.0c.exe | Unknown | 405KB | Software |
| hbergeron@KaZaA | James Bond 007 Nightfire.crack.exe | Unknown | 29KB | Software |
| hbergeron@KaZaA | Kazaa Skins 1.8.exe | Unknown | 712KB | Software |
| hbergeron@KaZaA | 04-r_kelly-ill_never_leave.mp3 | R. Kelly | 5,280KB | Audio |

Downloading, sharing 370520 files (2989 TB)    Not sharing any files

**Kazaa - [Search]**

File   View   Player   Tools   Actions   Help

Web | My Kazaa | Theater | Download

New search

Search | Traffic | Shop | Tell A Friend

Search Field

| User | Filename | Artist | Size | Media Type |
|------|----------|--------|------|------------|
| hbergeron@KaZaA | 04 - R. Kelly - If I never leave.mp3 | R. Kelly | 5,280KB | Audio |
| hbergeron@KaZaA | 05 - Jingle bell rock.mp3 | christmas music | 3,707KB | Audio |
| hbergeron@KaZaA | 07 - Earth, Wind and Fire - Shining Star.mp3 | Earth, Wind and Fire | 32,672KB | Audio |
| hbergeron@KaZaA | 08-Keeper Of my Heart.mp3 | Mercy Me | 4,346KB | Audio |
| hbergeron@KaZaA | 10-Wayne Wonder - No Letting Go (Diwali Riddim).wav | | 36,697KB | Audio |
| hbergeron@KaZaA | 11 - Jesus Loves Me.mp3 | Aaron Neville | 6,109KB | Audio |
| hbergeron@KaZaA | 18 - The Lord's Prayer.mp3 | Marvin Gaye | 1,802KB | Audio |
| 2 Users | | | | |
| hbergeron@KaZaA | 18-3 - Silent Night - Christina Aguilera.mp3 | Christina Aguilera | 6,787KB | Audio |
| hbergeron@KaZaA | 702 feat. Missy Elliot - WHERE MY GIRLS AT (Remix).mp3 | Missy Elliot | 2,666KB | Audio |
| hbergeron@KaZaA | A Punk Rock Christmas - Merry Christmas.mp3 | The Ramones | 2,428KB | Audio |
| hbergeron@KaZaA | Aaron Neville - Ava Maria (2).mp3 | Aaron Neville | 4,397KB | Audio |
| hbergeron@KaZaA | Aaron Neville - Can't Stop The Rain From Falling.mp3 | Aaron Neville | 4,008KB | Audio |
| hbergeron@KaZaA | Aaron Neville - Dont Go Please Stay.mp3 | Aaron Neville | 2,569KB | Audio |
| hbergeron@KaZaA | Aaron Neville - It Feels Like Rain.mp3 | Aaron Neville | 3,550KB | Audio |
| hbergeron@KaZaA | Aaron Neville - Louisiana 1927.mp3 | Aaron Neville | 2,178KB | Audio |
| hbergeron@KaZaA | Aaron Neville - Song Of Bernadette.mp3 | Aaron Neville | 2,872KB | Audio |
| hbergeron@KaZaA | Aaron Neville - When a Man Loves a Woman.mp3 | A | 4,221KB | Audio |
| hbergeron@KaZaA | Alexis On Fire, No One Knows My Name.mp3 | Alexisonfire | 3,020KB | Audio |
| hbergeron@KaZaA | Aliyah ft. R. Kelly - Let Me Know.mp3 | R. Kelly | 4,203KB | Audio |
| hbergeron@KaZaA | Amii Stewart - Knock on Wood.mp3 | Amii Stewart | 4,366KB | Audio |
| hbergeron@KaZaA | Medal Of Honor (Allied Assault) crack.exe | Unknown | 200KB | Software |
| hbergeron@KaZaA | mIRC 6.x addon patch.exe | Unknown | 541KB | Software |
| hbergeron@KaZaA | mIRC 59th war-script.exe | Unknown | 559KB | Software |
| hbergeron@KaZaA | MP3 cut pro 3.0.exe | Unknown | 473KB | Software |
| hbergeron@KaZaA | Need for Speed 6 (new cars + crack).exe | Unknown | 46KB | Software |
| hbergeron@KaZaA | NeoNapster 3.92.exe | Unknown | 747KB | Software |
| hbergeron@KaZaA | New Nvidia (geForce) drivers (beta).exe | Unknown | 798KB | Software |
| hbergeron@KaZaA | Operation Flashpoint (bioopatch).exe | Unknown | 217KB | Software |
| hbergeron@KaZaA | Patch Creator 3.5a.exe | Unknown | 354KB | Software |

**Kazaa - [Search]**

File  View  Player  Tools  Actions  Help

Web | My Kazaa | Theater | Download | Search | Traffic | Shop | Tell A Friend

New search | Search | Search Field

| User | Filename | Artist | Size | Media Type |
|---|---|---|---|---|
| hbergeron@KaZaA | Patch Creator 3.58.exe | Unknown | 354KB | Software |
| hbergeron@KaZaA | Photoshow 3.1.exe | Unknown | 422KB | Software |
| hbergeron@KaZaA | Ps2 to Pc tutorial (txtbot).exe | Unknown | 268KB | Software |
| hbergeron@KaZaA | Raven Shield 5.32 crack.exe | Unknown | 131KB | Software |
| hbergeron@KaZaA | Remotespy 1.5.exe | Unknown | 371KB | Software |
| hbergeron@KaZaA | Sim City 4 crack.exe | Unknown | 193KB | Software |
| hbergeron@KaZaA | Splinter Cell crack.exe | Unknown | 183KB | Software |
| hbergeron@KaZaA | TicJiggle (flash game).exe | Unknown | 356KB | Software |
| hbergeron@KaZaA | UniversalFlood (41.0b).exe | Unknown | 576KB | Software |
| hbergeron@KaZaA | Unreal2 (2.0) crack.exe | Unknown | 114KB | Software |
| hbergeron@KaZaA | UT2003 multicrack (new).exe | Unknown | 97KB | Software |
| hbergeron@KaZaA | Warcraft3 battle.net(25).crack.exe | Unknown | 234KB | Software |
| hbergeron@KaZaA | Winzip 8.5b (crack).exe | Unknown | 382KB | Software |
| hbergeron@KaZaA | Winzip 2.1 (beta).exe | Unknown | 695KB | Software |
| hbergeron@KaZaA | ACDSee 5.5b.exe | Unknown | 815KB | Software |
| hbergeron@KaZaA | ACDSee Classic 2.79.exe | Unknown | 849KB | Software |
| hbergeron@KaZaA | Adaware 6.1.5 (new).exe | Unknown | 956KB | Software |
| hbergeron@KaZaA | Adobe Acrobat Reader 5.0.exe | Unknown | 1,413KB | Software |
| hbergeron@KaZaA | AOL Instant Messenger 6.4.exe | Unknown | 935KB | Software |
| hbergeron@KaZaA | DirectDVD 4.9.exe | Unknown | 832KB | Software |
| hbergeron@KaZaA | DivX Bundle 6.2.exe | Unknown | 1,362KB | Software |
| hbergeron@KaZaA | DivX Video Bundle 5.5.1.exe | Unknown | 1,225KB | Software |
| hbergeron@KaZaA | Download Accelerator Plus 6.3.exe | Unknown | 1,003KB | Software |
| hbergeron@KaZaA | Dynamite Downloads.exe | Unknown | 883KB | Software |
| hbergeron@KaZaA | Find 1.0.exe | Unknown | 866KB | Software |
| hbergeron@KaZaA | GetRight 5.5 + crack.exe | Unknown | 1,293KB | Software |
| hbergeron@KaZaA | Global DivX Player 2.0.1.exe | Unknown | 1,174KB | Software |
| hbergeron@KaZaA | Grokster 2.0.exe | Unknown | 1,071KB | Software |
| hbergeron@KaZaA | ICQ Lite beta (b2203).exe | Unknown | 900KB | Software |

Info by: 2003 Lists/KaZaA - 2003

832,162 users online - sharing 895,370,329 files (6,983,592 GB)    More sharing and files

**Kazaa - [Search]**

File  View  Player  Tools  Actions  Help

Web | My Kazaa | Theater | Download | Search | Shop | Tell A Friend

New search | Search | Traffic | Search Field

| User | Filename | Artist | Size | Media Type |
|------|----------|--------|------|------------|
| hbergeron@KaZaA | ICQ Lite beta (5225S).exe | Unknown | 900kB | Software |
| hbergeron@KaZaA | ICQ Pro 2003a beta (3r600).exe | Unknown | 982kB | Software |
| hbergeron@KaZaA | iMesh 4.1 beta.exe | Unknown | 969kB | Software |
| hbergeron@KaZaA | Kazaa Media Desktop 2/5.exe | Unknown | 1,037kB | Software |
| hbergeron@KaZaA | Kazaa0M MP3 Kazaa Accelerator 2/5.exe | Unknown | 1,123kB | Software |
| hbergeron@KaZaA | Microangelo 5.0b.exe | Unknown | 1,379kB | Software |
| hbergeron@KaZaA | Morpheus 2.0.6.exe | Unknown | 1,088kB | Software |
| hbergeron@KaZaA | MSN Messenger 6.5.0.110.exe | Unknown | 1,208kB | Software |
| hbergeron@KaZaA | Nero Burning ROM 5.8.2.4.exe | Unknown | 1,105kB | Software |
| hbergeron@KaZaA | Network Cable + ADSL Speed 2.0.exe | Unknown | 1,276kB | Software |
| hbergeron@KaZaA | Nimo Codec Pack 9.0 (stable).exe | Unknown | 1,396kB | Software |
| hbergeron@KaZaA | Pop-Up Stopper 4.00 (beta).exe | Unknown | 1,242kB | Software |
| hbergeron@KaZaA | Quicktime 7.2 (new).exe | Unknown | 1,259kB | Software |
| hbergeron@KaZaA | RealOne RealJukebox Basic 2.8.exe | Unknown | 1,328kB | Software |
| hbergeron@KaZaA | RealOne Free Player 2.8.exe | Unknown | 1,191kB | Software |
| hbergeron@KaZaA | Trillian 0.18-*-plugins.exe | Unknown | 1,020kB | Software |
| hbergeron@KaZaA | Window Washer 4.8.exe | Unknown | 1,140kB | Software |
| hbergeron@KaZaA | WinMX 3.5.1.1.exe | Unknown | 1,311kB | Software |
| hbergeron@KaZaA | WinRAR 3.0.exe | Unknown | 1,065kB | Software |
| hbergeron@KaZaA | WinZip 9.0 SR-1.exe | Unknown | 917kB | Software |
| hbergeron@KaZaA | WS_FTP LE 6.0.exe | Unknown | 1,157kB | Software |
| hbergeron@KaZaA | XviD bundle (codec+tutorial).exe | Unknown | 1,345kB | Software |
| hbergeron@KaZaA | Arron Neville - Dont Take Away My Heaven.mp3 | Arron Neville | 5,565kB | Audio |
| hbergeron@KaZaA | Arron Neville - Everybody Plays The Fool.mp3 | Aaron Neville | 3,844kB | Audio |
| hbergeron@KaZaA | Arron Neville And Robbie Robertson - Crazy Love.mp3 | Aaron Neville | 4,174kB | Audio |
| hbergeron@KaZaA | Arron Neville- Grand Tour.MP3 | Aaron Neville | 3,968kB | Audio |
| hbergeron@KaZaA | artist - Track 13.mp3 | TI | 3,726kB | Audio |
| hbergeron@KaZaA | Baby Grand.mp3 | Billy Joel | 4,328kB | Audio |
| beausoleil - Cajun Crawl.mp3 | | Buckwheat Zydeco | 1,908kB | Audio |

**Kazaa - [Search]**

File  View  Player  Tools  Actions  Help.

Web | My Kazaa | Theater | Search | Traffic | Stop | Talk A Friend

New search | Download

| Filename | Artist | Size | Media Type |
|---|---|---|---|
| beaulsiell - Cajun Crawl.mp3 | Buckwheat Zydeco | 1,908KB | Audio |
| benny maddones - If it could Fly 1st Pick You Up.mp3 | A | 4,167KB | Audio |
| Billy Joel - Allentown.mp3 | Billy Joel | 3,565KB | Audio |
| Billy Joel - Code of Silence.mp3 | Billy Joel feat Cyndi Lauper | 4,936KB | Audio |
| Black crows - Soul Singing.mp3 | Black Crows | 2,324KB | Audio |
| Blues Traveler - Regarding Steven.mp3 | Blues Traveler | 4,403KB | Audio |
| Blues Traveler - Regarding Steven.mp3 | Blues Traveler | 4,893KB | Audio |
| bright eyes - Drunk Kids - Catholics.mp3 | Bright Eyes | 4,503KB | Audio |
| buckwheat Zydeco - Don't Mess with My TOOT TOOT.mp3 | Buckwheat Zydeco | 2,022KB | Audio |
| buckwheat zydeco - Lache Pas La Patate.mp3 | 3 | 5,776KB | Audio |
| Buckwheat Zydeco - Ya Ya.mp3 | Buckwheat Zydeco | 4,219KB | Audio |
| Buckwheat Zydeco-Zydeco-La Louisianne.mp3 | Buckwheat Zydeco | 3,028KB | Audio |
| cameo - attack me with your love.mp3 | Cameo | 4,272KB | Audio |
| Cameo - Keep it Hot - Shake Your Paints.mp3 | Cameo | 4,452KB | Audio |
| Cameo - Knights By Night .mp3 | Cameo | 3,298KB | Audio |
| Cameo - She's Strange - 01 - She's Strange.mp3 | Cameo | 5,028KB | Audio |
| Cameo - Talkin' out the side of Your neck.mp3 | Cameo | 3,620KB | Audio |
| Cameo - Word Up.mp3 | Cameo | 5,999KB | Audio |
| Cat Stevens - Another Saturday Night.mp3 | Cat Stevens | 2,108KB | Audio |
| Cat Stevens - Hard Headed Woman.mp3 | Cat Stevens | 3,578KB | Audio |
| Cat Stevens - Moonshadow.mp3 | Cat Stevens | 2,622KB | Audio |
| Cat Stevens - Morning Has Broken (1).mp3 | Cat Stevens | 2,664KB | Audio |
| Cat Stevens - Oh Very Young.mp3 | Cat Stevens | 2,419KB | Audio |
| Cat Stevens - Wild World.mp3 | Cat Stevens | 3,132KB | Audio |
| cat stevens- father and son(1).mp3 | Cat Stevens | 3,001KB | Audio |
| Celine Dion - So This Is Christmas (1).mp3 | Celine Dion | 2,146KB | Audio |
| Celine Dion - The Power Of The Dream.mp3 | Celine Dion | 3,690KB | Audio |
| Chemical Brothers - How does it Feel like.mp3 | Chemical Brothers | 3,678KB | Audio |
| Christian - DC Talk - Lord I lift your name on high.mp3 | Christian | 2,849KB | Audio |

89,162 users online, sharing 2,220,500 files (09,598 GB)

**Kazaa - [Search]**

| User | Filename | Artist | Size | Media Type |
|---|---|---|---|---|
| hbergeron@KaZeA | Christian - DC Talk: Lord I lift your name on high.mp3 | Christian | 2,849KB | Audio |
| hbergeron@KaZeA | Christmas - Harry Conick Jr (1).mp3 | Christmas | 2,412KB | Audio |
| hbergeron@KaZeA | College Fight Song - LSU TIGERS.mp3 | LSU TIGER BAND | 1,864KB | Audio |
| hbergeron@KaZeA | Comedy - Nascar song (They Named Me...mp3 | Tim Wilson | 1,505KB | Audio |
| hbergeron@KaZeA | commodores -- penny lover.mp3 | Lionel Ritchie | 5,726KB | Audio |
| hbergeron@KaZeA | Conick Jr, Harry - Let's Kiss.mp3 | Harry Conick Jr | 7,096KB | Audio |
| hbergeron@KaZeA | Conway Twitty, Loretta Lynn - Hey Good Lookin.mp3 | Buckwheat Zydeco | 2,496KB | Audio |
| hbergeron@KaZeA | COUN -Mindy McCready-10000 Angels.mp3 | Mindy McCready | 3,244KB | Audio |
| hbergeron@KaZeA | Creed -With Arms Wide Open Orchestral Version.mp3 | Creed | 3,670KB | Audio |
| hbergeron@KaZeA | Dave Matthews Band - The Christmas Song.mp3 | Dave Matthews Band | 5,169KB | Audio |
| hbergeron@KaZeA | Dazz Band - Let It Wip.mp3 | Dazz Band | 7,262KB | Audio |
| hbergeron@KaZeA | dead smiles - can't see you.mp3 | dead smiles | 1,943KB | Audio |
| hbergeron@KaZeA | dido - white flag (new real thing) (1) (1) (1) (1) (4).mp3 | dido | 3,385KB | Audio |
| hbergeron@KaZeA | DJ Crack - Funk Bass (Ibiza House Mix).mp3 | dj crack | 6,280KB | Audio |
| hbergeron@KaZeA | DJ Icey - Dreams.mp3 | DJ Icey (Ft Erica Baxter) | 3,674KB | Audio |
| hbergeron@KaZeA | DMX - Ruff Ryders Anthem (1).mp3 | DMX | 2,093KB | Audio |
| hbergeron@KaZeA | Donna summer - Hot Stuff.mp3 | Donna Summer | 3,172KB | Audio |
| hbergeron@KaZeA | Donna Summer - Bad Girl (1).mp3 | Donna Summer | 4,668KB | Audio |
| hbergeron@KaZeA | Donna Summers - On the radio (1).mp3 | Donna Summer | 7,809KB | Audio |
| hbergeron@KaZeA | ELO - Blinded By The Light.mp3 | ELO | 3,332KB | Audio |
| hbergeron@KaZeA | ELO - Its Magic.mp3 | ELO | 3,396KB | Audio |
| hbergeron@KaZeA | ELO - Love Is Like Oxigeh.mp3 | c | 3,554KB | Audio |
| hbergeron@KaZeA | Eminem - Christmas Song.mp3 | Eminem | 4,102KB | Audio |
| hbergeron@KaZeA | Everlasting Love - Pure Disco.mp3 | Pure Disco | 2,462KB | Audio |
| hbergeron@KaZeA | FFH - I'm a Believer.mp3 | FFH | 3,666KB | Audio |
| hbergeron@KaZeA | Five Card Stud.mp3 | Buckwheat Zydeco | 2,400KB | Audio |
| hbergeron@KaZeA | Flora Purim- Jazz Latin Vocal.mp3 | Flora Purim | 5,664KB | Audio |
| Frank Sinatra - Winter Wonderland (1).mp3 | Christmas Songs - Amy G... | 2,140KB | Audio | |
| Frank zappa - st etienne.mp3 | Frank Zappa | 6,055KB | Audio | |

# Kazaa - [Search]

File  View  Player  Tools  Actions  Help

Web | My Kazaa | Theater | Download | New search

Search | Traffic | Shop | Tell a Friend | Search Field

| Filename | Artist | Size | Media Type |
|---|---|---|---|
| Frank Zappa - St. etienne.mp3 | Frank Zappa | 6,055KB | Audio |
| Freddy Fender - Hello Loneliness.mp3 | Freddy Fender | 2,782KB | Audio |
| Freddy Fender - Wasted Days And Wasted Nights.mp3 | Freddy Fender | 3,264KB | Audio |
| Frosty The Snowman.mp3 | A-Motown Christmas Clas... | 2,527KB | Audio |
| Fugazi - Epic Problem.mp3 | Fugazi | 3,779KB | Audio |
| fugazi - exit only.mp3 | Fugazi | 3,015KB | Audio |
| Further. Seems Forever - How To Start a Fireway | Further, Seems Forever | 29,592KB | Audio |
| George Clinton. Parliament Funkadelic - Bring on the Funk... | Funkadelic | 3,540KB | Audio |
| gov't mule - Angel From Montgomery.mp3 | Gov't Mule | 2,462KB | Audio |
| gov't mule - In My Life.mp3 | Gov't Mule | 3,863KB | Audio |
| gov't mule - Madman Across The Water.mp3 | Gov't Mule | 4,298KB | Audio |
| Grand Funk Railroad - American Woman.mp3 | Grand Funk Railroad | 5,472KB | Audio |
| Harry Connick Jr - Recipe For Making Love.mp3 | Harry Connick Jr | 4,793KB | Audio |
| Harry Connick Jr - .MP3 | Harry Connick Jr. | 1,522KB | Audio |
| Harry Connick Jr - Change Partners.mp3 | Harry Connick Jr. | 5,364KB | Audio |
| Harry Connick Jr - Charade.mp3 | Harry Connick Jr. | 3,446KB | Audio |
| Harry Connick Jr - Easy For You To Say.mp3 | Harry Connick Jr. | 4,606KB | Audio |
| Harry Connick Jr - Easy To Love.mp3 | Harry Connick Jr. | 2,915KB | Audio |
| Harry Connick Jr - Kiss Me.mp3 | Harry Connick Jr. | 4,041KB | Audio |
| Harry Connick Jr - Next Door Blues.mp3 | Harry Connick Jr. | 3,928KB | Audio |
| Harry Connick Jr - Nowhere With Love.mp3 | Harry Connick Jr. | 3,699KB | Audio |
| Harry Connick Jr.mp3 | Harry Connick Jr., | 2,560KB | Audio |
| Harry Connick Jr. (Dixieland Jazz) - Sweet Georgia Brown ... | Connick Jr., Harry | 4,340KB | Audio |
| Harry Connick, Jr. - Our Love Is Here To Stay.mp3 | Harry Connick Jr. | 2,766KB | Audio |
| Home Alone Soundtrack - I'm Dreaming of a White Christm... | A+ | 2,505KB | Audio |
| Home Alone Soundtrack - O Holy Night.mp3 | Christmas Songs | 1,410KB | Audio |
| I Heard The Bells On Christmas Day.mp3 | Bing Crosby | 1,762KB | Audio |
| Ice Cube _Eazy E (NWA)- Fuck The Police.mp3 | NWA w/ Eazy E. | 4,542KB | Audio |
| Ice Tea - Colors .mp3 | Ice Tea | 2,220KB | Audio |

hbergeron@KaZaA (repeated for each row)

More sharing any files

Kazaa - [Search]

File  View  Player  Tools  Actions  Help

Web  My Kazaa  Theater  Search  Traffic  Shop  Tell A Friend

New search  Download

| Filename | Artist | Size | Media Type |
|---|---|---|---|
| Ice Tea - Colors .mp3 | Ice Tea | 2,220KB | Audio |
| Irma Thomas - Time Is On My Side (orig).mp3 | Irma Thomas | 2,659KB | Audio |
| Isley Brothers - Contagious.mp3 | Isley Brothers | 8,156KB | Audio |
| Jazz - Boney James - Smooth Jazz Groove (#6, #15).G.mi... | Boney James, Rick Braun | 3,908KB | Audio |
| Jazz Masters - Smooth Groove.mp3 | Paul Hardcastle | 4,912KB | Audio |
| jet-set born are you gonna be my girl.mp3 | Jet | 3,970KB | Audio |
| Jets - anytime.mp3 | Jets | 3,648KB | Audio |
| Jim Groce - Americanpie.mp3 | Jim Croche | 8,000KB | Audio |
| Jim Croce - Bad, Bad Leroy Brown.mp3 | Jim Croce | 2,776KB | Audio |
| Jim Croce - I Got a Name.mp3 | Jim Croche | 2,621KB | Audio |
| Jim Croce - Time In A Bottle.mp3 | Jim Croce | 2,291KB | Audio |
| Jim Croche - I Love You in a Song.mp3 | Jim Croce | 2,370KB | Audio |
| jim_croche - i have to say i love you in this song.mp3 | Jim Croche | 1,152KB | Audio |
| john mayall - Jazz Blues Fusion.mp3 | John mayall | 3,741KB | Audio |
| John Mayer - comfortable.mp3 | John Mayer | 2,059KB | Audio |
| Jolene - The White Stripes.mp3 | The White Stripes | 3,207KB | Audio |
| jon b - you're my angel.mp3 | Mya | 3,544KB | Audio |
| KC And The Sunshine Band - Please Dont Go.mp3 | KC And The Sunshine Band | 7,296KB | Audio |
| KENNEY CHESNEY - TOUCHDOWN TENNESSEE.MP3 | Kenney Chesney | 3,292KB | Audio |
| Kid Rock - The History of Rock - 08 - Abortion.mp3 | Kid Rock | 6,390KB | Audio |
| kido - Rock The Boat (Remix) .mp3 | kido | 3,552KB | Audio |
| Kreo - Burn For You.mp3 | Kreo | 3,779KB | Audio |
| Led Zeppelin_Pink Floyd - Stairway to heaven.mp3 | 9^_^o | 7,847KB | Audio |
| Leon Redbone - Blue Christmas (1).MP3 | Leon Redbone | 1,280KB | Audio |
| Los Bunkers - Sunshine for your love (cover).mp3 | Los Bunkers | 5,283KB | Audio |
| LSU Tiger Band - Fight Song.mp3 | LSU | 1,694KB | Audio |
| LynardSkynyrd-TheBalladOfCurtisLowe.mp3 | Lynyard Skynyard | 4,546KB | Audio |
| Lynyrd Skryrd - Gimme Back My Bullets.mp3 | Lynyard Skynyard | 4,654KB | Audio |
| Mariah Carey - All I Want For Christmas Is You.mp3 | Mariah Carey | 3,772KB | Audio |

2 Users

hbergeron@KaZaA

Kazaa - [Search]

Web | Player | Tools | Actions | Help

New search | My Kazaa | Download | Theater | Search | Traffic | Shop | Tell A Friend

| User | Filename | Artist | Size | Media Type |
|---|---|---|---|---|
| hbergeron@KaZaA | Mariah Carey - All I Want For Christmas Is You.mp3 | Mariah Carey | 3,772KB | Audio |
| 2 Users | Mark Cohn - Walking In Memphis (Acoustic) (1).mp3 | Mark Cohn | 4,319KB | Audio |
| hbergeron@KaZaA | Martina Mcbride - Do You Hear What I Hear - Christmas(m... | Martina Mcbride | 3,744KB | Audio |
| 2 Users | Marvin Gay - Let's Get It On.mp3 | TI | 4,562KB | Audio |
| hbergeron@KaZaA | mercy me - I will sing.mp3 | Mercy.me | 2,137KB | Audio |
| hbergeron@KaZaA | MercyMe - Look  04 - In You.mp3 | Mercy Me | 2,515KB | Audio |
| hbergeron@KaZaA | Midnight Star - Don't Rock The Boat.mp3 | Midnight Star | 5,978KB | Audio |
| hbergeron@KaZaA | Midnight Star - Egyptian Lover.mp3 | Midnight Star | 6,318KB | Audio |
| hbergeron@KaZaA | Midnight Star - Midas touch.mp3 | Midnight Star | 3,421KB | Audio |
| hbergeron@KaZaA | Midnight Star - Wet My Whistle.mp3 | Midnight Star | 5,996KB | Audio |
| hbergeron@KaZaA | N17-As The World Turns.mp3 | EminEm; | 1,805KB | Audio |
| hbergeron@KaZaA | NASCAR- Crank It Up - Gov't Mule - Drivin Rain.mp3 | Gov't Mule) | 3,865KB | Audio |
| hbergeron@KaZaA | Ned's Atomic Dustbin - Not Sleeping Around.mp3 | Ned's Atomic Dustbin | 7,556KB | Audio |
| hbergeron@KaZaA | Ned's Atomic Dustbin - Swallowing Air.mp3 | Ned's Atomic Dustbin | 9,883KB | Audio |
| hbergeron@KaZaA | Ned's Atomic Dustbin - Two And Two Made Five.mp3 | Ned's Atomic Dustbin | 9,060KB | Audio |
| hbergeron@KaZaA | Ned's Atomic Dustbin - Walking Through Syrup.mp3 | Ned's Atomic Dustbin | 6,346KB | Audio |
| 2 Users | Nickel Back - 04 Story of a Girl.mp3 | Nickel Back | 2,942KB | Audio |
| hbergeron@KaZaA | Nickel Back - Hold Out Your Hand (1).mp3 | Nickel Back | 3,874KB | Audio |
| hbergeron@KaZaA | Nickle Back- So Hard To Swallow (1).mp3 | Nickel Back | 3,265KB | Audio |
| hbergeron@KaZaA | Nikelback- Someday.mp3 | Nickel Back | 3,206KB | Audio |
| hbergeron@KaZaA | Oh Christmas Tree - Jazz Instrumental (2).mp3 | PEANUTS | 3,614KB | Audio |
| hbergeron@KaZaA | Oh Very Young.mp3 | Cat Stevens | 2,204KB | Audio |
| hbergeron@KaZaA | oldies - can't take my eyes off you.mp3 | Oldies | 1,570KB | Audio |
| hbergeron@KaZaA | Oldies 70s - Rock Me Gently.mp3 | 70's | 3,260KB | Audio |
| hbergeron@KaZaA | Oldies- Jackson Browne - Brown Eyed Girl.mp3 | Van Morrison | 2,550KB | Audio |
| hbergeron@KaZaA | Pat Green - Songs About Texas.mp3 | Pat Green | 4,426KB | Audio |
| hbergeron@KaZaA | Pink Floyd - Time.mp3 | Pink Floyd | 6,648KB | Audio |
| hbergeron@KaZaA | public enemy - give it up (2).mp3 | Public Enemy | 5,516KB | Audio |
| hbergeron@KaZaA | Public Enemy- He Got Game.mp3 | Public Enemy | 6,707KB | Audio |

**Kazaa - [Search]**

File  View  Player  Tools  Actions  Help

New search | Web | My Kazaa | Theater | Search | Traffic | Shop | Tell A Friend | Download

hbergeron@KaZaA

| Filename | Artist | Size | Media Type |
|---|---|---|---|
| Public Enemy - He Got Game.mp3 | Public Enemy | 6,707KB | Audio |
| Punk Covers - Sublime - Gin And Juice.mp3 | X New Found Glory | 7,066KB | Audio |
| Raffi - First Noel.mp3 | Children Christmas Songs | 1,554KB | Audio |
| Rage Against the Machine-Renegades of Funk (1).mp3 | Rage Against The Machine | 5,490KB | Audio |
| Rave, Dance, Techno, Trance - DJ Mystic - Tears In Heav... | DJ Mystic | 2,812KB | Audio |
| Recess Theory - Couples Only.mp3 | Further Seems Forever | 3,726KB | Audio |
| Relax.mp3 | Franky goes to Hollywood | 3,684KB | Audio |
| Rick James - Standing on the Top .mp3 | RICK JAMES | 6,920KB | Audio |
| rick james - Superfreak (Wicked Mix).mp3 | rick james | 8,303KB | Audio |
| R.Kelly-Download.mp3 | R. Kelly | 4,506KB | Audio |
| Sarah McLachlan - Big Yellow Taxi (Lilith Fair).mp3 | Sara.Mc, Alanis Mo Jewel, J... | 3,370KB | Audio |
| Seven nation army.mp3 | White Stripes | 2,264KB | Audio |
| Shils - Short Island Ice Tea.mp3 | Shils | 5,867KB | Audio |
| Shirley Horn - Sunday In New York.mp3 | Shirley Horn | 7,311KB | Audio |
| Simon and Garfunkel - Hello Darkness.wav | Simon, Garfunkel | 7,229KB | Audio |
| Simon and Garfunkle - Mr. Tambourine Man.mp3 | Simon and Garfunkel | 4,193KB | Audio |
| smooth Jazz Kenny G - The Sound of Silence (Saxaphone)... | Kenny G | 2,214KB | Audio |
| Soulshine Gov't Mule The Deep End-Vol. 1.mp3 | Gov't Mule | 2,040KB | Audio |
| Sounds of the 70s - Rock the Boat (The Hues Corporation)... | Sounds of the 70s | 2,572KB | Audio |
| South Park - Who Let Timmy Out.mp3 | South Park | 1,608KB | Audio |
| Starting Line - Piano song.mp3 | The Starting Line | 2,885KB | Audio |
| Swing Jazz - Big Band - Harry Connick Jr. - Stardust .mp3 | Harry Connick Jr. | 7,313KB | Audio |
| T.I.-Dope Boy-Fresh.mp3 | TI | 4,728KB | Audio |
| Tank - Maybe I Deserve.mp3 | Tank | 3,813KB | Audio |
| Techno_Trance-Rave-Jungle-Alphaville - Forever Young (... | Trance | 3,445KB | Audio |
| Temptations - Under the Boardwalk.mp3 | TI | 2,528KB | Audio |
| Thats the way she loves.mp3 | aaron neville | 4,484KB | Audio |
| The Jets - Make It Real.mp3 | The Jets | 6,002KB | Audio |
| The Neville Brothers - Tears.mp3 | The Neville Brothers | 4,673KB | Audio |

83,162 users sharing

Kazaa - [Search]

File  View  Player  Tools  Actions  Help

Web | My Kazaa | Theater | Search | Traffic | Shop | Tell A Friend

New search | Download | Search | Search field

| User | Filename | Artist | Size | Media Type |
|---|---|---|---|---|
| hbergeron@KaZaA | The Neville Brothers - Tears.mp3 | The Neville Brothers | 4,673KB | Audio |
| 2 Users | Franky goes to hollywood | Franky goes to hollywood | 5,135KB | Audio |
| hbergeron@KaZaA | The Power Of Love.mp3 | | 5,972KB | Audio |
| hbergeron@KaZaA | The Starting Line-Im-Real.mp3 | The Starting Line | 5,960KB | Audio |
| hbergeron@KaZaA | a perfect circle | a perfect circle | 6,503KB | Audio |
| hbergeron@KaZaA | thirteenth step-blue-a perfect circle.mp3 | | | |
| hbergeron@KaZaA | Thomas, Irma - Wish Someone Would Care.mp3 | Irma Thomas | 2,198KB | Audio |
| hbergeron@KaZaA | Three Dog Night - Naturally - 06 - Sunlight.mp3 | Three Dog Night | 2,741KB | Audio |
| hbergeron@KaZaA | Toby Keith - My List2.mp3 | Toby Keith | 4,713KB | Audio |
| hbergeron@KaZaA | Tori Amos - Aint No Sunshine.mp3 | Tori Amos | 4,272KB | Audio |
| 2 Users | Train - Meet Virginia.mp3 | Counting Crows | 4,680KB | Audio |
| hbergeron@KaZaA | Tyrese - R Kelly - Sweet Lady (remix).mp3 | R.Kelly | 3,972KB | Audio |
| hbergeron@KaZaA | U2 - Numb.mp3 | U2 | 6,888KB | Audio |
| hbergeron@KaZaA | u2-the best of 1990 - 2000-lemon.mp3 | U2 | 5,275KB | Audio |
| hbergeron@KaZaA | UGA University of Georgia - Fight song.mp3 | Red Coat Marching Band | 794KB | Audio |
| hbergeron@KaZaA | Van Morrison - Into The Mystic.mp3 | Van Morrison | 4,120KB | Audio |
| hbergeron@KaZaA | Violent Femmes - Do It All the Time.mp3 | Violent Femmes | 3,288KB | Audio |
| hbergeron@KaZaA | War.mp3 | Franky goes to Hollywood | 5,825KB | Audio |
| hbergeron@KaZaA | Booty Bounce.mp3 | DJ Funk | 2,212KB | Audio |
| hbergeron@KaZaA | 01-50_cent_in_the_club_dirty-cms (1).mp3 | 3 | 5,664KB | Audio |
| hbergeron@KaZaA | 02 - The Taste of Ink (1).mp3 | The Used | 3,263KB | Audio |
| hbergeron@KaZaA | 03 - Bulimic.mp3 | The Used | 3,133KB | Audio |
| 2 Users | 04 - The Used - Say Days Ago.mp3 | The Used | 4,638KB | Audio |
| hbergeron@KaZaA | 04 - Track 4 (1).mp3 | lil wayne | 2,976KB | Audio |
| hbergeron@KaZaA | 05 - Coldplay - Clocks.mp3 | 3 | 5,806KB | Audio |
| hbergeron@KaZaA | 05 - She's A Super Lady (1).mp3 | Luther Vandross | 3,582KB | Audio |
| hbergeron@KaZaA | 05 What It's Like to Be Me.mp3 | 3 | 3,062KB | Audio |
| hbergeron@KaZaA | 06 - Buried Myself Alive.mp3 | The Used | 3,786KB | Audio |
| hbergeron@KaZaA | 06 Unsaveable.mp3 | Faith Hill | 4,523KB | Audio |
| hbergeron@KaZaA | 07 All Messed Up.wma | A | 3,882KB | Audio |
| hbergeron@KaZaA | 076  Poison - Every rose has its torn.mp3 | A | 4,023KB | Audio |

Not sharing any files

**Kazaa - [Search]**

File - View - Player - Tools - Actions - Help

New Search | My Kazaa | Theater | Search | Traffic | Shop | Tell A Friend

| Filename | Artist | Size | Media Type | |
|---|---|---|---|---|
| Van Morrison - John Lee Hooker - The Healing Game.mp3 | Van Morrison / John Lee ... | 4,864KB | Audio | |
| Van Morrison / Mose Allison - You Can Count On Me (1).m... | Van Morrison / Mose Allison | 3,174KB | Audio | |
| Van Morrison with the BBC Orchestra-Live At The Edinburg... | Van Morrison with the BBC... | 4,080KB | Audio | Your | |
| Van Morrisoni - Brown-Eyed Girl (1).mp3 | Van Morrison | 1,448KB | Audio | |
| Victor - Wooten - Classical Thump.mp3 | Béla Fleck, the Flecktoni... | 4,386KB | Audio | 'Classical Thump (featur |
| Vixen - Edge Of A Broken Heart.mp3 | Vixen | 4,123KB | Audio | Edge |
| Whitney Houston - I Wanna Dance With Somebody.mp3 | Whitney Houston | 4,574KB | Audio | I Wanna Dan |
| Wild Thing - Tone Loc_061905163887.mp3 | Old School Songs | 4,156KB | Audio | -W |
| Wilson Pickett - Mustang Sally.mp3 | Wilson Pickett | 2,929KB | Audio | |
| World Class Wrecking Crew - Before You Turn Out The Ligh... | World Class Wrecking Cr... | 6,808KB | Audio | Before You |
| You Don't Love Me Anymore.mp3 | Tim McGraw | 3,463KB | Audio | You Don' |
| z100-Baby Got Gas.mp3 | Comedy - Z-Morning Zoo | 1,530KB | Audio | |
| Zero 7 feat. Sia_Sophie - Destiny.mp3 | Zero 7 feat. Sia - Sophie | 5,280KB | Audio | |
| zg - Ain't No Stoppin' Us Now - McFadden and Whitehead.m... | Commodores | 3,402KB | Audio | |
| Marshall Tucker Band - Can't You See.mp3 | Marshall Tucker Band | 11,396KB | Audio | |
| Gauge-pigtail anal gymnast.mpeg | Porno. | 30,613KB | Video | |
| Relaxing Sounds - Nature - Angels Flight(Shadowfax).mp3 | Various Artists | 1,901KB | Audio | Angels |
| hentai evangelion asuka upskirt.mpeg | I just wish it was me | 6,694KB | Video | Expert B |
| Hard_Core_Blonde Latina Porn.mpeg | hottest girl ever. | 37,316KB | Video | best pussy. perfect tits. nice a |
| Huge Tits Bouncing Sex (1) (1).mpeg | Movies. | 2,208KB | Video | fuck me |
| I deep throat - C-16.mpeg | Heather Brooks | 3,616KB | Video | |
| Queen of blow jobs - Brooks Hunter - Deepthroat.mpeg | Heather DeepThroat | 8,752KB | Video | |
| I deep throat and anal.mpeg | Heather DeepThroat | 10,228KB | Video | |
| Horny Housewife and babysitter.depthroat (1).mpeg | heather I deep throat | 6,672KB | Video | |
| I deep throat - swallow.mpg | Heather I Deep Throat | 7,716KB | Video | |
| Deep Tongue Massage and Swallow.mpg | Heather Deep Throat | 14,419KB | Video | deep Tongue Ma |
| I Deep Throat - Teacher.mpeg | Heather Brooke | 7,920KB | Video | |
| Erotica - Heather - Backdoor Orgasm.mpeg | Heather / deep throat | 19,244KB | Video | Heat |
| 10-11-03.mpg | Heather / deep throat | 10,152KB | Video | |

**Tab 1**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UMG RECORDINGS, *et al.*,

    Plaintiffs,

    v.

JOHN DOES 1-199,

    Defendants.

Civil Action No. 04-093 (CKK)

## MEMORANDUM OPINION
### (March 10, 2004)

    Before the Court is Plaintiffs' motion for leave to take expedited discovery. Plaintiffs are record companies suing a series of John Doe Defendants for copyright infringement. Plaintiffs request permission to serve limited, immediate discovery on Verizon, a third party internet service provider ("ISP"), in the form of a Rule 45 subpoena. Plaintiffs seek the true identities of Defendants, including each Defendant's true name, address, telephone number, email address, and Media Access Control address.

    According to Plaintiffs' complaint, each Defendant uses an online media distribution system to download Plaintiffs' copyrighted works, distribute these works to the public, and/or make copyrighted works available for distribution to others. Pls' Mot. at 2. Although Plaintiffs do not know Defendants names, Plaintiffs have identified each Defendant by a unique internet protocol ("IP") address assigned to that Defendant on the date and at the time of the allegedly infringing activity. *Id.* Through the use of a publicly available database, Plaintiffs have traced the IP address for each Defendant and determined that it belongs to Verizon. *Id.*

Public Citizen, the American Civil Liberties Union ("ACLU"), the Electronic Frontier Foundation, and the ACLU of the National Capitol Area have collectively requested leave to file a memorandum as *amici curiae* addressing Plaintiffs' motion. *See Amici* Mot. Plaintiffs oppose this motion, stating that the issues raised by *amici* are premature. Plaintiffs point out that no party has raised the issues *amici* raises in its memorandum, and that it is well established that *amici* cannot inject issues into a case which have yet to be raised by a party. Pls' Opp. to *Amici* Mot. at 1, 5; *see McCleskey v. Zant*, 499 U.S. 467, 523 n.10 (1991). While Plaintiffs are correct that *amici* raise issues prematurely, the constitutional and procedural issues identified by *amici* can be resolved in the ordinary course of this litigation at the appropriate time. Accordingly, the Court shall Grant *amici*'s motion for leave to file.

It is clear to the Court that Defendants must be identified before this suit can progress further. The Court shall grant Plaintiffs' request for expedited discovery, with certain limitations outlined herein. Plaintiffs will be allowed to serve immediate discovery on Verizon to obtain the identity of each John Doe Defendant by serving a Rule 45 subpoena that seeks information sufficient to identify each Defendant, including name, address, telephone number, email address, and Media Access Control address. The disclosure of this information is ordered pursuant to 47 U.S.C. § 551(c)(2)(B), which authorizes cable operators to disclose personally identifiable information when the cable operators are ordered to do so by a court. Any information disclosed to Plaintiffs in response to the Rule 45 subpoena may be used by Plaintiffs solely for the purpose of protecting Plaintiffs' rights as set forth in the Complaint.

If and when Verizon is served with a subpoena, Verizon shall give written notice, which may include email notice, to the subscribers in question within five business days. If Verizon

2

and/or any Defendant wants to move to quash the subpoena, the party must do so before the return date of the subpoena, which shall be 25 days from the date of service. Verizon shall preserve any subpoenaed information pending the resolution of any timely filed motion to quash. Plaintiffs shall provide Verizon a copy of this Memorandum Opinion and Order along with its subpoena.

     An appropriate Order accompanies this Opinion.

March 10, 2004

                                   /s/
                               COLLEEN KOLLAR-KOTELLY
                               United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UMG RECORDINGS, *et al.*,

    Plaintiffs,

       v.

JOHN DOES 1-199,

    Defendants.

Civil Action No. 04-093 (CKK)

**ORDER**
(March 10, 2004)

In keeping with the accompanying Memorandum Opinion, it is this 10th day of March,

2004, hereby

ORDERED that Plaintiffs' Motion for Leave to Take Immediate Discovery [5] is

GRANTED. Plaintiffs will be allowed to serve immediate discovery on Verizon to obtain the

identity of each John Doe Defendant by serving a Rule 45 subpoena that seeks information

sufficient to identify each Defendant, including name, address, telephone number, email address,

and Media Access Control address. Any information disclosed to Plaintiffs in response to the

Rule 45 subpoena may be used by Plaintiffs solely for the purpose of protecting Plaintiffs' rights

as set forth in the Complaint. If and when Verizon is served with a subpoena, Verizon shall give

written notice, which can include use of email, to the subscribers in question within five business

days. If Verizon and/or any Defendant want to move to quash the subpoena, the party must do so

before the return date of the subpoena, which shall be 25 days from the date of service. Verizon

shall preserve any subpoenaed information pending the resolution of any timely filed motion to

quash. It is further

ORDERED that Plaintiffs shall provide Verizon a copy of this Memorandum Opinion and Order along with its subpoena; it is further

ORDERED that the Motion of Public Citizen, the American Civil Liberties Union, the Electronic Frontier Foundation and the ACLU of the National Capitol Area to file as *amici curiae* [6] is GRANTED.


March 10, 2004

_____/s/_____

COLLEEN KOLLAR-KOTELLY
United States District Judge

**Tab 2**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MOTOWN RECORD COMPANY, L.P., a California limited partnership; INTERSCOPE RECORDS, a California general partnership; VIRGIN RECORDS AMERICA, INC., a California corporation; ATLANTIC RECORDING CORPORATION, a Delaware corporation; BMG MUSIC, a New York general partnership; ELEKTRA ENTERTAINMENT GROUP INC., a Delaware corporation; WARNER BROS. RECORDS INC., a Delaware corporation; PRIORITY RECORDS LLC, a California limited liability company; CAPITOL RECORDS, INC., a Delaware corporation; ARISTA RECORDS, INC., a Delaware corporation; MAVERICK RECORDING COMPANY, a California joint venture; SONY MUSIC ENTERTAINMENT INC., a Delaware corporation; LOUD RECORDS, LLC, a Delaware corporation; and UMG RECORDINGS, INC., a Delaware corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No.: 04 C 3019 |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| DOES 1 - 16. | ) ) | |
| Defendants. | ) ) | |

## ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR LEAVE TO TAKE IMMEDIATE DISCOVERY

Upon the *Ex Parte* Motion of Plaintiffs for Leave to Take Immediate Discovery and the supporting Memorandum of Law, and the declaration of Jonathan Whitehead and the exhibit thereto, it is hereby:

ORDERED that Plaintiffs may serve immediate discovery on WideOpenWest Holdings LLC to obtain the identity of each Doe Defendant by serving a Rule 45 subpoena that seeks information sufficient to identify each Doe Defendant, including the name, address, telephone number, e-mail address, and Media Access Control addresses for each Defendant. The disclosure of this information is ordered pursuant to 47 U.S.C. § 551(c)(2)(B).

IT IS FURTHER ORDERED THAT any information disclosed to Plaintiffs in response to the Rule 45 subpoena may be used by Plaintiffs solely for the purpose of protecting Plaintiffs' rights under the Copyright Act.

IT IS FURTHER ORDERED THAT WideOpenWest shall preserve the data, records and information responsive to the subpoena that will be served by the Plaintiffs.

IT IS FURTHER ORDERED THAT if and when WideOpenWest is served with a subpoena, within five (5) business days thereof it shall notify each Doe Defendant (WideOpenWest subscribers) of the existence of this lawsuit and of receipt of Plaintiffs' subpoena whereby Plaintiffs are seeking to learn the subscribers' identities. After WideOpenWest gives such notice to the Doe Defendants, any Doe Defendant may raise an objection in the form of a motion to quash at the status conference which the Court has scheduled for June 15, 2004, 9:30 a.m. in Courtroom 1858, Dirksen Federal Building, 219 S. Dearborn, Chicago, Illinois 60604. WideOpenWest shall include in its notice to the Doe Defendants notice of this status conference.

IT IS FURTHER ORDERED THAT counsel for the Plaintiffs shall provide a copy of this Order to WideOpenWest when the subpoena is served.

Dated: 5/24/04

United States Magistrate Judge Nan R. Nolan

2

**Tab 3**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

ARISTA RECORDS, INC., a Delaware )
corporation; ELEKTRA ENTERTAINMENT )
GROUP INC., a Delaware corporation; )
MOTOWN RECORD COMPANY, L.P., a )
California limited partnership; SONY MUSIC )
ENTERTAINMENT INC., a Delaware )    Cause No.:
corporation; UMG RECORDINGS, INC., a )
Delaware corporation; and WARNER BROS. )    **4:04CV0036AS**
RECORDS INC., a Delaware corporation, )
                                )
             Plaintiffs, )
                                  )
     v. )
                                    )
JOHN DOE, )
                                    )
             Defendant. )

## ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE TO TAKE IMMEDIATE DISCOVERY

This matter coming before the Court upon Plaintiffs' Motion for Leave to Take Immediate Discovery, and the Court being duly advised, hereby

ORDERS that Plaintiffs may serve immediate discovery on Northwest Indiana Internet Services, Inc. to obtain the identity of the Doe Defendant by serving a Rule 45 subpoena that seeks information sufficient to identify the Doe Defendant, including the name, address, telephone number, e-mail address, and Media Access Control addresses for the Defendant. The disclosure of this information is ordered pursuant to 47 U.S.C. § 551(c)(2)(B).

IT IS FURTHER ORDERED THAT any information disclosed to Plaintiffs in response to the Rule 45 subpoena may be used by Plaintiffs solely for the purpose of protecting Plaintiffs' rights under the Copyright Act.

Dated: 5/24/2004                          s/Allen Sharp
                                   United States District Judge


Copies to:

James Dimos #11178-49
Joel E. Tragesser #21414-29
LOCKE REYNOLDS LLP
201 North Illinois Street
Suite 1000
P.O. Box 44961
Indianapolis, IN 46244-0961
jdimos@locke.com
jtragesser@locke.com

**Tab 4**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

United States Courts
Southern District of Texas
ENTERED

MAY 2 4 2004

Michael N. Milby, Clerk of Court

ARISTA RECORDS, INC., a Delaware
corporation; MAVERICK RECORDING
COMPANY, a California joint venture; SONY
MUSIC ENTERTAINMENT INC., a
Delaware corporation; PRIORITY RECORDS
LLC, a California limited liability company;
UMG RECORDINGS, INC., a Delaware
corporation; ATLANTIC RECORDING
CORPORATION, a Delaware corporation;
WARNER BROS. RECORDS INC., a
Delaware corporation; MOTOWN RECORD
COMPANY, L.P., a California limited
partnership; ELEKTRA ENTERTAINMENT
GROUP INC., a Delaware corporation;
CAPITOL RECORDS, INC., a Delaware
corporation; VIRGIN RECORDS AMERICA,
INC., a California corporation; BMG MUSIC,
a New York general partnership; and
INTERSCOPE RECORDS, a California
general partnership,

                 Plaintiffs,

vs.

DOES 1 - 9,

                 Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Case No.:

## H 04-1677

**ORDER GRANTING PLAINTIFFS' EXPEDITED *EX PARTE* MOTION FOR ORDER
PERMITTING THIRD-PARTY DISCOVERY PRIOR TO FED. R. CIV. P. 26(f)
CONFERENCE**

Upon the Expedited *Ex Parte* Motion of Plaintiffs for Order Permitting Third-

Party Discovery Prior to Fed. R. Civ. P. 26(f) Conference and Memorandum of Law in Support,

and the declaration of Jonathan Whitehead and the exhibit thereto, it is hereby:

ORDERED that Plaintiffs may serve immediate discovery on Texas A&M University to obtain the identity of each Doe Defendant by serving a Rule 45 subpoena that seeks information sufficient to identify each Doe Defendant, including the name, address, telephone number, e-mail address, and Media Access Control addresses for each Defendant.

IT IS FURTHER ORDERED THAT any information disclosed to Plaintiffs in response to the Rule 45 subpoena may be used by Plaintiffs solely for the purpose of protecting Plaintiffs' rights under the Copyright Act.

Dated: May 20, 2004

_____
United States District Judge

2

**Tab 5**

04-CV-00960-IFP

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

9  UMG RECORDINGS, INC., a Delaware
   corporation; ATLANTIC RECORDING
10 CORPORATION, a Delaware corporation;
   WARNER BROS. RECORDS INC., a
11 Delaware corporation; SONY MUSIC
   ENTERTAINMENT INC., a Delaware
12 corporation; BMG MUSIC, a New York
   general partnership; and VIRGIN
13 RECORDS AMERICA, INC., a California
   corporation,
14
          Plaintiffs,
15
      v.
16
   DOES 1 - 2,
17
          Defendants.
18

No. C04-0960(C)-L

[PROPOSED] ORDER GRANTING
PLAINTIFFS' MOTION FOR LEAVE TO
TAKE IMMEDIATE DISCOVERY

19      Upon the Motion of Plaintiffs for Leave to Take Immediate Discovery and the

20  supporting Memorandum of Law, and the declaration of Jonathan Whitehead and the

21  exhibit thereto, it is hereby:

22      ORDERED that Plaintiffs may serve immediate discovery on Microsoft Corporation

23  to obtain the identity of each Doe Defendant by serving a Rule 45 subpoena that seeks

24  information sufficient to identify each Doe Defendant, including the name, address,

25  telephone number, e-mail address, and Media Access Control addresses for each Defendant.

26

[PROPOSED] ORDER GRANTING
PLAINTIFFS' MOTION FOR LEAVE TO
TAKE IMMEDIATE DISCOVERY
Page 1

YARMUTH WILSDON CALFO PLLC
THE IDX TOWER
925 FOURTH AVENUE, SUITE 2500
SEATTLE, WA 98104
T 206 516 3800 F 206 516 3888

1      IT IS FURTHER ORDERED THAT any information disclosed to Plaintiffs in

2   response to the Rule 45 subpoena may be used by Plaintiffs solely for the purpose of

3   protecting Plaintiffs' rights under the Copyright Act.

4

5   Dated: _May 14, 2004_

6                             United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

[PROPOSED] ORDER GRANTING
PLAINTIFFS' MOTION FOR LEAVE TO
TAKE IMMEDIATE DISCOVERY
Page 2

YARMUTH WILSDON CALFO PLLC
THE IDX TOWER
925 FOURTH AVENUE, SUITE 2500
SEATTLE, WA 98104
T 206 516 3800  F 206 516 3888

**Tab 6**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ELEKTRA ENTERTAINMENT GROUP INC., a Delaware corporation; MOTOWN RECORD COMPANY, L.P., a California limited partnership; ATLANTIC RECORDING CORPORATION, a Delaware corporation; UMG RECORDINGS, INC., a Delaware corporation; CAPITOL RECORDS, INC., a Delaware corporation; SONY MUSIC ENTERTAINMENT INC., a Delaware corporation; WARNER BROS. RECORDS INC., a Delaware corporation; BMG MUSIC, a New York general partnership; VIRGIN RECORDS AMERICA, INC., a California corporation; and ARISTA RECORDS, INC., a Delaware corporation,<br><br>        Plaintiffs,<br><br>    v.<br><br>DOES 1 - 5,<br><br>        Defendants. | CIVIL ACTION NO.<br><br><br>FILED<br>SCRANTON<br>MAY 1 1 2004<br>Per _____<br>DEPUTY CLERK<br><br>3 : CV - 04 - 940 |

**ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE TO TAKE**
**IMMEDIATE DISCOVERY**

      Upon the Motion of Plaintiffs for Leave to Take Immediate Discovery and the supporting Memorandum of Law, and the declaration of Jonathan Whitehead and the exhibit thereto, it is hereby:

      ORDERED that Plaintiffs may serve immediate discovery on Mansfield University to obtain the identity of each Doe Defendant by serving a Rule 45 subpoena that seeks information sufficient to identify each Doe Defendant,

including the name, address, telephone number, e-mail address, and Media Access

Control addresses for each Defendant.

IT IS FURTHER ORDERED THAT any information disclosed to

Plaintiffs in response to the Rule 45 subpoena may be used by Plaintiffs solely for

the purpose of protecting Plaintiffs' rights under the Copyright Act.

Dated: _May 4, 2004_          _____

United States District Judge

2

**Tab 7**

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

MAY 10 2004

JAMES R. LARSEN, CLERK
_____DEPUTY
SPOKANE, WASHINGTON

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

LOUD RECORDS, LLC, a
Delaware corporation; WARNER
BROS. RECORDS INC., a
Delaware corporation; ATLANTIC
RECORDING CORPORATION, a
Delaware corporation; VIRGIN
RECORDS AMERICA, INC., a
California corporation; PRIORITY
RECORDS LLC, a California
limited liability company;
ELEKTRA ENTERTAINMENT
GROUP INC., a Delaware
corporation; BMG RECORDINGS,
INC., a Delaware corporation;
ARISTA RECORDS, INC., a
Delaware corporation; BMG
MUSIC, a New York general
partnership; SONY MUSIC
ENTERTAINMENT INC., a
Delaware corporation; MAVERICK
RECORDING COMPANY, a
California joint venture; and
CAPITOL RECORDS, INC., a
Delaware corporation,

           Plaintiffs,

v.

DOES 1-5,

           Defendants.

NO. CV-04-0134-RHW

**ORDER GRANTING PLAINTIFFS'
MOTION FOR LEAVE TO TAKE
IMMEDIATE DISCOVERY**

Before the Court is Plaintiffs' Motion for Leave to Take Immediate

Discovery (Ct. Rec. 7). The Plaintiffs, members of the Recording Industry

Association of America, Inc. ("RIAA"), have filed a complaint alleging that DOES

ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE TO TAKE
IMMEDIATE DISCOVERY * 1

1  1-5 illegally engaged in uploading and downloading copyrighted recordings

2  through www.KaZaA.com, a peer to peer ("P2P") internet service (Ct. Rec. 1).

3  While Plaintiffs are unable to identify the Does, they collected records of

4  Defendants' Internet Protocol ("IP") address, the times the downloads or uploads

5  took place, and information regarding the specific recordings that were

6  downloaded or uploaded.  The Plaintiffs were able to ascertain from Defendants'

7  IP addresses that they were utilizing Gonzaga University as their Internet Service

8  Provider ("ISP").  Plaintiffs seek statutory damages under 17 U.S.C. § 504(c),

9  attorneys fees and costs pursuant to 17 U.S.C. § 505, and injunctive relief under

10  17 U.S.C. §§ 502 and 503.

11      In their Motion for Leave to Take Immediate Discovery, the Plaintiffs seek

12  leave to serve Gonzaga University, the ISP for Does 1-5, with a Rule 45 Subpoena

13  Duces Tecum, requiring Gonzaga University to reveal the Defendant's names,

14  addresses, email addresses, telephone number, and Media Access Control

15  ("MAC") addresses.

16      The Ninth Circuit has held that "where the identity of alleged defendants

17  will not be known prior to the filing of a complaint . . . . the plaintiff should be

18  given an opportunity through discovery to identify the unknown defendants,

19  unless it is clear that discovery would not uncover the identities, or that the

20  complaint would be dismissed on other grounds."  *Gillespie v. Civiletti*, 629 F.2d

21  637, 642 (9th Cir. 1980).  Presumably, the discovery device anticipated by this

22  ruling was Rule 45, under which a party may compel a nonparty to produce

23  documents or other materials that could reveal the identities.  *See Pennwalt Corp.*

24  *v. Durand-Wayland, Inc.*, 708 F.2d 492 (9th Cir. 1983).  The Court finds that this

25  instance presents the very situation indicated by *Gillespie*.  The Plaintiffs' case

26  relies on the disclosure of the Does' identities, and those identities are likely

27  discoverable from a third party.

28      Under Rule 26(d), Rule 45 subpoenas should not be served prior to a Rule

ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE TO TAKE
IMMEDIATE DISCOVERY * 2

26(f) conference unless the parties can show good cause. Fed. R. Civ. P. 26(d) ("a party may not seek discovery from any source before the parties have conferred as required by Rule 26(f) . . . . [u]nless the court upon motion . . . . orders otherwise"); *see Semitool, Inc. V. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 275-76 (N.D. Cal. 2002). The Plaintiffs have presented compelling evidence that the records kept by ISP providers of IP addresses are regularly destroyed. Thus, good cause has been shown.

Accordingly, **IT IS ORDERED** that:

1. Plaintiffs' Motion for Leave to Take Immediate Discovery (Ct. Rec. 7) is **GRANTED**.

2. Plaintiffs are **GIVEN LEAVE** to serve immediate discovery on Gonzaga University to obtain the identity of each Doe Defendant by serving a Rule 45 subpoena duces tecum that seeks each Doe Defendants' name, address, telephone number, email address, and Media Access Control address. As agreed by Plaintiffs, this information disclosed will be used solely for the purpose of protecting their rights under the copyright laws.

3. Plaintiffs are **ORDERED** to review Local Rule 7.1(g)(2) regarding the citation of unpublished decisions. All unpublished decisions cited to the Court have been disregarded.

**IT IS SO ORDERED.** The District Court Executive is hereby directed to enter this order and to furnish copies to counsel of record.

**DATED** this _10_ day of May, 2004.

ROBERT H. WHALEY
United States District Judge

Q:\Civil\2004\Loud Records\Loud.immediatediscovery.order.wpd

**ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE TO TAKE IMMEDIATE DISCOVERY * 3**

**Tab 8**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2004 MY -6  AM 11: 24

U.S. CLERK'S OFFICE ... AS
BY _____
CPL. TY

INTERSCOPE RECORDS, a California
general partnership, ET AL.,

           Plaintiffs,

V.

DOES 1-37,

           Defendants.

§
§
§
§
§
§
§
§
§
§

A-04-CA-237 LY

## ORDER

    Before the Court is Plaintiffs' Expedited *Ex Parte* Motion for Order Permitting Third-Party Discovery Prior to Fed. R. Civ. P. 26(f) Conference, filed April 28, 2004 (Clerk's Dkt. #2). The motion was referred to United States Magistrate Judge Robert Pitman for resolution pursuant to 28 U.S.C. § 636(b), Federal Rule of Civil Procedure 72 and Rule 1(c) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas.

    Plaintiffs, members of the Recording Industry Association of America, Inc. ("RIIA"), are record companies holding copyrights for numerous sound recordings. (Compl. ¶22). They allege each Defendant has, without permission, used the Internet to download, and/or make available for download to others, various copyrighted sound recordings. (*Id.* ¶24). Plaintiffs contend these actions constitute copyright infringement, entitling them to damages from the Defendants. (*Id.* ¶¶24-26).

    Plaintiffs now seek expedited discovery from a third party for the purpose of identifying Defendants Does 1-37. Specifically, they wish to issue a Rule 45 subpoena to Grande Communications, an Internet Service Provider ("ISP"). Plaintiffs request permission to obtain names and addresses for persons they believe are offering copyrighted sound recordings for download over the Internet.



A party is generally not entitled to seek discovery from any source prior to a Rule 26(f) conference with the opposing parties. FED. R. CIV. P. 26(d). Early discovery may, however, be authorized by court order upon a showing of good cause. *Qwest Comms. Int'l, Inc. v. WorldQuest Networks, Inc.*, 213 F.R.D. 418, 419 (D. Colo. 2003); *Semitool, Inc. v. Tokyo Elec. Am., Inc.*, 208 F.R.D. 273, 275 (N.D. Cal. 2002); *Yokohama Tire Corp. v. Dealers Tire Supply, Inc.*, 202 F.R.D. 612, 614 (D. Ariz. 2001); *Ellsworth Assoc., Inc. v. United States*, 917 F. Supp. 841, 844 (D.D.C. 1996).

According to Plaintiffs, they have no means of identifying each Doe Defendant without the requested discovery. In support of their motion, Plaintiffs have submitted a declaration from Jonathan Whitehead ("Whitehead"), Vice President and Counsel for Online Copyright Protection for RIAA. Whitehead avers that the RIAA has downloaded and listened to a sample of music files offered for download on a P2P network by each Defendant.[1] (Whitehead Decl. ¶16). The RIIA, thus, has a record of the recordings offered for download, the date and time the infringing activity was observed, as well as the Internet Protocol ("IP") address assigned to each Defendant at the time. (*Id.* ¶¶16-17).

According to Whitehead, the IP address, in combination with publicly available databases, allowed the RIAA to determine the ISP used by each Defendant. (*Id.* ¶12). In this case, the RIAA determined the ISP for each Defendant was Grande Communications. (*Id.* ¶16). Whitehead maintains the RIAA is unable to make any further specific identification because an ISP owns a range of IP addresses, but assigns a specific address only when that subscriber actually goes online. (*Id.* ¶14 n.8).

Plaintiffs should be afforded the opportunity to obtain discovery relevant to the identification

---

[1] A P2P, or peer to peer, network allows individuals with a personal computer and access to the internet to offer digital copies of recordings for download by other users. These programs, such as KaZaA, Morpheus, Grokster, and eDonkey, allow an internet user to directly search the .mp3 file libraries of other users. Thus, no specific web site is involved, or subject to liability. *Recording Industry Ass'n v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1231-32 (D.C. Cir. 2003).

of defendants they contend are liable to them. *See Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999) (dismissal of action against unnamed defendant not required as identity might be ascertained through discovery); *Valentin v. Dinkins*, 121 F.3d 72, 75-76 (2d Cir. 1997) (dismissal for want of prosecution improper where plaintiff not permitted to conduct discovery to identify defendant). *See also Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 351-52 (5th Cir. 1989) (complaint should not be dismissed for failure to demonstrate standing without providing plaintiff opportunity to supply more supportive facts). As they point out, without identification of the Defendants, the type of conference contemplated under Rule 26(f) is impossible. Thus, they have established good cause for the necessity of engaging in discovery at this early stage of the proceedings.

Accordingly, Plaintiffs' Expedited *Ex Parte* Motion for Order Permitting Third-Party Discovery Prior to Fed. R. Civ. P. 26(f) Conference (Clerk's Dkt. #2) is hereby **GRANTED**. Plaintiffs may serve immediate discovery on Grande Communications to obtain the identity of each Doe Defendant by serving a Rule 45 subpoena that seeks information sufficient to identify each Doe Defendant, that is, the name, address, telephone number, e-mail address and Media Access Control address for each Defendant. The disclosure of this information is governed by the provisions of 47 U.S.C. § 511(c)(2)(B). Any information disclosed to Plaintiffs in response to the subpoena may be used solely for the purpose of protecting Plaintiff's rights under the Copyright Act.

SIGNED this __6__ day of May, 2004.


ROBERT PITMAN
UNITED STATES MAGISTRATE JUDGE

3

**Tab 9**

From:SOBLE & ROWE LLP          734 662 0552       05/06/2004 14:15 #224 P.002/005.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BMG MUSIC, a New York general partnership;
ATLANTIC RECORDING CORPORATION,
a Delaware corporation; ELEKTRA
ENTERTAINMENT GROUP INC., a Delaware
corporation; MOTOWN RECORD COMPANY, L.P.,
a California limited partnership; ARISTA
RECORDS, INC., a Delaware corporation;
WARNER BROS. RECORDS INC., a Delaware
corporation; CAPITOL RECORDS, INC., a
Delaware corporation; SONY MUSIC
ENTERTAINMENT INC., a Delaware
corporation; UMG RECORDINGS, INC., a
Delaware corporation; VIRGIN RECORDS
AMERICA, INC., a California corporation;
and MAVERICK RECORDING COMPANY,
a California joint venture,

Case No. 5:04-cv-58

Hon. Wendell A. Miles

     Plaintiffs,

v.

DOES 1 - 9,

     Defendants.

_____/

## ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR LEAVE TO TAKE IMMEDIATE DISCOVERY

The plaintiffs in this action have asserted claims of copyright infringement against nine

unknown or "Doe" defendants.  The complaint, filed on April 28, 2004, alleges that each defendant

disseminated over the Internet copyrighted musical works owned or controlled by the plaintiffs,

doing so without plaintiffs' consent or permission.

The matter is currently before the court on Plaintiffs' *Ex Parte* Motion for Leave to Take

Immediate Discovery (docket no. 3).  Plaintiffs' motion is supported by the Declaration of Jonathan

Whitehead (docket no. 6).  In their motion, which is made *ex parte* because plaintiffs do not

From:SOBLE & ROWE LLP          734 662 0552          05/06/2004 14:16 #224 P.003/005

currently know the names of the defendants, plaintiffs seek discovery in advance of the conference

provided by Fed.R.Civ.P. 26(f) so that they may obtain information which will enable them to

identify and serve the defendants. More specifically, plaintiffs seek leave to serve a Fed.R.Civ.P. 45

subpoena on Michigan State University ("MSU"), which plaintiffs contend they have been able to

identify as the Internet Service Provider of each of the defendants. Although the plaintiffs do not so

state in their motion, the court has inquired of plaintiffs whether they have notified MSU of the

pendency of this action and of the motion for discovery. Plaintiffs have responded to these inquiries

in the affirmative, and have represented that MSU has communicated to plaintiffs that it does not

intend to object to the discovery.

Given plaintiffs' allegations, it is apparent that this action will not advance to service of the

summons and complaint unless and until plaintiffs are able to learn the defendants' identifying

information. For that reason, the court GRANTS the plaintiffs' motion and hereby ORDERS as

follows:

1. Plaintiffs may serve immediate discovery on MSU to obtain the identity of each Doe

defendant by serving a Fed.R.Civ.P. 45 subpoena that seeks information sufficient to identify each

Doe defendant. This information shall be limited to the name, address, telephone number, e-mail

address, and Media Access Control address for each defendant.

2. Any information disclosed to plaintiffs by MSU in response to the subpoena may be used

by plaintiffs solely for the purpose of protecting plaintiffs' rights under the Copyright Act.

3. Plaintiffs shall serve upon MSU a copy of this Order together with any subpoena.

Ordered this 6th day of May, 2004.

/s/ Wendell A. Miles
Wendell A. Miles
Senior U.S. District Judge

2

**Tab 10**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION

WARNER BROS. RECORDS INC., a )
Delaware corporation; ARISTA )
RECORDS, INC., a Delaware corporation; )
VIRGIN RECORDS AMERICA, INC., a ) No.: 04-84
California corporation; MAVERICK )
RECORDING COMPANY, a California )
joint venture; BMG MUSIC, a New York )
general partnership; ATLANTIC )
RECORDING CORPORATION, a )
Delaware corporation; ELEKTRA )
ENTERTAINMENT GROUP INC., a )
Delaware corporation; CAPITOL )
RECORDS, INC., a Delaware corporation; )
PRIORITY RECORDS LLC, a California )
limited liability company; MOTOWN )
RECORD COMPANY, L.P., a California )
limited partnership; UMG RECORDINGS, )
INC., a Delaware corporation; )
INTERSCOPE RECORDS, a California )
general partnership; and SONY MUSIC )
ENTERTAINMENT INC., a Delaware )
corporation, )
                                      )
        Plaintiffs,                   )
                                      )
            vs.                       )
                                      )
DOES 1 - 35,                          )
                                      )
        Defendants.                   )

Eastern District of Kentucky
**FILED**
MAY - 4 2004
AT COVINGTON
LESLIE G WHITMER
CLERK U.S. DISTRICT COURT

## ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE TO TAKE IMMEDIATE DISCOVERY

Upon the Motion of Plaintiffs for Leave to Take Immediate Discovery and the

supporting Memorandum of Law, and the declaration of Jonathan Whitehead and the exhibit

thereto, it is hereby:

ORDERED that Plaintiffs may serve immediate discovery on Insight Midwest, L.P. to obtain the identity of each Doe Defendant by serving a Rule 45 subpoena that seeks information sufficient to identify each Doe Defendant, including the name, address, telephone number, e-mail address, and Media Access Control addresses for each Defendant. The disclosure of this information is ordered pursuant to 47 U.S.C. § 551(c)(2)(B).

IT IS FURTHER ORDERED THAT any information disclosed to Plaintiffs in response to the Rule 45 subpoena may be used by Plaintiffs solely for the purpose of protecting Plaintiffs' rights under the Copyright Act.

Dated: _May 4, 2004_

_William O. Bertelsman_
United States District Judge

2

**Tab 11**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 04-1758(DSD/JSM)

Sony Music Entertainment,
Inc., a Delaware corporation;
Elektra Entertainment Group,
Inc., a Delaware corporation;
BMG Music, a New York general
partnership; Warner Bros.
Records, Inc., a Delaware
corporation, UMG Recordings,
Inc., a Delaware corporation;
Atlantic Recording Corporation,
a Delaware corporation; and
Virgin Records America, Inc.,
a California corporation,

        Plaintiffs,

v.                                                    **ORDER**

Does 1-2,

        Defendants.

    Felicia J. Boyd, Esq., Kara L. Benson, Esq. and Faegre &
Benson, 2200 Wells Fargo Center, 90 South Seventh Street,
Minneapolis, MN 55402, counsel for plaintiffs.

    This matter is before the court upon plaintiffs' ex parte
motion for leave to take immediate discovery. Plaintiffs own
numerous copyrights in sound recordings. They allege that
defendants have infringed some of those copyrights. In the present
motion, plaintiffs seek leave to obtain limited discovery from a
third-party internet service provider ("ISP") to determine the
defendants' true identities. Plaintiffs assert that without this
limited discovery, they will be unable to identify the defendants,

vindicate their rights under the Copyright Act or protect their works from further infringement. For the following reasons, plaintiffs' motion is granted.


## BACKGROUND

Defendants are alleged to have used an online media distribution system to download, copy, distribute and make available for distribution by others many of plaintiffs' copyrighted works. (Whitehead Decl. ¶ 16 & Ex. 1.) Plaintiffs have identified the Doe defendants by the unique Internet Protocol ("IP") addresses assigned to them at the time the alleged infringement occurred. (Id. ¶¶ 12, 16.) Plaintiffs have obtained lists of the sound files which they allege defendants made available to the public for copying and redistribution. (Id. Ex. 1.)

Plaintiffs identify the University of Minnesota as the ISP that provided internet access to the Doe defendants. (Id. ¶¶ 12, 16.) ISPs are capable of matching an IP address to its assigned user through subscriber activity logs. However, such logs are generally kept for a limited period of time. Therefore, plaintiffs seek leave to immediately serve limited discovery requests upon the University of Minnesota via Rule 45 subpoena. See Fed. R. Civ. P.

45. Plaintiffs agree to request only the name, address, telephone number, e-mail address and Media Access Control address of each defendant.

## DISCUSSION

It is well settled in this circuit that plaintiffs may use discovery to identify Doe defendants. See Munz v. Parr, 758 F.2d 1254, 1257 (8th Cir. 1985). Plaintiffs may seek expedited discovery where good cause is shown. See, e.g., Intermedia Partners SE, Gen. P'ship v. QB Distrib's. L.L.C., 999 F. Supp. 1274, 1278 (D. Minn. 1998) (granting TRO and expedited discovery where plaintiff alleged piracy of cable broadcast programming in violation of the Communications Act of 1934); Tonka Corp. v. Tsaisun, Inc., 1989 WL 29980, at *1 (D. Minn. Nov. 6, 1986) (allowing expedited discovery in copyright action).

In this case, plaintiffs have shown good cause for limited discovery, because they stand to suffer irreparable harm, the information they seek is necessary to further the litigation, it is unavailable by any other means and it may be short lived. Further, the court finds no prejudice to defendants, because plaintiffs may use the information discovered solely for the purpose of protecting their rights under the Copyright Act.

3

**CONCLUSION**

For the reasons stated, **IT IS HEREBY ORDERED** that:

1.   Plaintiffs' motion for leave to take immediate discovery [Docket No. 3] is granted.

2.   Plaintiffs may immediately serve a Rule 45 subpoena on the University of Minnesota to obtain the identity of each defendant.

3.   Plaintiffs may use any information so discovered solely for the purpose of protecting their rights under the Copyright Act.


Dated:  May 4, 2004

                              s/David S. Doty
                              David S. Doty, Judge
                              United States District Court

4

**Tab 12**

CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED

**MAY 0 3 2004**

JOHN F. CORCORAN, CLERK
BY: *Kayeusman*
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

LONDON-SIRE RECORDS INC., et al.,          )
                                            )
         Plaintiffs,                        )
                                            )          Civil Action No.: 7:04CV00208
v.                                          )
                                            )               **ORDER**
                                            )
JOHN DOE,                                   )          By: Hon. Glen E. Conrad
                                            )          United States District Judge
         Defendant.                         )
                                            )

     This case is before the court on Plaintiffs' Motion for Leave to Take Immediate Discovery. Upon consideration of Plaintiffs' Motion and supporting Memorandum of Law, as well as the declaration of Jonathan Whitehead, it is hereby

ORDERED

that Plaintiffs may initiate immediate discovery prior to the conduct of a Rule 26(f) conference.

     The Clerk is directed to send a certified copy of this Order to counsel for all parties.

     ENTER: This ___3rd___ day of May, 2004.

_____
United States District Judge

**Tab 13**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VIRGIN RECORDS AMERICA, INC. :
ET AL :
     Plaintiffs :     CIVIL ACTION NO.
     :     3-04-cv-701 (JCH)
v. :
     :
DOES 1 - 3 :     APRIL 29, 2004
     Defendants :

### ORDER GRANTING PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY [DKT. NO. 5-1]

Upon the Motion of plaintiffs for Expedited Discovery, the supporting

Memorandum of Law, and the declaration of Jonathan Whitehead and the exhibit thereto,

the court finds there is good cause for expedited discovery, in particular, to preserve

evidence and to identify the defendants for service.

It is therefore ORDERED that:

1.     Plaintiffs may serve immediate discovery on Patriot Media &

Communications ("Patriot") to obtain the identity of Doe defendants 1, 2 and 3 by serving

a Rule 45 subpoena that seeks information sufficient to identify each Doe defendant,

including the name, address, telephone number, e-mail address, and Media Access Control

address for each defendant.

2.     If and when Patriot is served with a subpoena, within five business days

thereof, it shall give notice (notice via email is sufficient) of the subpoena to the subscribers

in question. If Patriot and/or any defendant wishes to move to quash the subpoena, the

party must do so before the return date of the subpoena, which will be 15 business days from the date of service.

    3.     If and when Patriot is served with a subpoena, Patriot shall immediately preserve the subpoenaed information in question pending resolution of any timely-filed motion to quash; and

    4.     Counsel for plaintiffs shall provide a copy of this Order to Patriot along with the subpoena.

    5.     The disclosure of this information is ordered pursuant to 47 U.S.C. § 551(c)(2)(B), which authorizes cable operators to disclose personally identifiable information when the cable operators are ordered to do so by a court.

    IT IS FURTHER ORDERED THAT any information disclosed to plaintiffs in response to the Rule 45 subpoena shall be used by plaintiff solely for the purpose of protecting plaintiffs' rights under the Copyright Act.

**SO ORDERED.**

    Dated at Bridgeport, Connecticut this 29th day of April, 2004.


                             /s/ Janet C. Hall
                             Janet C. Hall
                             United States District Judge

**Tab 14**

1   JEFFREY G. KNOWLES (State Bar # 129754)
    JULIA D. GREER (State Bar # 200479)
2   ZUZANA J. SVIHRA (State Bar # 208671)
    COBLENTZ, PATCH, DUFFY & BASS, LLP
3   One Ferry Building, Suite 200
    San Francisco, California 94111
4   Telephone: (415) 391-4800
    Facsimile: (415) 989-1663
5
    Attorneys for Plaintiffs
6   MAVERICK RECORDING CO.; WARNER BROS.
    RECORDS INC.; ARISTA RECORDS, INC.; VIRGIN
7   RECORDS AMERICA, INC.; UMG RECORDINGS, INC.;
    INTERSCOPE RECORDS; BMG MUSIC; SONY MUSIC
8   ENTERTAINMENT INC.; ATLANTIC RECORDING
    CORP.; MOTOWN RECORD COMPANY, L.P.; and
9   CAPITOL RECORDS, INC.

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13  MAVERICK RECORDING COMPANY, a          CASE NO. C-04-1135 MMC
    California joint venture; WARNER BROS.
14  RECORDS INC., a Delaware corporation;  [PROPOSED] ORDER GRANTING
    ARISTA RECORDS, INC., a Delaware       PLAINTIFFS' MISCELLANEOUS
15  corporation; VIRGIN RECORDS AMERICA,   ADMINISTRATIVE REQUEST FOR
    INC., a California corporation; UMG     LEAVE TO TAKE IMMEDIATE
16  RECORDINGS, INC., a Delaware           DISCOVERY
    corporation; INTERSCOPE RECORDS, a
17  California general partnership; BMG MUSIC,
    a New York general partnership; SONY
18  MUSIC ENTERTAINMENT INC., a
    Delaware corporation; ATLANTIC
19  RECORDING CORPORATION, a Delaware
    corporation; MOTOWN RECORD
20  COMPANY, L.P., a California limited
    partnership; and CAPITOL RECORDS, INC.,
21  a Delaware corporation,

22              Plaintiffs,

23         vs.

24  DOES 1 - 4,

25              Defendants.

26

27

28

                                        [PROPOSED] ORDER

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONLANTT, PATCH, DUFFY & BASS, LLP
One Ferry Building, Suite 200, San Francisco, CA 94111-4213
(415) 391-4800 • (415) 989-1663

Upon the Miscellaneous Administrative Request of Plaintiffs For Leave To Take Immediate Discovery, the Declaration of Jonathan Whitehead and the exhibit thereto, Plaintiffs' Request for Judicial Notice, and the Declaration of Zuzana J. Svihra, it is hereby:

ORDERED that Plaintiffs may serve immediate discovery on the University of California, Berkeley to obtain the identity of each Doe Defendant by serving a Rule 45 subpoena that seeks information sufficient to identify each Doe Defendant, including the name, address, telephone number, e-mail address, and Media Access Control addresses for each Defendant.

IT IS FURTHER ORDERED THAT any information disclosed to Plaintiffs in response to the Rule 45 subpoena may be used by Plaintiffs solely for the purpose of protecting Plaintiffs' rights under the Copyright Act.

Without such discovery, Plaintiffs cannot identify the Doe Defendants, and thus cannot pursue their lawsuit to protect their copyrighted works from infringement.

Dated:  April 28, 2004

James Larson U.S. Magistrate Judge

~~United States District Judge~~

2

[PROPOSED] ORDER

Case No. C-04-1135 MMC

**Tab 15**

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

RECEIVED

APR 28 2004)

U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

MAVERICK RECORDING COMPANY,              )
a California joint venture; UMG           )
RECORDINGS, INC., a Delaware             )
corporation; WARNER BROS. RECORDS        )
INC., a Delaware corporation; MOTOWN     )
RECORD COMPANY, L.P., a California       )
limited partnership; ATLANTIC            )    Civil No.
RECORDING CORPORATION, a                 )
Delaware corporation; CAPITOL            )
RECORDS, INC., a Delaware corporation;   )
VIRGIN RECORDS AMERICA, INC., a          )
California corporation; BMG MUSIC, a     )
New York general partnership; and SONY   )
MUSIC ENTERTAINMENT INC., a              )
Delaware corporation,                    )
                                         )
        Plaintiffs,                      )
                                         )
            vs.                          )
                                         )
DOES 1 - 2,                              )
                                         )
        Defendants.                      )

CA 04 149ML

## ORDER GRANTING PLAINTIFFS' *EX PARTE* APPLICATION FOR LEAVE TO TAKE IMMEDIATE DISCOVERY

Upon the *Ex Parte* Application of Plaintiffs for Leave to Take Immediate

Discovery and the supporting Memorandum of Law, the declaration of Jonathan Whitehead and

the exhibit thereto, and Plaintiffs' Request for Judicial Notice it is hereby:

ORDERED that Plaintiffs may serve immediate discovery on Brown University

to obtain the identity of each Doe Defendant by serving a Rule 45 subpoena that seeks

information sufficient to identify each Doe Defendant, including the name, address, telephone

number, e-mail address, and Media Access Control addresses for each Defendant.

IT IS FURTHER ORDERED THAT any information disclosed to Plaintiffs in response to the Rule 45 subpoena may be used by Plaintiffs solely for the purpose of protecting Plaintiffs' rights under the Copyright Act.

Dated: _April 28, 2004_

_____
United States District Judge

**Tab 16**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| LOUD RECORDS, LLC, a Delaware corporation;<br>WARNER BROS. RECORDS INC., a Delaware corporation;<br>VIRGIN RECORDS AMERICA, INC., a California<br>corporation;<br>BMG MUSIC, a New York general partnership;<br>ARISTA RECORDS, INC., a Delaware corporation;<br>ELEKTRA ENTERTAINMENT GROUP INC., a Delaware<br>corporation;<br>SONY MUSIC ENTERTAINMENT INC., a Delaware<br>corporation;<br>PRIORITY RECORDS LLC, a California limited liability<br>company;<br>UMG RECORDINGS, INC., a Delaware corporation;<br>ATLANTIC RECORDING CORPORATION, a Delaware<br>corporation; and<br>CAPITOL RECORDS, INC., a Delaware corporation,<br><br>        Plaintiffs,<br><br>v.<br><br>DOES 1 - 4,<br><br>        Defendants. | Case No.  04-C-289 |

## ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE
## TO TAKE IMMEDIATE DISCOVERY

Upon the Motion of Plaintiffs for Leave to Take Immediate Discovery and the

supporting Memorandum of Law, and the declaration of Jonathan Whitehead and the exhibit

thereto, it is hereby ORDERED that Plaintiffs may serve immediate discovery on Marquette

University to obtain the identity of each Doe Defendant by serving a Rule 45 subpoena that

seeks information sufficient to identify each Doe Defendant, including the name, address, telephone number, e-mail address, and Media Access Control addresses for each Defendant.

IT IS FURTHER ORDERED THAT any information disclosed to Plaintiffs in response to the Rule 45 subpoena may be used by Plaintiffs solely for the purpose of protecting Plaintiffs' rights under the Copyright Act.

Dated at Milwaukee, Wisconsin, this 22nd day of April, 2004.

SO ORDERED,


s/Rudolph T. Randa
HON. RUDOLPH T. RANDA
Chief Judge

Page -2-

**Tab 17**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SONY MUSIC ENTERTAINMENT INC.,   )
et al.,                          )
                                 )
            Plaintiffs,          )
                                 )
      v.                         )    No. 4:04-CV-339 CEJ
                                 )
DOES 1 - 200,                    )
                                 )
            Defendants.          )

### ORDER

    This matter is before the Court on plaintiffs' motion for leave to take immediate discovery. Plaintiffs are record companies who own copyrights in several sound recordings. They seek leave to serve limited discovery upon a third party Internet Service Provider ("ISP") to determine the true identities of the 200 Doe defendants who are being sued for direct copyright infringement. Plaintiffs argue that without this discovery they cannot identify the defendants, and they would be unable to pursue their lawsuit to protect their copyrighted works from infringement.

    Defendants are alleged to have used an online media distribution system to download plaintiffs' copyrighted works, to distribute copyrighted works, and/or to make copyrighted works available for distribution to others. Plaintiffs have identified each defendant by a unique Internet Protocol ("IP") address assigned to that defendant on the date and time of the alleged infringing activity. Plaintiffs have made copies of sound recordings each defendant made available for distribution, and have

obtained copies of a more complete list of files that each defendant has made available to the public for distribution. The ISP that provided Internet access to these defendants is Charter Communications, Inc. ("Charter"). Charter is able to match an IP address to a particular subscriber by reviewing its subscriber activity logs. These activity logs are typically retained by the ISP for a limited period of time; therefore, plaintiffs seek immediate discovery before the information is permanently destroyed.

Courts allow discovery to identify Doe defendants. See Wakefield v. Thompson, 177 F.3d 1160, 1163 (9th Cir. 1999); Valentin v. Dinkins, 121 F.3d 72, 75 (2nd Cir. 1997); Munz v. Parr, 758 F.2d 1254, 1257 (8th Cir. 1985). Courts will also allow expedited discovery where the party establishes good cause, i.e. the need for expedited discovery, in consideration of administration of justice, outweighs prejudice to responding party. Semitool, Inc. v. Tokyo Electron Am., Inc., 208 F.R.D. 273, 276 (N.D. Cal. 2002); Qwest Comm. Int'l, Inc. v. WorldQuest Networks, Inc., 213 F.R.D. 418, 419 (D. Colo. 2003); Yokohama Tire Corp. v. Dealers Tire Supply, Inc., 202 F.R.D. 612, 613-14 (D. Ariz. 2001). Plaintiffs demonstrate good cause here because they show irreparable harm from infringement, no prejudice to defendants, limited availability of the information sought and the movement forward of the case.

Plaintiffs have shown that they will suffer ongoing irreparable harm by the repeated unauthorized copying of their

copyrighted material.  In addition, the defendants will not be prejudiced because plaintiffs seek contact information only and will use the information for the limited purpose of enforcing their rights under the Copyright Act.  Because the information regarding the identity of the IP subscribers is available only for a limited time, the plaintiffs may lose the opportunity to assert their rights if they are not allowed immediate discovery.  Plaintiffs are unable to obtain the subscriber names by any other means, and without this information the case cannot proceed.

Accordingly,

**IT IS HEREBY ORDERED** that the plaintiff's motion for leave to take immediate discovery [#3] is **granted.**

**IT IS FURTHER ORDERED** that the plaintiffs may immediately serve a Rule 45 subpoena on Charter Communications, Inc. to obtain the identity of each defendant solely for the purpose of protecting plaintiffs' rights under the Copyright Act.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of April, 2004.

- 3 -

**Tab 18**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

VIRGIN RECORDS AMERICA, INC.,       *
        et al.          *

       Plaintiffs       *

v.          *     Civil No. **PJM 04-964**

JOHN DOE,       *

       Defendant       *

              *

## ORDER

Upon Consideration of Plaintiffs' Motion for Leave to Take Immediate Discovery [Paper No. 4], it is this 19th day of April, 2004,

ORDERED:

1)    Plaintiffs' Motion for Leave to Take Immediate Discovery [Paper No. 4] is GRANTED;

2)    Plaintiffs will be allowed to serve immediate discovery on the University of Maryland to obtain the identity of the John Doe Defendant by serving a Rule 45 subpoena that seeks information sufficient to identify said Defendant, including the name, address, telephone number, e-mail address, and Media Access Control address of Defendant;

3)    If and when the University of Maryland is served with a subpoena, it shall give written notice, which can include use of e-mail, to the subscriber in question within five business days. If the University of Maryland and/or Defendant wishes to move to quash the

1

subpoena, the party must do so before the return date of the subpoena, which shall be 25 days from the date of service;

4)   If and when the University of Maryland is served with a subpoena, it shall preserve the subpoenaed information pending resolution of any timely filed motions to quash;

5)   Any information disclosed to Plaintiffs in response to the Rule 45 subpoena may be used by Plaintiffs solely for the purpose of protecting Plaintiffs' rights under the Copyright Act as set forth in the Complaint; and

6)   Plaintiffs shall provide a copy of their Motion for Leave to Take Immediate Discovery and of this Order to the University of Maryland along with the subpoena.

_____ /s/ _____
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

2

**Tab 19**

7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Walker D. Miller

Civil Action No. 04-WM-548 (PAC)

FONOVISA, INC.,
CAPITOL RECORDS, INC.,
MAVERICK RECORDING CO.,
LONDON-SIRE RECORDS INC.,
ARISTA RECORDS, INC.,
BMG MUSIC,
INTERSCOPE RECORDS,
PRIORITY RECORDS LLC,
SONY MUSIC ENTERTAINMENT INC.,
VIRGIN RECORDS AMERICA, INC.,
UMG RECORDINGS, INC.,
WARNER BROS. RECORDS INC.,
MOTOWN RECORD COMPANY, L.P.,
ELEKTRA ENTERTAINMENT GROUP INC., and
ATLANTIC RECORDING CORPORATION,

     Plaintiffs,

v.

DOES 1-67,

     Defendants.

F I L E D
UNITED STATES DISTRICT COURT
DENVER, COLORADO

APR – 8 2004

GREGORY C. LANGHAM
CLERK

---

## ORDER

---

Miller, J.

     This matter is before me on the Plaintiffs' *Ex Parte* Application for Leave to Take

Immediate Discovery ("Application"), filed March 23, 2004. Having considered the

Application, Plaintiffs' memorandum of law in support of the Application, and the

Declaration of Jonathan Whitehead, I conclude that the Application should be granted,

as modified below.

     On March 23, 2004, Plaintiffs filed a complaint for copyright infringement against

sixty-seven John Doe defendants ("Defendants").  The complaint alleges that Defendants distributed and/or duplicated copyrighted sound recordings owned or controlled by the Plaintiffs without Plaintiffs' authorization via an online media distribution system in violation of 17 U.S.C. § 501.  However, Plaintiffs are only able to identify Defendants  with an unique Internet Protocol ("IP") address; they do not know Defendants' names or any other identifying information.

Consequently, Plaintiffs seek permission to obtain immediate discovery from Defendants' Internet Service Provider ("ISP"), Level 3 Communications, LLC ("Level 3"), whose subscriber activity log files would allow Plaintiffs to discover Defendants' identities.  Specifically, they wish to serve a subpoena on Level 3 pursuant to Fed. R. Civ. P. 45, seeking each Defendant's true name, address, telephone number, e-mail address, and Media Access Control ("MAC") address.[1]

Under Fed. R. Civ. P. 26(d), "a party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)," unless authorized by a court order or agreement of the parties or when otherwise allowed under the Rules of Civil Procedure.  A court order allowing expedited discovery will issue only upon a showing of good cause.  *Qwest Communications Int'l, Inc. v. Worldquest Networks, Inc.*, 213 F.R.D. 418, 419 (D. Colo. 2003); *Pod-ners, LLC v. Northern Feed & Bean of Lucerne LLC*, 204 F.R.D. 675, 676 (D. Colo. 2002).

Here, Plaintiffs argue that their immediate need of the data in the subscriber

---

[1]A MAC address is the hardware address that uniquely identifies each node, or processing location (such as a computer), of a network. *See* Webopedia, *at* http://www.webopedia.com/TERM/M/MAC_address.html (accessed Apr. 5, 2004).

2

activity logs establishes good cause. They indicate that ISPs such as Level 3 typically keep these logs for brief periods of time before erasing the data they contain. Plaintiffs might never identify the Defendants without obtaining access to the data contained in the logs. *See* Decl. Johnathan Whitehead Supp. *Ex Parte* App., at ¶ 22.

Under these circumstances, Plaintiffs have established good cause. Good cause exists where the evidence sought "may be consumed or destroyed with the passage of time, thereby disadvantaging one or more parties to the litigation." *Qwest*, 213 F.R.D. at 419. *See also Semitool, Inc. v. Tokyo Electron America, Inc.*, 208 F.R.D. 273, 276 (N.D.Cal. 2002) (Good cause exists where "the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party").

However, given the fact that Plaintiffs' Application was *ex parte*, Plaintiffs should serve a copy of this Order along with the subpoena. Further, Level 3 may move to quash the subpoena within ten days of being served with the subpoena.

Accordingly, it is ORDERED:

1.  Plaintiffs' *Ex parte* Application for Leave to Take Immediate Discovery, filed March 23, 2004, is granted. Plaintiffs may serve a Rule 45 subpoena upon Level 3 Communications, LLC that seeks information sufficient to identify each Defendant's true name, address, telephone number, e-mail address, and Media Access Control address.

2.  Any information disclosed to Plaintiffs in response to the subpoena may be used by Plaintiffs solely for the purpose of protecting Plaintiffs' rights

3

under the Copyright Act as set forth in the Complaint.

3.    Plaintiffs' shall serve Level 3 Communications, LLC with a copy of this Order along with the subpoena.

4.    If Level 3 Communications, LLC wishes to move to quash the subpoena, it must do so within ten days of being served with it.

DATED at Denver, Colorado, this ___ day of April, 2004.

BY THE COURT:

Walker D. Miller
United States District Judge

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Walker D. Miller


<u>CERTIFICATE OF MAILING</u>


Case No.04-WM-548

Copies of this Order were served by delivery, or depositing the same in the United
States mail, postage prepaid, addressed to the persons listed below:

Richard L. Gabriel
Timothy M. Reynolds
Holme Roberts & Owen LLP
DC Box 7

Magistrate Judge Patricia Coan


Dated:  April 7, 2004

**Tab 20**

From:SOBLE & ROWE LLP          734 662 0552          04/12/2004 16:33 #102 P.002/003

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

WARNER BROS. RECORDS INC., a
Delaware corporation; BMG MUSIC, a New
York general partnership; SONY MUSIC
ENTERTAINMENT INC., a Delaware
corporation; MAVERICK RECORDING
COMPANY, a California joint venture; UMG
RECORDINGS, INC., a Delaware corporation;
ELEKTRA ENTERTAINMENT GROUP
INC., a Delaware corporation; INTERSCOPE
RECORDS, a California general partnership;
VIRGIN RECORDS AMERICA, INC., a
California corporation; ATLANTIC
RECORDING CORPORATION, a Delaware
corporation; CAPITOL RECORDS, INC., a
Delaware corporation; and CAPITOL
RECORDS, INC., a Delaware corporation,

      Plaintiffs,

      v.

DOES 1 - 9,

      Defendants.

Hon. :  Gerald E. Rosen
Case :  04-71058

**FILED**

APR 0 5 2004

CL... ...CE
U.S. DISTRICT COURT
EASTERN MICHIGAN

JONATHAN D. ROWE (P35384)
MATTHEW E. KRICHBAUM (P52491)
SOBLE & ROWE, LLP
Attorneys for Plaintiff
221 North Main Street, Suite 200
Ann Arbor, Michigan 48104
(734) 996 5600

## ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR LEAVE TO TAKE IMMEDIATE DISCOVERY

Upon the *Ex Parte* Motion of Plaintiffs for Leave to Take Immediate Discovery,
the supporting Memorandum of Law, and the declaration of Jonathan Whitehead and the exhibit
thereto, it is hereby:

ORDERED that Plaintiffs may serve immediate discovery on the University of Michigan to obtain the identity of each Doe Defendant by serving a Rule 45 subpoena that seeks information sufficient to identify each Doe Defendant, including the name, address, telephone number, e-mail address, and Media Access Control addresses for each Defendant.

IT IS FURTHER ORDERED THAT any information disclosed to Plaintiffs in response to the Rule 45 subpoena may be used by Plaintiffs solely for the purpose of protecting Plaintiffs' rights under the Copyright Act.

Dated: ___4-5-04___          **GERALD E. ROSEN**
                             _____
                             United States District Judge

2

**Tab 21**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**



| | |
|---|---|
| ATLANTIC RECORDING CORPORATION, a Delaware corporation; PRIORITY RECORDS LLC, a California limited liability company; WARNER BROS. RECORDS INC., a Delaware corporation; VIRGIN RECORDS AMERICA, INC., a California corporation; ARISTA RECORDS, INC., a Delaware corporation; BMG MUSIC, a New York general partnership; CAPITOL RECORDS, INC., a Delaware corporation; FONOVISA, INC., a California corporation; INTERSCOPE RECORDS, a California general partnership; ELEKTRA ENTERTAINMENT GROUP INC., a Delaware corporation; MOTOWN RECORD COMPANY, L.P., a California limited partnership; MAVERICK RECORDING COMPANY, a California joint venture; UMG RECORDINGS, INC., a Delaware corporation; and SONY MUSIC ENTERTAINMENT INC., a Delaware corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  Case No. 1:04CV316 |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| Does 1 - 13, | ) ) ) |
| Defendants. | ) ) |

**ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE TO TAKE IMMEDIATE**

**DISCOVERY**

Upon the Motion of Plaintiffs for Leave to Take Immediate Discovery and the

supporting Memorandum of Law, and the declaration of Jonathan Whitehead and the exhibit

thereto, it is hereby:

ORDERED that Plaintiffs may serve immediate discovery on America Online, Inc. to obtain the identity of each Doe Defendant by serving a Rule 45 subpoena that seeks information sufficient to identify each Doe Defendant, including the name, address, telephone number, e-mail address, and Media Access Control addresses for each Defendant.

IT IS FURTHER ORDERED THAT any information disclosed to Plaintiffs in response to the Rule 45 subpoena may be used by Plaintiffs solely for the purpose of protecting Plaintiffs' rights under the Copyright Act.

Dated: _April 2 2005_

_____
United States Magistrate Judge

2

**Tab 22**

Received 04/02/2004 04:25PM in 01:28 from 213 894 1815 to on line [7] for FAX3 * Pg 2/3
04/02/04  FRI 17:22 FAX 213 894 1815          U.S DISTRICT COURT                    ☒002

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

#### CIVIL MINUTES - GENERAL

Case No. CV 04-1962 ABC (AJWx)                    Date: April 2, 2004

Title: LONDON-SIRE RECORDS, INC., et. al., v. DOES 1-4
================================================
PRESENT:

HON. ANDREW J. WISTRICH, MAGISTRATE JUDGE

|          Ysela Benavides          |                          |
| :-------------------------------- | :----------------------- |
|          Deputy Clerk             |       Court Reporter     |

ATTORNEYS PRESENT FOR PLAINTIFFS:              ATTORNEYS PRESENT FOR DEFENDANTS:
None Present                                                        None Present

## ORDER REGARDING PLAINTIFFS' EX PARTE APPLICATION FOR LEAVE TO TAKE IMMEDIATE DISCOVERY

Plaintiffs are thirteen record companies who have filed a lawsuit against four unnamed "doe" defendants for alleged copyright infringement. Plaintiffs filed a motion for leave to take immediate discovery on March 23, 2004. [Notice of Ex Parte Application for Leave to Take Immediate Discovery ("Notice") filed March 23, 2004]. Plaintiffs allege that defendants, using an online peer-to-peer ("P2P") media distribution system, made available for distribution, and in fact distributed, copyrighted songs without license or other authority to do so, thereby infringing plaintiffs' copyrights. [See Memorandum of Law in Support of Ex Parte Application For Leave to Take Immediate Discovery ("Memorandum") filed March 23, 2004, at 2]. Plaintiffs have acquired the Internet Protocol ("IP") addresses assigned to each of the four defendants on the dates and times of the infringing activity. [Memorandum 2]. Using a public database, plaintiffs determined that the subject IP addresses belong to the University of Southern California ("USC"). [Memorandum 2-3]. As an Internet Service Provider ("ISP"), USC maintains a subscriber activity log indicating which of its subscribers were assigned the IP addresses in question on the relevant dates and times. [Memorandum 3]. In plaintiffs' experience, most ISPs maintain subscriber activity logs for only a short period of time before destroying the information contained in the logs. [Memorandum 3]. From the subscriber logs, USC can use the IP addresses and temporal information provided by plaintiffs to identify the true names, street addresses, phone numbers, e-mail addresses, and Media Access Control ("MAC") addresses for each defendant. [Memorandum 3]. Plaintiffs ask this Court to allow immediate issuance of a subpoena directing USC to produce defendants' names and the other personal information described above so that plaintiffs may contact defendants in an attempt to negotiate a resolution to plaintiffs' claims, or failing that, to add defendants as named parties to this litigation.

---

04/02/0?  Received 04/02/2004 04:25PM in 01:28 from 213 894 1815 to  on line [7] for FAX3 * Pg 3/3
          FRI 17:22 FAX 213 894 1815          U.S DISTRICT COURT                              ⓩ003

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES--GENERAL

Generally, parties must meet and confer prior to seeking expedited discovery. See Fed. R. Civ. P. 26(f). That requirement, however, may be dispensed with if good cause is shown. See Semitool, Inc. v. Tokyo Electron Am., Inc., 208 F.R.D. 273, 275-76 (N.D. Cal. 2002). Plaintiffs have shown good cause. The true identities of defendants are unknown to plaintiffs, and this litigation cannot proceed without discovery of defendants' true identities. [See Memorandum 7-9].

Subject to the following qualifications, plaintiffs' ex parte application for leave to take immediate discovery is granted.

If USC wishes to file a motion to quash the subpoena or to serve objections, it must do so before the return date of the subpoena, which shall be no less than twenty-one (21) days from the date of service of the subpoena. Among other things, USC may use this time to notify the subscribers in question.

USC shall preserve any subpoenaed information or materials pending compliance with the subpoena or resolution of any timely objection or motion to quash.

Plaintiffs must serve a copy of this order on USC when they serve the subpoena.

Any information disclosed to plaintiffs in response to the Rule 45 subpoena must be used by plaintiffs solely for the purpose of protecting plaintiffs' rights under the Copyright Act as set forth in the complaint.

**IT IS SO ORDERED.**

cc:     Parties

MINUTES FORM 11
CIVIL-GEN                                                Initials of Deputy Clerk_____

**Tab 23**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

FILED: CLERK
U.S. DISTRICT COURT

04 MAR 31  AM 9: 32

TEXAS-EASTERN

BY_____

ARISTA RECORDS, INC., a Delaware
corporation; SONY MUSIC
ENTERTAINMENT INC., a Delaware
corporation; MAVERICK RECORDING
COMPANY, a California joint venture;
FONOVISA, INC., a California corporation;
WARNER BROS. RECORDS INC., a
Delaware corporation; UMG RECORDINGS,
INC., a Delaware corporation; VIRGIN
RECORDS AMERICA, INC., a California
corporation; INTERSCOPE RECORDS, a
California general partnership; PRIORITY
RECORDS LLC, a California limited liability
company; LOUD RECORDS, LLC, a
Delaware corporation; MOTOWN RECORD
COMPANY, L.P., a California limited
partnership; CAPITOL RECORDS, INC., a
Delaware corporation; BMG MUSIC, a New
York general partnership; ATLANTIC
RECORDING CORPORATION, a Delaware
corporation; CAROLINE RECORDS, INC., a
New York corporation; ELEKTRA
ENTERTAINMENT GROUP INC., a
Delaware corporation; and LONDON-SIRE
RECORDS INC., a Delaware corporation,

                        Plaintiffs,

vs.

DOES 1 - 143,

                        Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Case No.: 4:04 cv 93

**ORDER GRANTING PLAINTIFFS' EXPEDITED _EX PARTE_ MOTION FOR ORDER
PERMITTING THIRD-PARTY DISCOVERY PRIOR TO FED. R. CIV. P. 26(f)
CONFERENCE**

Upon the *Ex Parte* Motion of Plaintiffs for Order Permitting Third-Party Discovery Prior to Fed. R. Civ. P. 26(f) Conference and Memorandum of Law in Support, and the declaration of Jonathan Whitehead and the exhibit thereto, it is hereby:

ORDERED that Plaintiffs may serve immediate discovery on Southwestern Bell Internet Services to obtain the identity of each Doe Defendant by serving a Rule 45 subpoena that seeks information sufficient to identify each Doe Defendant, including the name, address, telephone number, e-mail address, and Media Access Control addresses for each Defendant.

IT IS FURTHER ORDERED THAT any information disclosed to Plaintiffs in response to the Rule 45 subpoena may be used by Plaintiffs solely for the purpose of protecting Plaintiffs' rights under the Copyright Act.

Dated: 3-30-04

_____
United States District Judge

2

**Tab 24**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

INTERSCOPE RECORDS; VIRGIN )
RECORDS OF AMERICA, INC; )
ATLANTIC RECORDING CORP; )
SONY MUSIC ENTERTAINMENT, )
INC.; ELEKTRA ENTERTAINMENT )      No. 3-04-0240
GROUP, INC; UMG RECORDINGS, )
INC.; ARISTA RECORDS, INC.; )
WARNER BROS. RECORDS INC.; )
CAPITOL RECORD, INC.; )
MAVERICK RECORDING COMPANY; )
and BMG MUSIC )
                                )
v.                              )
                                )
DOES 1-7                        )

O R D E R

The plaintiffs' motion for expedited discovery (Docket Entry No. 3) is GRANTED. The stay of discovery, pursuant to Rule 26(d) of the Federal Rules of Civil Procedure, is hereby LIFTED.

If the defendants cannot be served with summons and the complaint prior to May 10, 2004, plaintiffs' counsel shall notify the office of the undersigned to reschedule the May 10, 2004, initial case management conference.

It is so ORDERED.

JULIET GRIFFIN
United States Magistrate Judge

This document was entered on
the docket in compliance with
Rule 58 and/or Rule 79 (a).
FRCP. on 3/29/04 By



**Tab 25**

Received 03/30/2004 09:44AM in 02:06 on line [11] for RHARRIS * Pg 2/3

1
2
3
4
5
6
7

_____ FILED _____ LODGED
_____ RECEIVED _____ COPY

MAR 3 0 2004

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

8  Interscope Records, et al.,

9                     Plaintiffs,                    No. CV-04-131 TUC - JM

10  v.

11  Docs 1 - 4,                                      **ORDER**

12

13                     Defendants.

14         Pending before the Court is the Plaintiffs' *ex parte* Motion for Leave to Take

15  Immediate Discovery [Docket No. 2]. Upon consideration of the Motion and the supporting

16  Memorandum of Law, and the declaration of Jonathan Whitehead and the exhibit attached

17  thereto, it is hereby:

18         ORDERED that Plaintiffs' Motion for Leave to Take Immediate Discovery [Docket

19  No. 2] is GRANTED;

20         IT IS FURTHER ORDERED that Plaintiffs may serve immediate discovery on the

21  University of Arizona to obtain the identity of each Doe Defendant by serving a Rule 45

22  subpoena that seeks information sufficient to identify each Doe Defendant, including the

23  name, address, telephone number, e-mail address, and Media Access Control addresses for

24  each Defendant;

25         IT IS FURTHER ORDERED that any information disclosed to Plaintiffs in response

26  to the Rule 45 subpoena shall be used by Plaintiffs solely for the purpose of protecting

27  Plaintiffs' rights under the Copyright Act as set forth in the Complaint;

28

JM                            6

Received 03/30/2004 09:44AM in 02:06 on line [11] for RHARRIS * Pg 3/3

1    IT IS FURTHER ORDERED that, if and when the University of Arizona is served

2    with a subpoena, within five (5) business days thereof it shall give written notice, which can

3    include use of e-mail, to the subscribers whose identities are to be disclosed in response to

4    the subpoena. If the University of Arizona and/or any Defendant wishes to move to quash

5    the subpoena, they shall do so before the return date of the subpoena, which shall be twenty-

6    five (25) business days form the date of service;

7    IT IS FURTHER ORDERED that, if and when the University of Arizona is served

8    with a subpoena, the University of Arizona shall preserve the data and information sought

9    in the subpoena pending resolution of any timely filed motion to quash;

10    IT IS FURTHER ORDERED that counsel for Plaintiffs shall provide a copy of this

11    Order to the University of Arizona when the subpoena is served.

12    Dated this ___25___ day of March, 2004.

13

14

15

16    JACQUELINE MARSHALL
17    UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28

2

**Tab 26**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

**ENTERED**

MAR 2 5 2004

U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

INTERSCOPE RECORDS, et al.,    )
                               )
            Plaintiffs,        )
                               )
    v.                         )  CAUSE NO. 1:04-cv-0542 DFH-TAB
                               )
JOHN DOES 1 – 5,               )
                               )
            Defendants.        )

## ORDER AUTHORIZING IMMEDIATE DISCOVERY

In this action for copyright infringement, plaintiffs Interscope Records and several recording companies have moved for court permission to serve Rule 45 subpoenas to discover the identity of five defendants. Plaintiffs have alleged claims of direct copyright infringement by five defendants through use of "Peer to Peer" or "P2P" software over the internet. The defendants are identified by Internet Protocol ("IP") addresses and the dates and times of the alleged infringements. To learn the identities of the defendants, plaintiffs need information from the Internet Service Provider ("ISP") for the defendants. The ISP in this case is Indiana University. Plaintiffs assert that the ISP should be able to identify the five defendants easily using the available information.

SCANNED

Plaintiffs seek an order authorizing immediate discovery because ISPs typically erase or overwrite data in a relatively short time period.  In such circumstances, expedited discovery is needed to avoid the loss of information about the identities of the alleged infringers.  The court finds that plaintiffs have shown good cause for launching discovery at this time, and there is no identified defendant with whom plaintiffs could conduct a discovery conference.  Because it appears that the information plaintiffs seek may be subject to 47 U.S.C. § 551(c)(2), the court will order the subpoenaed ISP to notify its subscribers of the fact that the subpoena has been received so that the subscribers may have an opportunity to assert any rights they might have related to the discovery.

Accordingly, it is hereby ORDERED that plaintiffs may immediately serve discovery requests on Indiana University to obtain the identities of the John Doe defendants by serving a Rule 45 subpoena for information identifying each defendant, including name, address, telephone number, e-mail address, and Media Access Control addresses for each defendant. Within **seven calendar days** after receiving the subpoena, Indiana University shall notify the persons in question of the receipt of the subpoena pursuant to 47 U.S.C. § 551(c)(2), and Indiana University shall not respond to the subpoena **until at least fourteen calendar days** after it has notified the persons in question.  Indiana University shall **immediately** take steps to preserve all subpoenaed information.

-2-

Plaintiffs may use any information disclosed to them in response to the Rule 45 subpoena solely for the purpose of asserting and protecting plaintiffs' rights under the Copyright Act.


So ordered.


Date: March 25, 2004

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana


Copies to:

James Dimos
Joel E. Tragesser
Locke Reynolds LLP
201 North Illinois Street
Suite 1000
P.O. Box 44961
Indianapolis, Indiana 46244-0961

jdimos@locke.com
jtragesser@locke.com

-3-

**Tab 27**

MAR-05-2004  15:32        COURTROOM DEPUTY CN                      267 299 7508    P.04/04

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BMG MUSIC, et al.                          :        CIVIL ACTION
    Plaintiffs                        :        NO.  04-650
       v.                             :
                       :
DOES 1-203,                                 :
    Defendants.                       :

## O R D E R

AND NOW, this 5th day of March, 2004, upon consideration of Plaintiff's Motion for Leave to Take Expedited Discovery (Doc. 3), it is hereby ORDERED that said Motion is GRANTED with respect to the Defendant identified as "Doe #1."  As this Court has severed all other Defendants, discovery issues in the other cases will be at the discretion of other randomly assigned judges of this Court.  Plaintiffs therefore have leave to serve immediate discovery on Comcast to obtain the identity only of the Doe Defendant known as "Doe #1" in Exhibit A of Plaintiffs' Complaint.  The Court notes that Comcast is now, if it is not already, on notice that it possesses documents necessary to litigation (the subscriber data that relates individual users to their internet protocol address), and it should act to preserve all relevant information with an eye towards Plaintiffs' discovery needs.  This Order does not prejudice Comcast's ability to seek a protective order, or to take other actions as are appropriate.

AND IT IS SO ORDERED.

                              _____
                              Clarence C. Newcomer, S.J.

MAR-05-2004  15:02            267 299 7508              99%            TOTAL P.04
                                                                P.04

**Tab 28**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

MAR 3   2004

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

VIRGIN RECORDS AMERICA, INC., :
et al., :
                                              :
                              Plaintiffs,     :
                                              :          CIVIL ACTION NO.
v.                                            :
                                              :          1:04-CV-0438-CC
DOES 1 - 44,                                  :
                                              :
                              Defendants.     :

## ORDER

Currently pending before the Court is Plaintiffs' Motion for Leave to Take Expedited Discovery. Plaintiffs, record companies who own copyrights in various sound recordings, seek leave of Court to serve limited, immediate discovery on Earthlink, Inc. ("Earthlink"), a third party Internet Service Provider ("ISP"), in order to determine the true identities of the Doe Defendants.

According to Plaintiffs' Complaint, the Doe Defendants used an online media distribution system to download Plaintiffs' copyrighted works to the public, and/or make copyrighted works available for distribution to others. Although Plaintiffs do not know the true names of the Defendants, Plaintiffs have identified each Defendant by a unique Internet Protocol ("IP") address assigned to that Defendant on the date and at the time of the Defendants' allegedly infringing activity. Through the use of a publicly available database, Plaintiffs have traced the IP address for each Defendant, and have determined that the ISP is Earthlink.[1] In their motion for expedited discovery, Plaintiffs ask the Court for permission to serve a Rule 45

---

[1]     Plaintiffs have submitted the declaration of Jonathan Whitehead, Vice President and Counsel for Online Copyright Protection for the Recording Industry Association of America, Inc., in support of their motion for expedited discovery.

subpoena on Earthlink that seeks information sufficient to identify each Doe Defendant, including the name, address, telephone number, e-mail address, and Media Access Control addresses for each Defendant.

Public Citizen, the American Civil Liberties Union, The Electronic Frontier Foundation, and the ACLU of Georgia (collectively referred to as "*amici*") have moved the Court for leave to file a memorandum as *amici curiae* addressing Plaintiffs' motion for expedited discovery. In their memorandum, *amici* argue that Plaintiffs have not made a sufficient factual showing to warrant discovery into the identities of persons who have communicated anonymously over the Internet, or made a sufficient showing that this Court has personal jurisdiction over each Defendant. In addition, *amici* argue that there are also serious concerns whether all 44 Doe Defendants are properly joined in one action. Lastly, *amici* argue that if the Court does allow some discovery, the Court should enlarge the period of time which Earthlink has to respond so that the individual defendants will have a meaningful opportunity to object to the subpoena if they so choose. Plaintiffs' oppose *amici's* motion, arguing that *amici's* effort to inject themselves into this case is premature.

As an initial matter, *amici's* motion for leave to file their memorandum is GRANTED.[2] However, after consideration of *amici's* brief, the Court agrees with Plaintiffs that the issues raised by *amici* are premature. In this regard, no party to this action has raised any of the issues addressed in *amici's* memorandum, and *amici* may not inject issues into the case which have not been raised by a party. *See* McCleskey v. Zant, 499 U.S. 467, 523 n.10, 111 S.Ct. 1454, 1485 n.10, 113 L.Ed.2d 517 (1991) ("It is well established . . . that this Court will not consider an argument

---

[2]    *See* DeJulio v. Georgia, 127 F.Supp.2d 1274, 1284 (N.D. Ga. 2001) (decision to allow a non-party to participate as amicus curiae is solely within the broad discretion of the Court).

advanced by *amicus* when that argument was not raised or passed on below and was not advanced in this Court by the party on whose behalf the argument is being raised."). The issues addressed by *amici* may be resolved in the ordinary course of this litigation if and when such issues are raised by any Defendant.

Turning to Plaintiffs' request for expedited discovery, upon consideration of Plaintiffs' motion and supporting brief, as well as the declaration of Mr. Whitehead, the Court finds that Plaintiffs have established good cause for the expedited discovery they request. Where the Complaint alleges a prima facie case of copyright infringement, and where the lawsuit cannot proceed until Defendants are properly identified, Plaintiffs' motion for limited, immediate discovery in order to identify the Doe Defendants is due to be GRANTED.

ACCORDINGLY, IT IS HEREBY ORDERED:

Plaintiffs may serve immediate discovery upon Earthlink to obtain the identity of each Doe Defendant by serving a Rule 45 subpoena that seeks information sufficient to identify each Doe Defendant, including the name, address, telephone number, e-mail address, and Media Access Control address for each Defendant.

Any information disclosed to Plaintiffs in response to the Rule 45 subpoena may be used by Plaintiffs solely for the purpose of protecting Plaintiffs' rights under the Copyright Act as set forth in the Complaint.

If and when Earthlink is served with a subpoena, within five (5) business days thereof it shall give notice to the subscribers in question of the subpoena. If Earthlink and/or any Defendant wishes to move to quash the subpoena, they shall do so before the return date of the subpoena, which shall be twenty-five (25) days from the date of service.

If and when Earthlink is served with a subpoena, Earthlink shall preserve the

- 3 -

subpoenaed information in question pending resolution of any timely filed motion to quash.

Counsel for Plaintiffs shall provide a copy of this Order to Earthlink when the subpoena is served.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Leave to Take Expedited Discovery [2-1] is GRANTED. *Amici's* Motion for Leave to File Memorandum as Amici Curiae [5-1] is also GRANTED.

SO ORDERED this 3rd day of _____March_____, 2004.

CLARENCE COOPER
UNITED STATES DISTRICT JUDGE

- 4 -

**Tab 29**

STERNS & WEINROTH, P.C.
50 West State Street, Suite 1400
Trenton, N.J. 08607-1298
KAREN A. CONFOY (KC-0848)
Telephone: (609) 392-2100
Facsimile: (609) 392-7956
*Attorneys for Plaintiffs*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| ELEKTRA ENTERTAINMENT GROUP INC., a Delaware corporation; CAPITOL RECORDS, INC., a Delaware corporation; PRIORITY RECORDS LLC, a California limited liability company; VIRGIN RECORDS AMERICA, INC., a California corporation; WARNER BROS. RECORDS INC., a Delaware corporation; SONY MUSIC ENTERTAINMENT INC., a Delaware corporation; ARISTA RECORDS, INC., a Delaware corporation; BMG MUSIC, a New York general partnership; MAVERICK RECORDING COMPANY, a California joint venture; MOTOWN RECORD COMPANY, L.P., a California limited partnership; UMG RECORDINGS, INC., a Delaware corporation; INTERSCOPE RECORDS, a California general partnership; and ATLANTIC RECORDING CORPORATION, a Delaware corporation, | CIVIL ACTION Case No.: ~~04~~ 04-607 (GEB) <br><br> [~~PROPOSED~~] **ORDER GRANTING EX PARTE RELIEF PERMITTING PLAINTIFFS TO CONDUCT LIMITED EXPEDITED DISCOVERY UPON RCN CORPORATION** |
| Plaintiffs, | |
| v. | |
| DOES 1 - 7, | |
| Defendants. | |

Upon Plaintiffs' application for an Order to Show Cause granting Plaintiffs *ex parte* relief permitting them to conduct limited expedited discovery, the supporting memorandum of law, the declaration of Jonathan Whitehead and exhibit thereto, and the declaration of Karen A. Confoy, it is hereby:

ORDERED that Plaintiffs may serve immediate discovery on RCN to obtain the identity of each Doe Defendant by serving a Rule 45 subpoena that seeks information sufficient to identify each Doe Defendant, including the name, address, telephone number, e-mail address, and Media Access Control addresses for each Defendant.

IT IS FURTHER ORDERED THAT any information disclosed to Plaintiffs in response to the Rule 45 subpoena may be used by Plaintiffs solely for the purpose of protecting Plaintiffs' rights under the Copyright Act.

Dated: 2/17/04

_____
United States District Judge

**Tab 30**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------x

CAPITOL RECORDS, INC., a Delaware
corporation; ARISTA RECORDS, INC., a
Delaware corporation; INTERSCOPE
RECORDS, a California general partnership;
LOUD RECORDS, LLC, a Delaware corporation;
UMG RECORDINGS, INC., a Delaware
corporation; WARNER BROS. RECORDS INC.,
a Delaware corporation; ATLANTIC
RECORDING CORPORATION, a Delaware
corporation; FONOVISA, INC., a California
corporation; SONY MUSIC ENTERTAINMENT
INC., a Delaware corporation; BMG MUSIC, a
New York general partnership; LONDON-SIRE
RECORDS INC., a Delaware corporation;
MOTOWN RECORD COMPANY, L.P., a
California limited partnership; PRIORITY
RECORDS LLC, a California limited liability
company; MAVERICK RECORDING
COMPANY, a California joint venture;
ELEKTRA ENTERTAINMENT GROUP INC., a
Delaware corporation; and VIRGIN RECORDS
AMERICA, INC., a California corporation,

                Plaintiffs,

           -against-

DOES 1 - 250,

                Defendants.

---------------------------------------x

Civil Action No.: 04 CV 472 (LAK)(HBP)

## [PROPOSED] ORDER GRANTING PLAINTIFFS' *EX PARTE* APPLICATION TO TAKE IMMEDIATE DISCOVERY

Upon the *ex parte* application of Plaintiffs to take immediate discovery, the annexed

declaration of Jonathan Whitehead and the exhibit thereto, the annexed declaration of J.

Christopher Jensen, Esq., and the accompanying Memorandum of Law, it is hereby:


ORDERED that Plaintiffs may serve immediate discovery on Time Warner Cable to

obtain the identity each Doe Defendant by requesting the name, address, telephone number, e-

mail address, and Media Access Control addresses for each Defendant. ~~The disclosure of this~~

~~information is ordered pursuant to 47 U.S.C. § 551(c)(2)(B).~~


IT IS FURTHER ORDERED THAT any information disclosed to Plaintiffs in response

to the discovery requests may be used by Plaintiffs solely for the purpose of protecting Plaintiffs'

rights under the Copyright Act.

Dated: _1/26/04_

_____
United States District Judge

0617027.1

**EXHIBIT A**

C

Only the Westlaw citation is currently available.

United States District Court,
N.D. Georgia, Atlanta Division.

UNITED PARCEL SERVICE OF AMERICA, INC.,
Plaintiff,
v.
JOHN DOES ONE THROUGH TEN, Defendants.

No. Civ.A. 1-03-CV-1639.

June 13, 2003.

*ORDER*

CAMP, J.

*1 WHEREAS, Plaintiff has filed an emergency motion requesting expedited discovery for the limited purposes of (a) securing the information necessary to identify the Defendants and determine the Defendants' locations and legal status and (b) preserving the information necessary for Plaintiff to prosecute its claims against Defendants; and

WHEREAS the Court has reviewed the record and Plaintiff's motion and has determined that Plaintiff has just need for the expedited discovery it requests by way of its motion,

IT IS HEREBY ORDERED that Plaintiff shall be permitted to take discovery immediately for the limited purposes of identifying the Defendants, determining the Defendants' location and legal status, and preserving evidence necessary for trial.

IT IS FURTHER ORDERED that Plaintiff may require full and complete responses to any subpoenas or other discovery it serves pursuant to this Order within three (3) calendar days of service.

2003 WL 21715365 (N.D.Ga.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

C

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.

ENTERTAINMENT TECHNOLOGY CORPORATION
v.
WALT DISNEY IMAGINEERING, et al.

No. Civ.A. 03-3546.

Filed June 9, 2003.
Oct. 2, 2003.

represented by Paul G. Nofer, Klehr Harrison Harvey, Branzburg & Ellers, LLP, Phila, PA, Lead Attorney, Attorney to be Noticed, Ira A. Rosenau, Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Philadelphia, PA, Attorney to be Noticed, for Entertainment Technology Corporation, Plaintiff.

represented by James D. Hollyday, Laurence Z. Shiekman, Steven K Winnie, Pepper Hamilton LLP, Philadelphia, PA, Lead Attorney, Attorney to be Noticed, for Walt Disney Imagineering, Defendant.

represented by James D. Hollyday, Laurence Z. Shiekman, Steven K Winnie, (See above for address), Lead Attorney, Attorney to be Noticed, for Walt Disney Imagineering Research & Development, Inc., Defendant.

represented by James D. Hollyday, Laurence Z. Shiekman, Steven K Winnie, (See above for address), Lead Attorney, Attorney to be Noticed, for the Walt Disney Company, Defendant.

represented by James D. Hollyday, Laurence Z. Shiekman, Steven K Winnie, (See above for address), Lead Attorney, Attorney to be Noticed, for Walt Disney World Co., Defendant.

represented by Ira A. Rosenau, (See above for address), Attorney to be Noticed, for Environmental Tectonics Corporation, Counter Defendant.

## MEMORANDUM AND ORDER

HUTTON, J.

*1 Currently before the Court are Plaintiff's Motion for Leave to Conduct Limited Discovery on an Expedited Basis and to Shorten Time to Respond to Motion (Docket No. 12), Defendants' Reply in Opposition thereto (Docket No. 20), and Plaintiff's Reply Memorandum in Further Support of its

Motion (Docket No. 21).

### I. ISSUE PRESENTED

Plaintiff Entertainment Technology Corporation ("ETC") seeks leave to conduct expedited discovery of documents concerning safety tests performed on "Mission: Space," a new ride at Walt Disney World's Epcot theme park. Plaintiff asserts expedited discovery of these documents is necessary to protect the public interest and ETC's contractual rights. Defendants Walt Disney Imagineering, Walt Disney Imagineering Research and Development, Walt Disney World Co., and Walt Disney Company (collectively referred to for purposes of this motion as "WDI") oppose the motion.

### II. FACTUAL BACKGROUND

In January 2000 ETC and WDI entered into a contract involving the creation of Mission: Space, a new ride at the Epcot theme park in Florida. The parties' relationship dates back to at least August 1998. The Mission: Space ride is a space flight simulator that uses a multiple-arm centrifuge system to simulate the g-force load of space launch and re-entry. The ride was opened to the public on August 15, 2003. Beyond those facts, the parties characterize both the contract and their relationship very differently. ETC claims the contract gave it the responsibility to design and build the ride and to perform safety tests on the ride. WDI describes the contract as the "Material Procurement Contract," an agreement under which ETC was to provide certain goods and services for the ride.

At some point, the relationship soured and the original contract was altered by a series of changes. The one pertinent to this litigation is Change Order No. 22. The parties disagree how Change Order No. 22 affected the January 2000 contract. The basic dispute is over which party retained ultimate responsibility to complete the ride after the Change Order. WDI claims Change Order No. 22 gave Disney final say; ETC claims it retained final control.

In the present motion, Plaintiff ETC motions for leave to conduct expedited discovery of, among other requests, the following documents:

All documents concerning the testing or analysis of the safety, functioning or performance of the Ride, including all components of the Ride, whether or not such testing or analysis was performed by Disney or another person or entity.

See Plf's Document Request No. 1, Ex. D. to Plf's Motion for Leave to Conduct Limited Discovery. The document request then lists the various categories of test data Plaintiff would like to discovery. Defendants oppose the motion, claiming expedition is not warranted and, in any event, the documents are proprietary.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A discovery request would not usually warrant the extended discussion of a full memorandum and order. However, much of the debate between the parties focuses on which legal standard should be applied to decide a motion for expedited discovery. The area of law is indeed very unclear. Plaintiff argues for an inquiry into the reasonableness of the discovery request, while Defendant argues the request must be analyzed under factors akin to those used to decide preliminary injunction motions. The Court agrees with Plaintiffs and will analyze the Plaintiff's motion according to the factors discussed below. Ultimately, Plaintiff's motion for expedited discovery is denied.

## III. LEGAL STANDARD

*2 Federal Rule of Civil Procedure 26(d) requires that "a party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)." Rule 26(d) expressly provides for departure from the "meet and confer" process of Rule 26(f) if the parties agree to expedited discovery or if the Court so authorizes. Unlike other discovery provisions of the Federal Rules, Rule 26(d) does not provide a standard under which a court should decide expedited discovery motions. See, e.g., Fed.R.Civ.P. 26(c) (providing that a party show "good cause" to get a protective order); Pansy v. Borough of Stroudsburg, 23 F.3d 772 (3d Cir.1994) (setting forth "good cause" test).

A survey of applicable case law, which until recently was scant, reveals that district courts in this circuit have used one of two standards to evaluate motions for expedited discovery. One standard analyzes expedited discovery requests as if they were actually requests for injunctive relief or for specific performance. This standard is understandably difficult to meet for the moving party. The other standard requires that the moving party show that the expedited discovery request is reasonable in light of all circumstances. Whether a request is reasonable, of course, changes depending on the circumstances of the case and timing of the motion. Both standards are discussed below, followed by an evaluation of which should be used in the present case.

### A. Standard One: The Notaro Factors

In Notaro v. Koch the Court set forth four factors for analyzing motions for expedited discovery under Rule 30(a), used for depositions. 95 F.R.D. 403 (S.D.N.Y.1982). The moving party must demonstrate "(1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." Notaro, 95 F.R.D. at 405. The four factors defined are akin to the factors used to

weigh a motion for preliminary injunction because, under the circumstances of the Notaro case, Plaintiffs had requested simultaneously a preliminary injunction and an expedited deposition of then- Mayor of New York Edward Koch. The Court reasoned these stringent factors are appropriate to protect the defendants at such an early stage of litigation. See Notaro, 95 F.R.D. at 405 (citing 4A Moore's Federal Practice, para. 30.54 (1982)).

A magistrate judge in the United States District Court for the District of New Jersey was first in the Third Circuit to apply the Notaro analysis to a motion for expedited discovery. In Gucci America, Inc. v. Daffy's, Inc., the court applied Notaro because the discovery request, although procedural in name, had a substantive element to it, similar to a request for equitable relief. See 2000 U.S. Dist. LEXIS 16714 (D.N.J. Nov. 14, 2000). In the case, Gucci sued Daffy's, a chain of retail clothing stores specializing in selling well-known brands at discounted prices, claiming that Daffy's sold counterfeit Gucci handbags. Gucci requested expedited discovery of the names of the alleged Gucci distributors who were selling Gucci products to Daffy's. Analyzing the motion, the Court looked behind the pleadings, implying that the entire litigation was a sham in order for Gucci to learn the identity of, and then to punish, these distributors. See Gucci, 2000 U.S. Dist. LEXIS, at *18-19. Once in possession of the distributors' names, said the Court, "Gucci will be able to act ... without the aid of the Court." Id. at *17. The Court found the preliminary inunction factors of Notaro to be appropriate because of the Court's "darker suspicion" that Gucci was using the discovery motion and the overall litigation process to root out certain Gucci distributors. See id. at *18. Ultimately, Gucci could not meet the preliminary injunction requirements and its expedited discovery motion was denied.

### B. Standard Two: Reasonableness Inquiry

*3 Other courts have analyzed expedited discovery motions using more liberal standards than the Notaro factors. While no one case provides a comprehensive standard as does Notaro, a review of the case law reveals an emerging reasonableness inquiry based on many different factors, including some preliminary injunction factors.

Many of the cases involve expedited discovery that is necessary to gather evidence for a pending preliminary injunction hearing. [FN1] In Philadelphia Newspaper, Inc. v. Gannett Satellite Information Network, Inc., a court in the Eastern District of Pennsylvania noted that "expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." 1998 U.S. Dist. LEXIS 10511, at *4 (E.D.Pa. July 15, 1998) (quoting Ellsworth Associates,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*Inc. v. United States*, 917 F.Supp. 841, 844 (D.D.C.1996). The court expressly rejected the *Notaro* factors as inappropriate under such circumstances. *See id.* at \*5 n. 1. In attempting to develop a standard, the court focused on the circumstances of the case: the pending preliminary injunction hearing, the need for discovery, and the breadth of the moving party's discovery requests. If narrowly tailored to fit the needs of the hearing, leave to conduct expedited discovery would be granted. Where the requests are overly broad, as they were in *Philadelphia Newspapers*, leave is denied.

FN1. *See, e.g., RDS Group Ltd. v. Davison*, No. 02-8168, 2003 LEXIS 1337 (E.D.Pa. Jan. 17, 2003) (granting expedited discovery for pending preliminary injunction hearing); *Educational Commission for Foreign School Medical Graduates v. Repik*, No. 99-1381, 1999 U.S. Dist. LEXIS 7185 (E.D.Pa. May 14, 1999); *BABN Technologies Corp. v. Bruno*, No. 98-3409, 1998 U.S. Dist. LEXIS 14802 (E.D.Pa. July 24, 1998) (same); *Philadelphia Newspaper, Inc. v. Gannett Satellite Information Network, Inc.*, No. 98- 2782, 1998 U.S. Dist. LEXIS 10511 (E.D.Pa. July 15, 1998) (same); *Energetics Sys. Corp. v. Advanced Cerametrics*, No. 95-7956, 1996 U.S. Dist. LEXIS 2830 (E.D.Pa. Mar. 5, 1996) (same); *see also Gucci*, at \*17 (rejecting a lower standard because Gucci's discovery motion was *not* in aid of an impending preliminary injunction hearing).

The United States District Court for the Northern District of Illinois added to the standard set forth in *Philadelphia Newspapers*. In *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*, the court commented that "it makes sense to examine the discovery request, as we have done, on the entirety of the record to date and the reasonableness of the request in light of all of the surrounding circumstances, similar to what was done in *Philadelphia Newspapers*." 194 F.R.D. 618, 624 (N.D.Ill.2000). The court examined the appropriateness of expedited discovery by weighing the need for discovery at that point in the litigation with the breadth of the discovery requests, ultimately denying the requests as too broad for such an early stage of litigation.

A similar approach was employed by the United States District Court for the Northern District of California, even though no preliminary injunction hearing was pending. In *Semitool, Inc. v. Tokyo Electron America, Inc.*, the court developed a "good cause" standard akin to the inquiries made in *Merrill Lynch* and *Philadelphia Newspapers*. [FN2] *See* 208 F.R.D. 273, 275 (N.D.Cal.2002) (expressly rejecting *Notaro* under the circumstances, citing the "reasonableness" inquiries of *Merrill Lynch* and *Philadelphia Newspapers*); *see also Qwest Communication*

*International, Inc. v. Worldquest Networks, Inc.*, 213 F.R.D. 418 (D.Colo.2003) (combining factors discussed in many cases to make "good cause" inquiry). The court used a balancing test, stating that "[g]ood cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Id.* at 276. The circumstances looked at by the court included how far in advance of the start of formal discovery was the motion made, how narrowly tailored are the discovery requests, what is the purpose of the plaintiff in requesting early discovery, do the requests burden the defendants, and whether the defendants are able to respond to the requests in an expedited manner. *See id.* at 276-78. The court concluded that the plaintiff's discovery was appropriate as to the requests made to the defendants, but inappropriate as to the requests made to third parties.

FN2. The "good cause" standard discussed in *Semitool* should not be confused with the Third Circuit's "good cause" standard used to decide motions for protective orders under Fed.R.Civ.P. 26(c). *See Glenmede Trust Co. v. Thompson*, 56 F.3d 476 (3d Cir.1995); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772 (3d Cir.1994). Because of the possibility of confusion, the Court will refer to the expedited discovery standard as a "reasonableness" inquiry, rather than a "good cause" inquiry.

**\*4** Using the progression of reasoning developed in *Philadelphia Newspapers, Merrill Lynch*, and *Semitool*, the "reasonableness" inquiry emerges: a district court should decide a motion for expedited discovery "on the entirety of the record to date and the reasonableness of the request in light of all of the surrounding circumstances," unless the circumstances are such that the *Notaro* factors apply. *See Merrill Lynch*, 194 F.R.D. at 624. Whether or not a preliminary injunction hearing is pending, then, has become one factor to be evaluated among many, rather than an outcome determinative fact.

### C. Applicable Standard

Defendants WDI argues that Plaintiff ETC's motion for expedited discovery should be analyzed under the *Notaro* factors because the discovery request is essentially the same relief asked for in Part IV of Plaintiff's complaint. Plaintiffs argue that the circumstances of this case are distinguishable from *Notaro* and that the motion for expedited discovery should be reviewed under a reasonableness analysis. As was stated above, the Court agrees with Plaintiffs as to which standard should apply.

The reasoning behind the *Notaro* and *Gucci* decisions was that the defendant non-moving party needed protection of the court from the plaintiff's extraordinary discovery

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

requests made extraordinarily early in the litigation process. The need for protecting the defendants from "unwarily incriminating themselves before they have a chance to review the facts of the case and to retain counsel," coupled with the substantive elements of plaintiffs' discovery requests, resulted in the appropriateness of the preliminary injunction-like factors. *See Notaro, 95 F .R.D. at 405.*

In this case, Defendants are not in need of protection. Plaintiff filed the complaint on June 9, 2003, and the pending motion on August 18, 2003. Defendants have retained counsel and are themselves sophisticated corporations. The parties have enjoyed a long contractual relationship under the "Mission: Space" agreements. Parties have filed a complaint and an answer; Defendants have had time to review the facts of the case. Further, the Court can discern no *Gucci*-like circumstances indicating that Plaintiff ETC is using the litigation as a shell game for the sole purpose of discovering the requested documents. Therefore, the strict preliminary injunction test should not apply to this case.

The Defendant is correct to point out that the discovery requests do have an element of ultimate relief to them. Given the totality of the circumstances, however, that fact is better weighed against granting the Plaintiff's motion within the rubric of an overall reasonableness test, rather than used to trigger the strictures of the *Notaro* test.

## IV. DISCUSSION

When viewed in light of the totality of the circumstances, Plaintiff's expedited discovery request is not reasonable at this time and, accordingly, Plaintiff is denied leave to conduct early discovery.

*5 Weighing in favor of Plaintiff's motion is the fact that the discovery request has not been made too far in advance of the start of formal discovery. The parties have already received their status forms and the case should be calendared relatively soon. Further, the discovery requests are not as overbroad as the requests deemed overbroad in the *Philadelphia Newspapers* case. *See Philadelphia Newspapers,* at *7-8 (denying expedited discovery because requests for five depositions, a set of interrogatories, and requests for production of documents were "wholly overbroad" and burdensome to defendant). Plaintiff ETC seeks only the production of documents "concerning any testing and analysis of the safety, functioning or performance of the ride, including all components of the Ride." Plf.'s Expedited Document Request No. 1. To the extent that Plaintiff seeks documents from third parties at his early stage, the requests may be overbroad; *see Semitool, 208 F.R.D. at 277-78* (granting expedited discovery as to requests made of opposing party, denying discovery as to requests pertaining to documents held by third parties); but

they are not so overbroad that the Court can dismiss the motion based on that factor alone.

Further weighing in favor of granting the Plaintiff's motion is ETC's contention that it will suffer harm to its reputation if the discovery is not expedited. Irreparable harm is one factor to consider in deciding this motion. Weighing against the Plaintiff, however, is the fact that the harm to ETC's reputation that may result from this ruling is the same harm that may result from the contract action in its entirety. This underscores the point raised by Defendant WDI that what Plaintiff seeks in this expedited discovery motion is close to part of the ultimate relief sought by Plaintiff in its complaint.

There are a number of factors that weigh against, and ultimately lead the Court to deny, Plaintiff's motion. First, there is no pending preliminary injunction hearing for which the parties need to prepare, rendering the need to expedite discovery less urgent. Second, the Court is unconvinced by ETC's arguments that expedited discovery is necessary so that ETC can protect the public by reviewing WDI's testing data.

Third, and most importantly, the Court is unwilling to grant Plaintiff under this motion for expedited discovery what may amount to specific performance of part of the contested contract. Defendant points out that Plaintiff's request for relief in Count IV, paragraph 78(c) is very similar to the document requests made in this motion. [FN3] But the fact that Plaintiff may have inserted what amounts to a valid request for discoverable documents in its complaint is of little consequence to this analysis. What is of consequence is how Plaintiff plans to use the testing data if discovered. In its memorandum of law at page two, in support of expedited discovery, ETC states:

> FN3. In its Complaint, Plaintiff requests specific performance in the form of "an order directing Disney immediately to provide ETC with access to any safety or testing data relating to the Ride in Disney's possession, custody or control." Plf's Complaint, Count IV, para. 78.c.

ETC needs to review the safety testing and analysis data as soon as possible to ensure that the public is not riding an unsafe entertainment ride. If ETC in fact discovers a problem in the safety testing data, it can quickly consult with Disney to try to correct any safety problems before more persons are exposed to danger.
*6 Thus, ETC wants the test data so it can participate in the safety evaluation of the Mission: Space attraction. That is precisely the specific performance ETC requests in its Complaint at Count IV, paragraph 78(a) and (b). The expedited discovery request at issue, then, goes to what may be ultimate issues in this case. That is, whether ETC has a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

(Cite as: 2003 WL 22519440 (E.D.Pa.))

contractual right to perform the testing and whether WDI is qualified to perform the testing without ETC's expertise.

For these reasons, the factors against Plaintiff's motion weigh more heavily than those in favor of it. The Court is unconvinced that it should depart from the formal discovery process. Accordingly, Plaintiff's Motion for Leave to Conduct Limited Discovery on an Expedited Basis is denied.

Plaintiff's Motion to Shorten Time to Respond to Motion is denied as moot.

An appropriate Order follows.

## ORDER

AND NOW, this 2nd day of October, 2003, upon consideration of Plaintiff's Motion for Leave to Conduct Limited Discovery on an Expedited Basis and to Shorten Time to Respond to Motion (Docket No. 12), and for the reasons set forth in the accompanying Memorandum, IT IS HEREBY ORDERED that:

(1) Plaintiff's Motion for Leave to Conduct Limited Discovery on an Expedited Basis is DENIED;

(2) Plaintiff's Motion to Shorten Time to Respond to Motion is DENIED AS MOOT.

2003 WL 22519440 (E.D.Pa.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1997 WL 639037
45 U.S.P.Q.2d 1078
(Cite as: 1997 WL 639037 (S.D.N.Y.))

Page 1

**H**

United States District Court, S.D. New York.

BENHAM JEWELRY CORPORATION and J.D. Finesse,
Inc. d/b/a/ Linea Aurea,
Plaintiffs,
v.
ARON BASHA CORPORATION, Defendant.
Aron Basha, Aron Basha Corporation, Counterclaimants
v.
Benham Jewelry Corporation, J.D. Finesse, Inc. d/b/a/ Linea
Aurea, and
Katherine Tess Jewelry, Counterclaim Defendants

No. 97 Civ. 3841(RWS).

Oct. 14, 1997.

Levisohn, Lerner, Berger, and Langsam, New York City, by
Thomas M. Furth, Peter L. Berger, Jane P. Linowitz, for
plaintiff.

Gottlieb Rackman and Reisman, New York City, by George
Gottlieb, Amy B. Goldsmith, for defendant Aron Basha
Corporation.

Tess Jewelry, Amster Rothstein and Ebenstein, New York
City, Nancy Dodderidge, for counterclaim defendant
Katherine.

SWEET, J.

*1 Defendants and counterclaim plaintiffs Aron Basha and
Aron Basha Corporation ("Basha") have moved for a
preliminary injunction precluding Plaintiffs Behnam
Jewelry Corporation ("Behnam"), J.D. Finesse, Inc. d/b/a/
Linea Aurea ("Finesse"), and Katherine Tess Jewelry
("Tess") (collectively "Counterclaim Defendants") from
manufacturing or selling certain baby shoe pendants ("baby
shoe pendants" or "pendants") which infringe Basha's
copyright. Basha has also moved for recall of any infringing
baby shoe sold by the Counterclaim Defendants to their
customers and for expedited discovery.

For the reasons set forth below, the motions are granted.

**Parties**

Basha is a corporation organized and existing under the
laws of the State of New York with a place of business on
680 Madison Avenue, New York, New York. Basha is
owned by Aron Basha, and is in the business of designing
and marketing fine jewelry, both wholesale and retail.

Finesse is a corporation organized and existing under the
laws of the State of New York, with offices at 576 Fifth
Avenue, New York, New York. Finesse is a manufacturer
and distributor of diamonds, gold and jewelry. Through the
entity Linea Aurea, Finesse distributes jewelry to stores
around the United States. Finesse is owned and run by
Robert Etessami ("Robert Etessami" or "Robert"). Linea
Aurea is managed by Robert Etessami's brother, Kevin
Etessami, ("Kevin Etessami" or "Kevin").

Tess is a company with a principal office located at 11
Middlesex Road, Great Neck, New York 11021. Tess is
owned and run by Katherine Tess Etessami, who is married
to Robert Etessami.

Behnam is a corporation organized and existing under the
laws of the State of New York, with offices at 23 West 47th
Street, New York, New York 10036. Behnam is in the
business of the manufacture and the distribution of jewelry
at the wholesale level. Jerry Fox ("Fox") is Behnam's sales
manager.

**Prior Proceedings**

On May 27, 1997, Behnam and Finesse filed a declaratory
judgment action, seeking a determination that: (a) Basha's
copyright registration of its baby shoe pendants was invalid;
(b) Basha's pendant designs are merely variants of designs
long available in the marketplace; (c) Behnam's baby shoe
pendant were not copied from any of Basha's designs and
were not substantially similar; (d) Finesse's baby shoe
pendants were not copies of Basha's designs and were not
substantially similar.

On May 28, 1997, Basha filed its answer to the declaratory
judgment action, asserting counterclaims for violation of
federal copyright and trademark laws, injury to business
reputation and dilution of trademark under the New York
General Business Law, and common law unfair
competition. Also on May 28, 1997, Basha filed the instant
motion for a preliminary injunction and temporary
restraining order, precluding Behnam and Finesse from
manufacturing, displaying or selling infringing baby shoe
pendants. On May 29, 1997, this Court granted a three day
temporary restraining order, preventing the defendants from
displaying or selling any infringing baby shoe pendants at
the JCK trade show in Las Vegas, held from May 28 to June
3, 1997.

*2 On June 16, 17, 18 and 19, the Court held an evidentiary
hearing regarding the preliminary injunction. On June 24
and June 25, the Court received additional papers from
Basha and Finesse, at which time the motion was considered
fully submitted.

**Findings of Fact**

1997 WL 639037
45 U.S.P.Q.2d 1078
(Cite as: 1997 WL 639037 (S.D.N.Y.))

Page 2

### I. Basha's Acquisition of Rights in Baby Shoe Pendants Designed by Staurino Fratelli

Basha has been in the jewelry business since 1959. He formed Aron Basha Corporation in 1991 to sell fine jewelry at the retail and wholesale levels. Basha's retail business is located on Madison Avenue in Manhattan. Since December 1996, Basha has held a license for the exclusive distribution of baby shoe pendants manufactured by Staurino Fratelli, an Italian jewelry design firm, and has owned the United States copyright for the pendants. At the wholesale level, Basha sells only Staurino Fratelli baby shoe pendants and accessories that complement the pendants. Basha also offers Staurino Fratelli baby shoe pendants for retail sale. The pendants are made from 18 karat gold, and 18 karat gold, and come in three basic shapes: (a) with a bow set on a band across the toe; (b) with a strap across the instep and a band across the toe; (c) with a strap across the instep and no band. The shoes are made of 14 karat gold or silver. Some are ornamented with french enamel in bright pastel colors and/or precious stones in various arrangements. The price of the pendants ranges from $900 to $3,600, depending on the number of diamonds set in the shoe, and the intricacy of the ornamentation.

The pendants were designed by Staurino Fratelli, an Italian firm in the business of the design, manufacture and wholesale of fine jewelry. The baby shoe pendants were first designed in April of 1994, after discussions of the concept between Luigi Staurino, David Staurino and a designer named Barbara Dragoni ("Dragoni"). Luigi Staurino instructed Dragoni to design baby shoe pendants in a specific shape, using bows or straps and colorful ornamentation. After Dragoni drafted the design, David Staurino created the first sample in plaster and then in wax. He spent two months adjusting the proportions of the original design as to length, width, and the use of a bow or strap, as well as ornamentation with precious stones and/or french enamel. Neither Dragoni nor David Staurino consulted actual baby shoes in designing the baby shoe charms.

Staurino Fratelli began marketing the baby shoe pendants in June 1994 at the Vicenza jewelry trade show in June 1994. [FN1] Subsequently, the baby shoes were prominently displayed in the window showcases at the Staurino Fratelli booth in all the major jewelry trade shows. Each of the baby shoe pendants are made according to the shapes and proportions established in the original model. Although the shoes are sold individually, Staurino Fratelli consistently advertises and displays the shoes in a group in order to create a strong impression of the design.

    FN1. The major jewelry trade shows include: the Vicenza trade show, (the "Vicenza show"), which

attracts a worldwide attendance and is held three times a year; the Valenza trade show, (the "Valenza show"), which occurs twice a year; the Basel trade show, (the "Basel show"), which attracts worldwide attendance and occurs once a year. (Collectively, the "major trade shows.")

*3 Staurino Fratelli advertised its baby shoes widely in the following magazines: Valenza Gioielli, an Italian trade magazine for jewelry, in March and April 1995, February, March and April 1996, and January 1997; Vogue Gioielli in December 1995, December 1996 and April 1997; and Vicenza Magazine in June 1996 and June 1997. These magazines are shipped to members to the jewelry trade, buyers coming to exhibitions and a number of shops around the world. Staurino Fratelli has spent approximately $100,000 on advertising.

As a result of their advertisements and trade show displays, Staurino Fratelli has received telephone orders from the United States, South America and the Far East. The first sales of Staurino Fratelli's baby shoe pendants were made to Japanese and British companies in August of 1994. Staurino Fratelli obtained a patent for their baby shoe pendant designs from the Italian Government on July 23, 1996. As a result of the number of pieces sold, the income accruing from these sales, and the amount of money invested in advertising, the baby shoe charms are now the most important product made by Staurino Fratelli.

Basha first saw Staurino Fratelli's baby shoes pendants at the Vicenza show in June 1995. Although Basha has attended the major jewelry trade shows since 1993, he had never noticed any other baby shoe pendants. Basha bought ten to fifteen baby shoe pendants from Staurino Fratelli for retail sale in his shop in 1995 and 500 pendants in 1996.

On December 23, 1996, Basha entered an agreement with Staurino Fratelli for the exclusive right to sell its baby shoe pendants in the United States. On December 26, 1996, Basha obtained copyright registration for the baby shoe pendants. The registration application stated that the registered work, entitled "It's Shoe Time," is a jewelry design authored by Staurino Fratelli first published in November of 1994. The application was accompanied by one of Basha's photographic advertisements depicting twelve different versions of Staurino Fratelli's baby-shoe pendant, six with bows and six with straps, and each ornamented differently with diamonds, french enamel or both. [FN2]

    FN2. In detail, the pendants depicted in the deposit photograph may be described as follows: (a) four pendants in enamel-covered gold with straps and bands, and seven diamonds set on the toe; (b) four pendants in enamel-covered gold with a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1997 WL 639037                                                                    Page 3
45 U.S.P.Q.2d 1078
(Cite as: 1997 WL 639037 (S.D.N.Y.))

diamond-covered bow set on a diamond-covered band across the toe; (c) two pendants, one in gold, one in silver, with a bow set on a band, entirely covered with precious stones; (d) one pendant made of silver with a strap, no band, and diamonds covering the toe only; (e) one pendant in enamel-covered gold with a diamond-covered strap across the instep, a band across the toe.

Basha displays the baby shoes prominently in the window of his Madison Avenue store. He has advertised the shoes in national magazines such as Manhattan File, Hampton magazine, Vogue Gioielli, W, Town and Country, and Parenting. Basha also mailed approximately 3,000 postcards to customers of American Express, displaying a photograph of the baby shoe pendants. The advertisements identify the pendants as baby shoes "designed exclusively for Aron Basha by Staurino Fratelli." Basha spent over $150,000 on advertising the pendants. In response to his advertisements, Basha has received numerous phone orders for the baby shoe pendants. So far in 1997, he has sold 1,200 to 1,500 pendants.

In early 1997, Basha became aware of baby shoe pendants offered for sale by Finesse d/b/a Linea Aurea, Tess and Behnam. Basha immediately instructed his counsel to send cease and desist letters to each of the alleged infringers. [FN3] The letter was sent to Tess on May 2, 1997, to Finesse on May 14, 1997, and to Behnam on May 13, 1997. On May 29, 1997 Basha obtained a temporary restraining order from this court, prohibiting Finesse, Tess and Behnam from displaying any infringing baby shoe pendants at the JCK Jewelry Trade Show which taking place in Las Vegas from May 28 to June 3, 1997, (the "Las Vegas show").

> FN3. Basha sent an additional warning to other participants in the Las Vegas show, advising that Basha's baby shoe line of jewelry products was protected by copyright. Basha also placed an advertisement in National Jeweler magazine, which is distributed to the jewelry trade twice a month, warning against infringement of Basha's copyright in the "It's Shoe Time" line of baby shoe jewelry. The warning included the photograph of the baby shoes **pendant** which was deposited with the copyright registration.

*4 Once at the Las Vegas show, Basha inspected the Finesse d/b/a Linea Aurea booth to determine whether they were abiding by the temporary restraining order issued by this Court prohibiting display or sale of infringing baby shoe pendants. In the Linea Aurea display window, Basha saw six baby shoe pendants which were made of gold, with straps or bows and a band across the toe, covered with two colors of french enamel and set with diamonds. In short, the

pendants closely resembled his own.

Basha also obtained an invoice from Behnam which indicated that, despite the restraining order, baby shoe pendants had been offered for sale and ordered by a customer.

## II. Infringement by Finesse d/b/a Linea Aurea

Finesse and Linea Aurea appear to have copied Basha's pendants by importing baby shoe pendants from another Italian company which copied the Staurino Fratelli design, and by using the imported copies to manufacture its own pendants. [FN4]

> FN4. Before relating the circumstances which establish this inference, it may be helpful to describe the two processes by which the imported baby shoe pendant could be copied.
>
> In first process, called the "lost wax" process, the model maker uses the finished piece as a physical design, and sculpts a wax model, excluding any stones set in the finished piece. The wax model is given to a caster, who attaches the model to a tree, a wax rod that holds the model in place. Model and tree are placed within a steel cylinder which is set onto a rubber base, the tree fixed into a hole in the rubber base. The caster then pours plaster of paris, which is called the "investment", around the wax model and tree. After the plaster sets, the wax model and tree are burned out of the plaster, and silver is poured into the plaster. The investment is broken open, leaving a silver model of the pendant attached to a silver rod. The silver model is filed and cleaned. If the product is to be finely crafted, the caster will drill holes in the silver cast to allow stone settings to be soldered into it at a future point. If it is not to be a fine piece of work, the caster will drill holes in the silver casting and solder in settings so that the settings will become part of the next version of the model. The caster then makes a rubber mold of the silver model by placing raw rubber in a frame, and placing the silver model between the layers of rubber. The rubber is vulcanized and cut into two halves, which become the two halves of the mold. Molten wax is shot into the rubber mold, and the investment process is repeated. The resulting plaster mold can be used to cast the finished pieces in gold, brass or silver. The size of the copy will vary according to the skill of the model-maker in carving wax, and according to variables in the vulcanizing process.
>
> The second method is called the "knock off" method. In this process any stones would be removed and the original pendant might also be

1997 WL 639037
45 U.S.P.Q.2d 1078
(Cite as: 1997 WL 639037 (S.D.N.Y.))

silver- plated to add thickness for later filing and polishing of the copy. The original is then attached to a sprue, a rod, and placed within layers of raw rubber which is vulcanized. The lost wax process is then utilized to create a silver model and a plaster mold. The finished casts are filed and polished, and stones are set. The dimensions of the copy would be smaller than those of the original.

In 1996 Kevin Etessami imported five to ten baby shoe pendants manufactured by an Italian jewelry manufacturer, Mario Della Carbonare, also called MDC (the "MDC baby shoe pendants"), which had been found to be infringing copies of Staurino Fratelli's designs by a trade fair jury at the Vicenza show in June of 1996. The trade fair jury is an organization that polices the use of jewelry designs at trade shows. The jury found the MDC shoes to be infringing copies, and ordered MDC to remove the pieces from their exhibit and the show catalogue and to cease any sales of the pieces. David Staurino later learned that, although MDC had removed the baby shoes from their window display, they had continued to offer the shoes for sale. [FN5] In September of 1996, Finesse, through Linea Aurea, purchased these pendants from MDC and began to sell the imported MDC baby shoe pendants in the United States.

> FN5. Staurino Fratelli sent MDC a warning letter dated July 4, 1996, directing MDC to cease production, exhibition or sales of its baby shoe jewelry, and, according to David Staurino, continues to pursue its claim against MDC in Italy.

The Etessamis was unsuccessfully attempted to import the actual Staurino Fratelli pendants. In January of 1997, Kevin Etessami visited the Staurino Fratelli booth at the Vicenza trade show with his sister-in-law Katherine Tess and expressed an interest in marketing the Staurino Fratelli baby shoe pendants in the United States. Etessami did not mention that he was already importing the MDC baby shoe pendants. David Staurino informed Etessami that the exclusive agreement with Aron Basha prevented Staurino Fratelli from selling the shoes to other American distributors. Etessami then remarked that he might distribute the shoes in the Far East and South America, and placed an order for four models. Katherine Tess also ordered some baby shoe pendants for her personal use. Two weeks later, Staurino Fratelli sent Etessami a letter declining to ship his order because it conflicted with agreements with other Staurino Fratelli distributors in the Far East, South America, as well as the agreement with Basha in the United States.

As regards the Etessamis manufacture of pendants in the United States, conflicting testimony was heard as to whether the Etessamis copied the MDC copy of Staurino Fratelli's design, or whether they used pendant designs which had

been created independently of the Staurino Fratelli designs to manufacture their pendants.

*5 Robert Etessami testified that in late 1984, he had seen a photograph of a baby shoe pendant in Sotheby's catalogue, and asked a designer named Mario Archangel ("Archangel") to create a baby shoe pendant design of baby shoe pendants. Between 1984 and 1996, the resulting models were not used.

Archangel testified that he was approached by Robert Etessami in 1984 to design a baby shoe pendant based on a photograph in a Sotheby's catalogue. Archangel created thirteen drawings based on the Sotheby's photograph, and nine silver models based on the drawings. He gave the drawings and models to Robert Etessami in 1985. Archangel had no further conversations with Robert regarding baby shoes until the fall of 1996, when Robert called and told Archangel that Finesse had imported some baby shoe pendants from Italy and intended to produce pendants from the baby shoe models made in 1985.

Kevin and Robert Etessami testified that the Archangel models were used to manufacture Linea Aurea's pendants in 1996. However, the weight of testimony by both the Etessamis is lessened by their self-interest in proving independent creation of the pendants. Moreover, certain discrepancies in other parts of Kevin Etessami's testimony further weakened his credibility. [FN6]

> FN6. For example, Kevin Etessami testified that he saw Basha's expert witness, Isaac Ainetchi, at the Las Vegas show with Basha. However, Ainetchi established that during the show he was not in Las Vegas.

Daniel Baez, the mold-maker employed by Kevin Etessami testified that he made baby shoe pendant molds for the Etessamis sometime before December, 1996. However, he could not positively identify the Archangel models as the basis for those molds. Baez also testified that one of the models from which molds were made for the Etessamis has been lost since February or March, 1997.

The pendants created from this missing model closely resemble one of the imported MDC pendants which in turn appear to be a copy of Staurino Fratelli's designs. Staurino Fratelli makes a gold pendant with a diamond-covered bow set on a diamond-covered band across the toe. The MDC pendant is made of gold, with a plain bow set on a diamond-covered band across the toe. The Linea Aurea pendant is made of gold, with a diamond-covered bow set on a diamond-covered band across the toe. All three pendants are very similar in their rounded proportions and size. The Linea Aurea pendant is very slightly smaller than the MDC pendant. The similarity between the MDC

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1997 WL 639037
45 U.S.P.Q.2d 1078
(Cite as: 1997 WL 639037 (S.D.N.Y.))

Page 5

pendant and the **Linea Aurea** pendant raises the inference that the Linea **Aurea** pendants were manufactured by copying the MDC pendant rather than using models made by Archangel.

According to testimony of an expert in the jewelry business, a credible and qualified witness, the Linea Aurea pendant was copied from the MDC pendant. The smaller size of the Linea Aurea pendant would result from the copying process, during which the copy of the baby shoe would lose 10 percent of its weight and mass.

The production of Linea Aurea's U.S. manufactured baby shoe pendants was completed sometime between August or September and December of 1996. Kevin Etessami first sold the U.S. manufactured pieces in December of 1996. He first displayed the pieces at a jewelry trade show in Orlando in early February of 1997. Etessami testified that he has sold approximately $100,000 worth of baby shoe pendants, both imported and U.S. made, between September 1996 and May 1997.

*6 In May 1997, the Etessamis published an advertisement for Linea Aurea jewelry in the brochure for the Las Vegas Show. The photograph in Linea Aurea's ad included two baby shoe pendants, one of which was the MDC pendant. On May 14, Finesse received a cease and desist letter from Basha. After issue of the temporary restraining order from this Court, Kevin Etessami removed the MDC shoes from his display at the Las Vegas show, but he continued to display the Linea Aurea made baby shoe pendants. As described above, the displayed pendants closely resembled those carried by Basha.

### III. Infringement by Katherine Tess Jewelry

Tess sells accessories and jewelry in a business which she began in Great Neck Long Island two years ago. As set forth above, in January 1997, Tess visited the Staurino Fratelli both at the Vicenza show with her brother-in-law, Kevin Etessami. During the visit Tess attempted to purchase several Staurino Fratelli pendants as part of Kevin Etessami's larger order. However, when Kevin's order was canceled, Tess' order was also not filled.

In January or **February** of 1997, Tess saw one of Basha's promotional **postcards** depicting baby shoe pendants. In March or April **1997**, Tess obtained 29 baby shoe pendants from Kevin Etessami and prepared a post card to advertise her own business. Kevin Etessami testified that eight of the shoes depicted in the postcard were made from Archangel models, and thirteen of the shoes were made from the model lost by the mold-maker, Daniel Baez. The remaining eight pendants were purchased from an Italian supplier, who was also the supplier of the MDC pendants.

Tess' postcard resembled Basha's in the arrangement of the pendants. Both postcards show a thick chain across the top linking the pendants. Both carry the name of the business in fancy script above the chain. Both display an array of other pendants below the chain, although Basha's pendants are linked by a fine gold chain and Tess' pendants are not. The cards are also approximately the same size, although Tess' is slightly narrower.

The individual pendants depicted in Tess' postcard, which she obtained from Linea Aurea, also resemble pendants depicted in Basha's postcard:

(a) sixteen of Tess' pendants are made of enamel-covered gold, with a diamond-covered bow and contrasting color on toe and heel; several of Basha's pendants meet that same description;

(b) three of Tess' pendants are made of enamel-covered gold, with a diamond-covered strap, and a gold band across the toe; several of Basha's pendants do as well;

(c) two of Tess' pendants have a diamond-covered strap and a plain gold or silver surface; none of the pendants in Basha's postcard meet that description, but Basha does carry such a pendant;

(d) three of Tess' pendants have a bow set on a band across the toe and are completely covered with diamonds, or are covered with diamonds on the bow and toe only; several of Basha's pendants have a bow set on a band and are completely covered with diamonds, although none are covered with diamonds on the bow and toe only.

*7 On May 2, 1997 Tess received a warning letter from Basha regarding infringement of his copyright in the baby shoe pendants and of his advertisement design. In response, Tess entered an agreement with Basha that she would no longer offer baby shoe pendants for sale.

### V. Behnam's Infringement

Jerry Fox, the sales manager of Behnam jewelry responsible for developing a new baby shoe product for Behnam, testified that he first thought of marketing baby shoe pendants in 1996 as a result of a trend in baby jewelry. Fox had attended the Vicenza show in January of 1996 and the Basel show in April of 1996 at which Staurino Fratelli baby shoe pendants were prominently displayed. Behnam does not itself manufacture jewelry, but contracts with model makers and casters outside the firm. In September of 1996 Fox asked a designer named Christine Szeto to create baby shoe pendants, and gave her some sketches he had made. Fox's sketches were not presented into evidence and he did not know whether Szeto used the sketches or other sources to create her designs. Behnam did not make Szeto available for testimony. Moreover, there were several differences between the Szeto designs and some of the finished Behnam baby shoes. For example, one Szeto design depicted a metal

bow and stones set around the opening of the baby shoe, but the corresponding finished Behnam pendant had stones set in the bow, but not at the opening. This latter arrangement of stones more closely resembles the Staurino Fratelli design than designs by Szeto. Finally, no testimony from the model-maker or caster of the maker of the Behnam shoes was offered which would establish the use of the Szeto designs.

Behnam's first sales of the baby shoes were to Macy's of California in November of 1996. All its shoes were made in 14 karat gold and the average retail selling prices of Behnam's shoes was about $199.

In April of 1997, Behnam sent a mailing of approximately 6,000 postcards depicting six of its baby shoe pendants. A comparison of the pendants in the Behnam postcard to those carried by Basha reveal a strong resemblance, as follows:
    (a) two of Behnam's pendants are made of gold, with a bow set on a band across the toe, and diamonds covering both bow and band, one with an emerald set in the center of the bow; Basha offers a gold baby shoe pendant with a bow set on a band across the toe, with diamonds covering bow and band;
    (b) two of Behnam's pendants are made of gold, with a diamond-covered strap across the instep, a band across the toe, and diamonds set on the toe, four in a cluster on the right hand side, and three set in a triangle pattern on the left hand side; Basha offers a gold pendant with a diamond-covered strap across the instep, a band across the toe, and diamonds set on the toe in the identical pattern, although Basha's pendant is also covered with french enamel in two colors;
    (c) one of Behnam's pendants is made of gold, with a strap across the instep and diamonds covering the toe; Basha offers a gold pendant with a strap across the instep and diamonds covering the toe;
    *8 (d) one of Behnam's pendants is made of gold, with a diamond-covered strap across the instep and a band on the toe; Basha offers a pendant made of gold with a diamond-covered strap across the instep, although there is no band on the toe.

Finally, Behnam's pendants are similarly proportioned and approximately the same size as those carried by Basha.

On May 13, 1997, Behnam received a cease and desist letter from Basha's attorneys, directing it to stop marketing its baby shoe pendants and to send all records to Basha's counsel. After learning of the temporary restraining order issued by this Court, Fox directed the Behnam staff at the Las Vegas show to remove display photographs and printed material regarding the shoes, and to remove the shoe pendants themselves from the showcase. However, an order form from Behnam dated June 1, 1997, the period of the Las Vegas show, lists six different types of baby shoe pendants which were ordered by one of Behnam's customers.

## VI. Affect of Infringement on Basha

Basha had received numerous complaints from his customers and authorized retailers regarding the presence of "knock-offs" being sold in the marketplace at a lower price than Basha's baby shoe pendants. The baby shoe pendants marketed by Finesse, Tess and Behnam are manufactured with gold of lesser quality, fewer precious stones and their design is less intricate and detailed. Basha reports that consumers who are familiar with his baby shoes will believe that Basha has gone into the lower market business, and that the confusion and complaints caused by the alleged infringement has reduced his business by 30 percent. Several exclusive retailers have informed him that they will not market his baby shoe pendants if knock-offs are generally available in the marketplace.

## Conclusions of Law

Basha has asserted his request for injunctive relief based on his counterclaim for copyright infringement and has not pressed or briefed his claims for trade dress infringement, dilution or unfair competition. Injunctive relief against a putative infringer should be granted when the moving party shows: (1) either (a) likelihood of success on the merits, or (b) sufficiently serious questions on the merits and a balance of hardships tipping decidedly in plaintiff's favor; and (2) likelihood of irreparable injury. *Richard Feiner and Company, Inc. v. Turner Entertainment Co., MGM/UAU, 98 F.3d 33, 34 (2d Cir.1996); Fisher-Price, Inc. v. Well-Made Toy Manufacturing Corp., 25 F.3d 119, 122 (2d Cir.1994); Topps Company, Inc. v. Gerrit J. Verburg Co., No. 96 Civ. 7302, 1996 WL 719381 (S.D.N.Y. Dec.13, 1996).*

## I. Basha has Demonstrated Likelihood of Success in His Infringement Claim

In order to establish a claim for copyright infringement, a plaintiff must show ownership of a valid copyright and the defendant's infringement by unauthorized copying. *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1002 (2d Cir.1995); Fisher-Price, 25 F.3d at 122-23; Laureyssens v. Idea Group, Inc., 964 F.2d 131, 139 (2d Cir.1992); Roger v. Koons, 960 F.2d 301, 306 (2d Cir.1992).* To prove infringement, a plaintiff must demonstrate that (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's. *Fisher- Price, 25 F.3d at 122-23; Laureyssens, 964 F.2d at 140.*

## A. Basha's Copyright is Valid and Basha has Standing to Bring an Infringement Action as to All Staurino Fratelli

1997 WL 639037                                                                                              Page 7
45 U.S.P.Q.2d 1078
(Cite as: 1997 WL 639037 (S.D.N.Y.))

*Pendants*

*9 Apart from certain exceptions not applicable here, a copyright claimant must obtain a registration from the United States before bringing suit for copyright infringement. 17 U.S.C.A. § 411 (West 1996); *Pristine Industries, Inc. v. Hallmark Cards, Inc.*, 753 F.Supp. 140, 148 (S.D.N.Y.1990) (valid federal copyright registration is a necessary element of infringement action).

Basha obtained a single registration for the baby-shoe pendants. The application stated that the work is a jewelry design entitled "It's Shoe Time", authored by Staurino Fratelli and first published in November of 1994. The application was accompanied by a photograph depicting twelve different baby shoe pendants.

The Copyright statute permits registration of multiple related works under a single copyright application. [FN7] 17 U.S.C.A. § 408(c) (West 1996). Single registration of multiple works was established in the 1976 amendment to § 408(c) in order to encourage authors to seek copyright registration. The House Report to the 1976 amendment states:

> FN7. The section states in relevant part: The Register of Copyrights is authorized to specify by regulation the administrative classes into which works are to be placed for purposes of deposit and registration, and the nature of the copies or phonorecords to be deposited in the various classes specified. The regulations may require or permit, for particular classes, ... a single registration for a group of related works. 17 U.S.C.A. § 408(c)(1) (West 1996).

The provision empowering the Register to allow a number of related works to be registered together as a group represents a needed and important liberalization of the law now in effect. At present the requirement for separate registrations where related works or parts of a work are published separately has created administrative problems and has resulted in unnecessary burdens and expenses on authors and other copyright owners. In a number of cases the technical necessity for separate applications and fees has caused copyright owners to forego copyright altogether. Examples of cases where these undesirable and unnecessary results could be avoided by allowing a single registration include ... *a group of related jewelry designs* ...
House Report on the 1976 Amendment of the Copyright Act, H.R.Rep. No. 1476, 94th Cong., 1st Sess. (1976) *reprinted in* 17 U.S.C.A. § 408 at 466 (West 1996) (emphasis added). The regulation governing single registration, set forth at 37 C.F.R. § 202.3, states in relevant part:

(i) *Registration as a single work.* (1) For the purpose of registration on a single application and upon payment of a single registration fee, the following shall be considered a single work: (A) in the case of published works: All copyrightable elements that are otherwise recognizable as self-contained works, that are included in a single unit of publication, and in which the copyright claimant is the same ...
37 C.F.R. § 202.3(b)(3)(i)(A) (1996).

The Counterclaim Defendants assert that, because the baby shoe pendants are sold separately, they are not eligible for registration as a single work. They cite two cases in support of this position: *Tabra Inc. v. Treasured Paradise Designs, Inc.*, 15 U.S.P.Q.2d 1234 (N.D.Cal.1990) and *Bruce & Company v. B.H. MultiCom. Corp.*, ---F.Supp.---- No. 96 Civ. 8083, 964 F.Supp. 265, 1997 WL 277998 (N.D.Ill. May 15, 1997). However, both cases turn on the question of relatedness of design rather than any evidence that the designs at issue were sold as a single unit.

*10 In *Tabra*, the plaintiff's copyright was found invalid because the jewelry designs were not related works; the issue of publication as a "single unit" was not even raised. The plaintiff in *Tabra* included 250 jewelry designs in six separate copyright registrations, grouped by year only, without any attempt to connect the jewelry by distinguishing characteristics. The court found that the jewelry pieces covered by each of these registrations were a "conglomeration of designs" not necessarily bear any resemblance to each other: "The only apparent relationship is that many pieces are earrings and have a primitive look." *Tabra*, 15 U.S.P.Q.2d at 1237. In contrast, Basha registered twelve closely related designs in its single application. All the pieces are baby shoe pendants shaped according to the specific dimensions created by Staurino Fratelli.

In *Black*, the defendant moved for summary judgment on the grounds that the plaintiff had defectively registered a group of unrelated rings in a single application. The Court agreed that the identifying materials submitted with the registration depicted "a conglomeration of ring designs which bear no resemblance to each other." *Black*, 964 F.Supp. 265, 1997 WL 277998 at *4. The plaintiff countered that the relatedness requirement set forth in 17 U.S.C. § 408(c) was satisfied because "the works are included in a 'single unit of publication' ... [where] the rings are offered for sale together as a line and appear together in their marketing material ..." The court found that "[w]hether the rings are sold separately or together as a line and whether that is sufficient" presented an issue of material fact, and denied summary judgment. *Id.* The court's reasoning in *Black* does not establish that group sale is a condition precedent for single registration of related works. Rather, the court considered without deciding whether

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1997 WL 639037
45 U.S.P.Q.2d 1078
(Cite as: 1997 WL 639037 (S.D.N.Y.))

Page 8

"single unit of publication" would be an adequate proxy for the relatedness requirement of § 408(c). *Id.*

One other case has addressed the validity of a single registration for multiple related works. In *Original Appalachian Artworks v. Toy Loft,* 489 F.Supp. 174 (N.D.Ga.1980), *aff'd,* 684 F.2d 821 (11th Cir.1982), the plaintiff brought an infringement action regarding a group of soft sculpture dolls registered under the title "The Little People". Like Basha's baby-shoe pendants, the assorted dolls were variations on the same basic design. Although they were sold individually, the dolls were marketed as a single line. The plaintiff corporation would ship its dolls with written information suggesting the manner in which the dolls should be displayed and sold. The court found that the single registration number established a valid copyright for all of the plaintiff's doll designs:

> The court has ... concluded that the defendants have infringed plaintiff's copyright ... In reaching this conclusion, the court notes that the plaintiff's copyright registration number VA 35-804 is sufficient to cover all of the differently-styled "Little People" that the plaintiff is presently manufacturing. *See* 37 C.F.R. 202.3(b)(3).

*11 *Id.* at 180.

Like the dolls in *Original Appalachian,* Basha's baby shoe pendants are marketed as a single line. Basha consistently displays the pendants in a group in his shop window and advertisements. The pendants are variations on the same basic design; they are related by size, shape, proportion, use of bows or straps, and ornamentation with diamonds or french enamel. Thus, the pendants satisfy the relatedness requirement of § 408(c), and, as in *Original Appalachian,* this relatedness in appearance permits single registration of multiple works.

This conclusion comports with the purpose of § 408(c), which has been "consistently described as a 'permissive' registration provision." Jane C. Ginsburg, *Copyright for the Nineties,* (4th ed.1993) at 381. The language and legislative history of the statute indicates that the only requirement for single registration of multiple works is "relatedness." There is no evidence in legislative history or case law that the "published in a single unit" language in 37 C.F.R. § 202.3 is meant to constitute an additional condition precedent to valid registration. [FN8] In fact, this conclusion is contradicted by the House Report on the 1976 amendment of 17 U.S.C. § 408(c), which explicitly states that the purpose of the amended section is to eliminate the "requirement of separate registrations where related works ... are published separately", thereby encouraging registration of such works as related jewelry designs. H.R.Rep. No. 1476 *reprinted in* 17 U.S.C.A. § 408 at 466. If the works satisfy the requirement of relatedness, as in the case of the Basha's baby-shoe pendants, an additional

requirement that the works also be "published in a single unit" would undermine the purpose of the statute.

> FN8. The regulatory language appears to have been drafted in order to protect copyrightable elements included in multi-media works, such as movies and computer games. *See* 2 Melville B. Nimmer, *Nimmer on Copyright,* § 7.18[C][3] (1994) & n. 26 (noting that certain courts have "accorded too much weight to the formality of registration").

Counterclaim defendants also contend that not all of Basha's pendants are covered by the copyright, because the photograph which Basha appended to his application only included twelve versions of the shoe. A copyright registrant is required to submit two complete copies of the best edition of the work within three months after the date of such publication. 17 U.S.C.A. § 407(a) (West 1996):

> The requirement of *complete* copies ... means that the copies as deposited must be fully as complete in all elements ... as were the copies theretofore published. Thus if only a ... portion of the published work is deposited (such as the first of several published chapters) this will not comply with the statutory requirement of complete copies.

2 *Nimmer,* § 7.17[E][2][a] at 7-183 (1991) (emphasis in original). [FN9]

> FN9. If the work is unwieldy, the registrant may deposit identifying material instead of copies. *Id.* § 408(c); House Report 1476 *reprinted in* 17 U.S.C.A. § 408 at 466; 2 *Nimmer,* § 7.17[E][2][e].

Failure to deposit a complete copy of the work does not forfeit copyright protection, but it is a prerequisite for bringing an infringement action. *Whimsicality, Inc. v. Rubie's Costume Co., Inc.,* 891 F.2d 452, 453 (2d Cir.1989); *Fonar Corporation v. Magnetic Resonance Plus, Inc.,* 920 F.Supp. 580, 513 (S.D.N.Y.1996). However, errors contained in copyright registration, if committed without deceptive intent, are harmless and do not invalidate the copyright. *Thomas Wilson & Co. v. Irving J. Dorfman, Co.,* 433 F.2d 409, 412 (2d Cir.1970) (failure of second copyright application to refer to first, while "potentially more serious", would not bar copyright protection because made innocently); *Gund, Inc. v. Swank, Inc.,* 673 F.Supp. 1233, 1237 (S.D.N.Y.1987) (error in date of creation and failure to refer to stuffed lion as derivative work not fatal to standing to bring action); *Data General Corp. v. Grumman Systems Support Corp.,* 825 F.Supp. 340 (D.Mass.1993) (several clerical errors in deposit copy of software program not fatal to standing to bring action); *See also* 2 *Nimmer,* § 7.20 (discussing long history of courts permitting plaintiff to bring infringement action where errors in registration were unaccompanied by fraud.) Thus, Basha's copyright in the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

pendants omitted from the deposit photograph is valid, and because there is no evidence that Basha submitted the photograph with an intent to deceive, his standing to bring this action is intact as to all pendants.

*B. Evidence of Actual Copying*

*12 A plaintiff in a copyright infringement action may prove actual copying either by direct evidence, or by indirect evidence showing the defendant's access to the copyrighted work and similarities that are probative of copying between the works termed "probative similarity". *Fisher-Price,* 25 F.3d at 123; *Laureyssens,* 964 F.2d at 140.

Access is established either by demonstrating that (1) the infringed work has been widely disseminated, or (2) a particular chain of events exists by which the alleged infringer might have gained access to the copyrighted work. *Repp v. Webber,* 892 F.Supp. 552, 556-57 (S.D.N.Y.1995). The term "probative similarity" is used to distinguish the analysis used to determine whether copying occurred from the substantial similarity analysis used to determine whether that copying constitutes infringement.

Probative similarity analysis requires consideration of the entire work, while substantial similarity analysis requires comparison only of the protected features. *Fisher-Price,* 25 F.3d at 123 (citing Alan Latman, *Probative Similarity as Proof of Copying: Toward Dispelling Some Myths in Copyright Infringement,* 90 Colum.L.Rev. 1187, 1214 (1990)); *Kurt S. Adler, Inc. v. World Bazaars, Inc.,* 897 F.Supp. 92, 93 (S.D.N.Y.1995); *Tienshan, Inc. v. C.C.A. International,* 895 F.Supp. 651, 656 (S.D.N.Y.1995); 3 Nimmer, § 13.03 [[A], at 13-29 (1996).

*1. Actual Copying by Finesse*

As to one particular gold and diamond bowed pendant, direct evidence was presented that Finesse d/b/a Linea Aurea copied Staurino Fratelli's design. The Etessamis acknowledged importing baby shoe pendants manufactured by MDC in Italy, which a jewelry trade show jury had found to be copies of Staurino Fratelli's design. After importing MDC pendants, Linea Aurea themselves manufactured baby shoe pendants. Although the Etessamis maintained that they had used models created in 1985 by the designer Archangel to manufacture their pendants, they had lost the model used to create one particular line of pendants and their mold-maker could not recall whether he had used the Archangel model to manufacture those pendants. Comparison of the Linea Aurea pendant made from this missing model and an MDC pendant reveals an almost identical appearance; both are made of gold, with a diamond-covered bow set on a band across the toe, and are similarly proportioned, although the Linea Aurea shoe is very slightly smaller than the MDC shoe. Both of these

pendants are almost identical to one made by Staurino Fratelli. A reliable expert witness testified that the Linea Aurea gold pendant was copied from the MDC pendant, which would result in a slightly smaller size.

As to the rest of Linea Aurea's pendants, indirect evidence of copying by Linea Aurea was provided by a demonstration of access and probative similarity. Linea Aurea had access to the baby shoe pendants both in Europe and the United States. Since 1994 Staurino Fratelli has displayed its baby shoe pendants at all the major European trade shows, as well as in extensive advertising in European and specifically Italian jewelry trade magazines. Both Etessamis attended several of the European shows. The Etessamis also receive the trade magazines cayrrying Staurino Fratelli's advertisements. [FN10] Kevin Etessami visited the Staurino Fratelli Booth at the Vicenza show in January 1997 and ordered several baby shoes. The Etessamis also had access to the baby shoe pendants in the United States through Basha's displays at trade shows and advertisements in various magazines and postcards. This evidence supports a determination that the Etessamis had access to the Staurino Fratelli designs. *See Kurt S. Adler,* 897 F.Supp. at 93-94 (finding access established by the display at two trade shows attended by defendant).

> FN10. Although Robert Etessami denied having seen any ads for Staurino Fratelli baby shoe pendants, his testimony carries less weight because he is a self-interested witness.

*13 Probative similarity has been established between Basha's pendants and those produced by Linea Aurea as follows:

(a) one of Basha's pendants is a gold shoe with a diamond-covered bow set on a diamond-covered band across the toe. Linea Aurea imported a pendant made by MDC which is gold, with a diamond-covered bow set on a plain band across the toe. Linea Aurea also manufactured a gold shoe pendant with a diamond-covered bow set on a diamond-covered band across the toe. Both the imported MDC pendant and Linea Aurea manufactured pendant are similar in proportion to the Basha pendant, albeit slightly smaller in size. The MDC pendant carries its trademark inside on the sole of the shoe. The Linea Aurea manufactured pendant carries a mark designating its gold content also inside on the sole. The Basha shoe also has a trademark stamped inside on the sole of the shoe, albeit slightly closer to the heel;

(b) one of Basha's pendants is made of enamel-covered gold and has a diamond- covered bow set on a diamond-covered band running across the toe. The toe of the shoe is covered in red french enamel, and black enamel covers the sides and back. A trademark is stamped on the inside sole of the shoe

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

towards the heel. The Linea Aurea pendant is also made of enamel-covered gold. The bow is white french enamel, with a diamond set on the center knot. The toe of the shoe is covered in red french enamel and dark blue enamel covers the sides and back. There is no markstamped inside the shoe.

(c) one of Basha's pendants is made of plain gold with a diamond-covered strap across the instep. There is no band or ornamentation on the toe. A trademark is stamped on the inside sole of the shoe towards the heel. The Linea Aurea pendant is also made of gold with a diamond-covered strap across the instep. There is a plain gold band across the toe. There is no trademark stamped on the inside sole.

(d) one of Basha's pendants is made of enamel-covered gold and has a diamond- covered strap across the instep and a gold band across the toe. Black enamel covers the toe, and white covers the sides and back. There is a trademark stamped on the inside sole near the heel. The Linea Aurea pendant is made of enamel-covered gold with a silver strap across the instep and blue enamel on the toe, sides and back. There is a trademark stamped on the inside sole near the heel.

In general, the Linea Aurea pendants are similarly proportioned as the Basha pendants, and follow two of the three basic variations established in Staurino Fratelli's designs, either bow set on a band across the toe, or strap across the instep with a band across the toe. Besides the differences noted above, the Linea Aurea pendants are smaller in size. However, the sum of these many similarities is sufficiently probative to conclude that Linea Aurea actually copied its pendants.

Linea Aurea attempts to rebut Basha's prima facie case of actual copying by asserting that its pendants were made from designs independently created by Archangel in 1984. "If the plaintiff meets its burden of establishing access and similarity, the defendant must then come forward with credible evidence of independent creation to negative the inference of copying." *Arrow Novelty Company Inc. v. EYCO National Corp.,* 393 F.Supp. 157, 160 (S.D.N.Y.1974) *aff'd* 515 F.2d 504 (2d Cir.1975). However, "even with such evidence from the defendant, there may be such substantial similarity that no other explanation other than copying is reasonably possible." *Novelty Textile Mills Inc. v. Joan Fabrics Corp.,* 558 F.2d 1090, 1092 n. 2 (2d Cir.1977); *Imperial Textile Co. of New York, Inc. v. Amitex Fabrics Inc.,* 682 F.Supp. 18, 19 (S.D.N.Y.1987); *Arrow Novelty,* 393 F.Supp. at 160. 3 *Nimmer,* § 13.01[B] at 13-13.

*14 In *Imperial Textile,* the defendant presented several witnesses who testified that it had independently created its fabric design, which contained the same pattern and colors as the plaintiffs most successful design. The court accepted

the defendant's contention that the source of its pattern came from in-house fabrics the defendant already had on hand, but rejected the defendant's conception that the spacing concept, size, selection of colors and arrangement of the pattern were the result of independent creation. The court based its rejection on strong evidence of access and a similarity so close that "to conclude otherwise would be to find coincidence that defies belief." *Imperial Textile,* 682 F.Supp. at 19. The facts in the instant case are similar. While the Etessamis may have used Archangel's models for the basic slipper used in the baby shoe pendants, the ornamentation with french enamel in bright colors, and diamonds arranged on bow or strap, are too similar to the design choices made by Staurino Fratelli to be mere coincidence. The Etessamis did not decide to use Archangel's models until after Kevin Etessami began importing the MDC copies of Staurino Fratelli's design. Moreover, the Etessamis have never produced those of Archangel's designs which differ from the Staurino Fratelli designs, such as a bootie version, a slipper without a strap or bow, and a slipper with a bow on the side of the strap. This chain of circumstances weakens the Etessamis assertions of independent creation, and re-establishes the conclusion that Linea Aurea's pendants were created to imitate Staurino Fratelli's designs.

*2. Actual Copying by Tess*

Copying by Tess was established by indirect evidence of access and probative similarity. Evidence of access included Tess' visit to the Staurino Fratelli booth at the Vicenza show in January 1997 with her brother in law Kevin Etessami, when she attempted to order Staurino Fratelli baby shoe pendants at that time. Also, Tess admitted seeing Basha's promotional postcard sometime in January or February 1997. It is also probable that Tess would have seen Basha's advertisements in various magazines.

In March or April 1997, Tess produced a promotional postcard that resembled Basha's both in design and in the individual shoes depicted. She obtained baby shoe pendants from Kevin Etessami and arranged them within the photograph in a chain across the top of the picture, as Basha had done in his postcard. She inserted her business' name above the chain in fancy script similar to that used by Basha. Tess' postcard is almost identical in size and shape to Basha's. While the shoes in the bottom half of Tess' postcard are loosely grouped, rather than linked by a fine gold chain as in Basha's, this difference does not outweigh the similarity between Tess' other design decisions and the choices used by Basha. Moreover, 21 of the 28 pendants in Tess' postcard were manufactured by Linea Aurea, and these pendants closely resembled Basha's.

*3. Actual Copying by Behnam*

1997 WL 639037
45 U.S.P.Q.2d 1078
(Cite as: 1997 WL 639037 (S.D.N.Y.))

Page 11

**\*15** Copying by **Behnam** was also established by indirect evidence. Behnam obtained access to Basha's pendants when Fox attended the Vicenza show in January 1996 and the Basel show in April 1996 and read the catalogues produced for those trade fairs. While Fox denied reading some of the magazines in which the Basha pendants were advertised, he acknowledged that it was his job to keep abreast of trends in the jewelry trade. Given the pervasive advertising of the pendants by both Basha in the United States and Staurino Fratelli in Europe, it is unlikely that Fox could have failed to note their designs. Finally, Behnam used six pendants for a promotional mailing which closely resembled Basha's shoes. Because not all of Behnam's pendants are similar to those of Basha, the choice of those which most closely resemble the Staurino Fratelli designs raises the inference that Behnam had access to Basha's ads and was attempting to benefit from the popularity of his pendants.

As detailed above, probative similarity has been established between the six Behnam pendants depicted in the post card and Basha's pendants, as follows:

(a) several of Basha's pendants are made of enamel-covered gold with a diamond-covered strap across the instep, contrasting colors of enamel on toe and back, and seven diamonds set in the enamel on its toe, four in a cluster on the right and three scattered on the left. Behnam has two pendant with a diamond-covered strap across the instep and diamonds arranged in an identical manner to the stones on Basha's pendants, although Behnam's pendants are not coated with enamel, and one is silver rather than gold;

(b) one of Basha's pendants is made of gold with a diamond-covered bow set on a diamond-covered band across the toe. Behnam has two gold pendants with a diamond-covered bow, although there is no band across the toe, and one of the pendants has a colored stone set in the center knot of the bow;

(c) one of Basha's pendants is made of gold, with a plain strap across the instep and diamonds covering the toe only. Behnam also carries a gold pendant with a plain strap across the instep and a diamond-covered toe;

(d) one of Basha's pendants is gold with a diamond-covered strap across the instep and no decoration on the toe. Behnam carries a pendant made of gold with a diamond-covered strap and a plain gold band across the toe.

Finally, both Basha's and these six of Behnam's pendants are similar in their rounded proportions, although the Behnam pendants are slightly smaller and have a circular opening rather than an oval opening, as in the Basha pendants. This evidence of access and similarity leads to a conclusion that the six shoes depicted in Behnam's postcard

were copied from Staurino Fratelli's design. [FN11]

> FN11. The other 42 Behnam pendants differ from Basha's because of their smaller size, different ornamentation or both.

Behnam attempts to rebut this conclusion with the defense of independent creation, but its evidence is unpersuasive. Behnam did not offer testimony by the designer, "the one person who knows first hand whether [the pendants] were copied." *Tienshan*, 895 F.Supp. At 658. Behnam's witness, Fox, testified that he provided sketches of baby shoes to a designer, but could not assert from first hand knowledge that the designer had used only his sketches when preparing her drawings. The details of Behnam's pendants differed from the details in the designer's drawings, but resembled the details in Staurino Fratelli's pieces. As set forth above, Fox had ample opportunity to observe the Staurino Fratelli pendants at trade shows and in Basha's advertisements. It is not unlikely that his designer, also a member of the jewelry trade, would have had equal access to Staurino Fratelli's designs.

### C. Substantial Similarity

**\*16** Once actual copying is established, Basha must show that "the copying amounts to an improper appropriation by demonstrating that substantial similarity to protected material exists between the two works." *Laureyssens*, 964 F.2d at 140. Analysis of substantial similarity requires a "sharper focus" than that of probative similarity, for it includes only the protectible elements of the two works. *Fisher Price*, 25 F.3d at 123. "That is, the plaintiff must show that the defendant appropriated the plaintiff's particular means of expressing an idea, not merely that he expressed the same idea." This determination is not an exact science. *Id.*

In most cases the test for substantial similarity is the "ordinary observer test", which determines whether an ordinary lay observer would recognize the alleged copy as having been appropriated from the copyrighted work. *Knitwaves*, 71 F.3d at 1002 (citing *Folio Impressions*, 937 F.2d at 766); *Laureyssens*, 964 F.2d at 141 (citing *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960) (L.Hand., J.)). Where, as here, the works contain both protected and unprotected elements, the Second Circuit applies the "discerning ordinary observer test", which examines similarity between the protectible elements of the plaintiff's work and the copy. *Knitwaves*, 71 F.3d at 1002; *Fisher-Price*, 25 F.3d at 123; *Laureyssens*, 964 F.2d at 141; *Tienshan*, 895 F.Supp. at 657. However, the Second Circuit cautions that in applying the more discerning inquiry, district courts should compare "the works' total concept and feel." *Knitwaves*, 71 F.3d at 1003, (citing *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

U.S. 340, 358, 362, 111 S.Ct. 1282, 113 L.Ed.2d 358).

There is a tension between the discerning ordinary observer test, which requires extraction and comparison only of protectible elements, and the *Knitwaves* court's direction that a determination of substantial similarity should rely on the work's "total concept and feel." *See M.H. Segan Limited Partnership v. Hasbro, Inc.*, 924 F.Supp. 512, 520 (S.D.N.Y.1996) ("Although the [more discerning ordinary observer test] requires that the Court exclude unprotectible ideas ... it must examine the 'total concept and feel' of the executed works.") At the root of these conflicting values is a concern that extraction of protectible elements would eliminate protection for works which are an original compilation of unprotected elements which, as the Supreme Court made clear, should be included under the aegis of the copyright statute. *Feist*, 499 U.S. at 358. As the *Knitwaves* court observed, if extracting only protectible elements was taken to its logical conclusion, "[courts] might have to decide that there can be no originality in a painting because all colors of paint have been used somewhere in the past." *Knitwaves*, 71 F.3d at 1003. To avoid this extreme, this Court must strike a balance between extraction of protected elements and consideration of overall look and feel when applying the discerning ordinary observer test:

> *17 Through *Knitwaves*, the Second Circuit has recently reconfirmed that the more discerning ordinary observer test is not an invitation to dissect a work into its constituent elements or features. The works as a whole must be compared to each other.

> *M.H. Segan*, 924 F.Supp. at 521.

The question of substantial similarity is largely answered by the comparison conducted in the probative similarity analysis. *Tienshan*, 895 F.Supp. at 658. However, it is necessary to identify the protectible elements of Basha's pendants. *Id.* Staurino Fratelli created three basic designs of baby shoe pendant: one with a bow set on a band running across the toe; one with a strap across the instep and a band running across the toe; one with a strap and no band across the toe. The proportions of the shoe were specifically adjusted to be round, even bulbous, with an ovoid opening to the shoe, creating an overall look of chubbiness. Protectible elements are found in Staurino Fratelli's different arrangements of the ornamentation with french enamel and diamonds, such as the setting of diamonds on strap or bow and band, the use of contrasting colors of french enamel on toe and sides, and the pattern of the seven stones on the toe. *See, Knitwaves*, 71 F.3d at 1004 (finding selection of leaves and squirrels as dominant design elements, fall palette of colors, and arrangement of elements into pattern to be protectible); *Tienshan*, 895 F.Supp. at 658-59 (finding placement on box of text, trademark, logo and photographs of actual plates and bowls to be protectible); *Saban Entertainment, Inc. v. 222 World Corp.*, 865 F.Supp. 1047,

1051 (S.D.N.Y.1994) (features in Power Ranger cartoon characters rarely found in combination distinguish them from generic masked heroic figures).

As set forth above, comparison of Linea Aurea's pendants to those sold by Basha reveals a close resemblance in protected features as well as overall look and feel. The shoes are almost identical in size and shape. Linea Aurea's shoes also incorporate two of the three basic variations established by Staurino Fratelli. Linea Aurea's shoes are ornamented similarly to those carried by Basha, for example, Linea Aurea coats its shoes with french enamel and insets diamonds on the band and strap. Even the choice of colors for the enamel is similar. While the Linea Aurea shoes are slightly smaller, they closely resemble Basha's pendants in their rounded proportions. In sum, sufficient similarities exist in both protectible elements and in the "total concept and feel" that a discerning observer would conclude that one was the copy of another.

As set forth above, comparison of Behnam's line of pendants to the Basha pendants reveals substantial similarity in six of Behnam's 48 pendants. These include the two pendants with the seven stones arranged on the toe, the two pendants with diamond-covered bows on the toe, the pendant with a plain strap across the instep and diamonds covering the toe, and the pendant with the diamond-covered strap across the instep.

**D. Merger Defense: Idea/Expression**

*18 Both Linea Aurea and Behnam contend that Staurino Fratelli's expression of baby shoes is merged with the idea of baby shoes, and is therefore unprotectible, and that the similarities between their pendants and those of Basha/Staurino Fratelli are common to any execution of the idea of baby shoes. Citing *Herbert Rosenthal Jewelry Corporation v. Kalpakian*, 446 F.2d 738 (9th Cir.1971). In *Rosenthal*, the court ruled that despite evidence of actual copying and substantial similarity between the jeweled bee pins created by plaintiff and defendant, no infringement had occurred, because "the idea and its expression appear to be indistinguishable" and the similarities observed were "inevitable from the use of jewel-encrusted bee forms in both." *Id.* at 742. According to this doctrine, "[t]he idea and expression will coincide when the expression provides nothing new or additional over the idea," *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corporation*, 562 F.2d 1157, 1168 (2d Cir.1977), however, "[t]he complexity and artistry of the expression of an idea will separate it from even the most banal idea." *Id.*

While there is no dispute that the simple idea of baby shoe pendant is unprotectible, "from an artistic standpoint, there is, indeed, a virtually infinite variety of ways to express the idea of [baby shoes]." *Kurt S. Adler*, 897 F.Supp. at 95. In

the instant case, **Staurino Fratelli** has designed a version of a baby shoe pendant which is more complex and artistic than the banal idea of baby shoe pendants. David Staurino testified that he spent two months adjusting the exact size, style and proportions of the pendant. He then designed several specific ornamentations of the shoe, using diamonds, french enamel, gold and silver. These specific choices as to size, shape, proportion, and ornamentation constitute an artistic expression of a baby shoe pendant beyond its stereotypical features. In sum, the Staurino Fratelli pendants contain far more than the "dash of originality" needed to provide copyright protection. *Tienshan, 895 F.Supp. at 658* (citing *Rogers, 960 F.2d at 307).*

Moreover, the Counterclaim Defendants' own evidence undercuts their claims of idea/expression merger. First, Defendants produced an actual baby shoe and a silver baby shoe ornament to establish that Staurino Fratelli merely used the basic idea of a baby shoe, but, in fact, the shoe and ornament differed in design from the pendants made by Staurino Fratelli: both sported both strap and bow; neither included a band across the toe. Second, the drawings by the defendants' own designers contained variations on a baby shoe which do not appear in Staurino Fratelli's designs, such as a bootie, a sneaker, a slipper without bow or strap, and a strapped instep with a bow on the side. In light of these many alternative versions of baby shoe design, the Counterclaim Defendants merger defense must fail.

*19 For the reasons set forth above, Basha has demonstrated a likelihood of success on the merits in its claim of copyright infringement.

## II. Irreparable Harm

Where a plaintiff makes out a prima facie case of copyright infringement, irreparable injury can be presumed. *Fisher-Price, 25 F.3d at 123; Kurt S. Adler, 897 F.Supp. at 96; Tienshan, 895 F.Supp. at 659; Golden Bear, 27 U.S.P.Q.2d at 1552.* As explained by the Second Circuit:

  [T]his is because the confusion created in the marketplace will damage the copyright holder in incalculable and incurable ways ... confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. Furthermore, if an infringer's product is of poor quality, a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market.

*Fisher-Price, 25 F.3d at 124* (internal quotations and ellipses omitted). Basha presented testimony to support this presumption; customers and authorized retailers have complained about the presence of "knock-off" versions being sold in the marketplace at a lower price, and several exclusive retailers have informed him that they will not

market his baby shoe pendants if the presence of knock-offs continues. Linea Aurea, Tess and Behnam have not presented any evidence to rebut this presumption.

## IV. Motion for Recall

Basha requests an order directing the Counterclaim Defendants to recall all infringing pendants sold to customers. Linea Aurea claims that it has sold 100,000 baby shoe pendants since September 1996. Behnam has not provided a figure of its total sales, although the figure would have to be adjusted to include only those shoes which have been determined to be substantially similar to the Staurino Fratelli pendants.

"[T]he imposition of a recall requirement is well within the district court's broad powers as a court of equity." *Perfect Fit Industries, Inc. v. Acme Quilting Co. Inc., 646 F.2d 800, 805 (2d Cir.1981).* A district court must consider the likely burden and expense of a recall to the defendant, and balance that burden against the benefit that would accrue to the plaintiff. *Id. at 807.* In this case, the burden to the Counterclaim Defendants in recalling existing stock ordered by other jewelry businesses would not be unduly burdensome. The Counterclaim Defendants need only write a letter to its wholesale customers and pay the cost of the return for customers who comply. *Id.* The recall of wholesale orders would significantly benefit Basha, who has testified that he risks losing customers if the infringing shoes are disseminated in the general marketplace.

However, the recall order will not apply to existing stock ordered by individual customers for personal use. *Eve of Milady v. Impression Bridal, Inc., 957 F.Supp. 484, 491 (S.D.N.Y.1997).* In *Eve of Milady,* the court issued a recall order as to infringing bridal gowns which had been ordered by retailers, but not as to gowns which had been ordered by individual customers because "such an order would be a source of immediate prejudice to the brides who had planned to wear the defendants' dresses at their weddings." *Id.* In the instant case, the baby shoe pendants are likely presents for new parents, and recall would impose prejudice to the individual customers who have already formed sentimental associations between the pendants and their babies. Recall to individual customers would also impose a greater burden on the Counterclaim Defendants.

## V. Motion for Expedited Discovery

*20 Basha also moves for expedited discovery pursuant to Rules 30(a), 33(a) and 34(a) of the Federal Rules of Civil Procedure in order to discover the full nature of each counterclaim defendant's infringing activities. District Courts have broad power to permit expedited discovery in appropriate cases, see Rules 26(d), 33(a) and 34(b), Fed.R.Civ.P., and such discovery is routinely granted in

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1997 WL 639037
45 U.S.P.Q.2d 1078
**(Cite as: 1997 WL 639037 (S.D.N.Y.))**

Page 14

actions involving **infringement** and unfair competition. *See, e.g., Revlon Consumer Products Corp. v. Jennifer Leather Broadway, 858 F.Supp. 1268, 1269 (S.D.N.Y.1994), aff'd without opinion, 57 F.3d 1062 (2d Cir.1995); Francis S. Denney, Inc. v. I.S. Lab, Inc., 737 F.Supp. 247, 248 (S.D.N.Y.1990).* Basha's discovery motion will be granted.

*Conclusion*

For the reasons set forth above, and pending a trial on the merits of this action, it is hereby ordered that J.D. Finesse d/b/a Linea Aurea, Katherine Tess Inc. and Behnam are enjoined from manufacturing or selling any baby shoe pendants which are substantially similar to the Staurino Fratelli pendants licensed to Aron Basha. It is also ordered that Behnam and Finesse recall infringing pendants which have been sold to its wholesale customers.

Basha's motion for expedited discovery regarding the full nature of each Counterclaim Defendant's infringing and improper activities is also hereby granted.

It is so ordered.

1997 WL 639037, 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

C

Only the Westlaw citation is currently available.

United States District Court, E.D. Michigan, Southern
Division.

George LYNN and Terrance Beauchamp, Plaintiffs,

v.

Dennis RADFORD, et al., Defendant.

No. 99-71007.

March 16, 2001.

Gary E. Levitt, Bloomfield Hills, for Plaintiffs Lynn &
Beauchamp.

Johnnie B. Rambus, Lacey & Jones, Birmingham, for
Defendant Kenneth Owens.

John P. Timmony, VanOverbeke, Michaud & Timmony,
P.C., Detroit, for Defendant Dennis Radford.

Joseph M. White, Patterson, Phifer, & Phillips, P.C.,
Detroit, for Christopher Hatcher.

Peter G. Rhoades, Detroit City Law Department, Detroit, for
City of Detroit & Isiah McKinnon.

MEMORANDUM OPINION AND ORDER DECLARING
DISCLOSURE OF INFORMATION BY GOVERNMENT
TO PLAINTIFFS NOT TO VIOLATE THE FEDERAL
PRIVACY ACT

PEPE, Magistrate J.

*1 Plaintiffs have filed a Section 1983 claim against various
Detroit Police Officers, the City of Detroit, the former
police chief, the Commander of the Sixth Precinct, and the
Detroit Police Department. Pursuant to a Fed.R.Civ.P. 45
subpoena plaintiffs sought information from the Federal
Bureau of Investigation ("FBI") regarding its investigation
of several officers in the Sixth Precinct. In order to obtain
this information from the United State's Attorney, Plaintiffs
need a declaration from the Court that disclosure of the
information will not violate the Federal Privacy Act, §
U.S.C. § 552a. Plaintiffs moved for such an order, and the
motion was referred for hearing and determination pursuant
to 28 U.S .C. § 636(b)(1)(A). On February 15, 2001, a
telephonic hearing was held on the motion.

The hearing was adjourned until March 15, 2001, for
additional briefing and so that Plaintiffs could detail exactly
what information the United State's Attorney was willing to
provide to them assuming the Court would enter an order
declaring disclosure of the information not to violate the

Privacy Act. [FN1] The Court also was to provide notice
and limited standing to appear at the subsequent hearing to
any parties whose privacy might be infringed by disclosure
of the information sought by Plaintiffs. See Laxalt v.
McClatchy, 809 F.2d 885, 890 (D.C.Cir.1987) ("the broad
authority of the District Court in supervising discovery
surely affords it the discretion to give such notice itself and
ask affected parties to appear" when information sought
about them is protected by the Privacy Act).

> FN1. Plaintiff is not seeking through this motion
> information beyond that which the United States
> Attorney is willing to provide. In order to obtain
> this information, Plaintiff would need to file an
> action against the government.

Plaintiffs have submitted the list of information that the
United States Attorney is willing to provide. It includes 302
investigative reports by the FBI pertaining to defendants
Radford and Hatcher as well as court exhibits from the case
of United States v. Owens and Radford, 97-81134
(E.D.Mich.1997), a criminal case arising out of the same
allegations as in this case. Because defendants Hatcher,
Owens, and Radford are represented in this action, no
special notice needed to be provided to them regarding
Plaintiffs' motion. It is possible that there are other persons
mentioned in those court exhibits apart from these
defendants or the other defendants in this action.
Nevertheless, it was determined that the privacy interests of
such individuals is negligible because the exhibits are
already part of this district's public court record and are
readily available from this Court should the Plaintiffs not be
able to obtain the information from the United States
Attorney. Cf. U.S. Department of Justice v. Reporters
Committee, 109 S.Ct. 1468, 1477 (1989) (in finding that
FBI rap sheets were subject to the protection of the Privacy
Act, "[p]lainly there is a vast difference between the public
records that might be found after a diligent search of
courthouse files, county archives, and local police stations,
throughout the country and a computerized summary
located in a single clearinghouse of information"). Unlike
the cumbersome, multiple court, possible nationwide search
that provided a de facto privacy in Reporters Committee,
here the transcripts and exhibits are clearly identifiable in a
single case and only the financial cost of obtaining them
would be substantially higher.

*2 Defendant Hatcher relies on the Supreme Court's
decision in the Reporters Committee case in opposing
Plaintiffs' motion. In that case, the Reporters Committee for
Freedom of the Press and a CBS news correspondent sought
through the Freedom of Information Act ("FOIA") FBI rap
sheets concerning four members of the Medico family, a
family with alleged links to organized crime. Id. at 1473.
Justice Stevens considered whether disclosure of these

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

records " 'could reasonably be expected to constitute an unwarranted invasion of personal privacy' within the meaning of the [FOIA]," 5 U.S.C. § 552(b)(7)(C). [FN2] *Id.* at 1470. After an extensive review of the purposes of the Privacy Act, the purpose fo the FOIA, the history and law around rap sheets, and other case law, Justice Stevens found that such disclosure would constitute an unwarranted invasion of personal privacy:

> FN2. The FOIA and the Privacy Act are interrelated. Under the Privacy Act, "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by or with the prior written request of, the individual to whom the record pertains, unless the disclosure of the record would be ..." 5 U.S.C. § 552a (b). Thereafter, a number of exceptions to the general rule are listed. One exception, § 552a (b)(2), is for the disclosure of any information required under the FOIA. The other exception, § 552a (b)(11), is for disclosures made pursuant to the order of a court of competent jurisdiction.
> The question in this case is which one of these exceptions should provide the test for the disclosures Plaintiffs seek. If it is the FOIA exception, then the next issue requires analysis of that statute. *See* 5 U.S.C. § 552. The particular provisions analyzed in *Reporters Committee* would be at issue if that were the case. Specifically, the FOIA while allowing disclosure of numerous types of information compiled by the government, will not allow the disclosure of information compiled for law enforcement purposes if it "could reasonably be expected to constitute an unwarranted invasion of personal privacy." § 552(b)(7)(C).

as a categorical matter that a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy, and that when the request seeks no "official information" about a Government agency, but merely records that the Government happens to be storing, the invasion of privacy is "unwarranted."
*Reporters Committee,* 109 S.Ct. at 1485. Justice Stevens also clarified that the identify of the individual(s) seeking the information has no bearing on the merits of requests made pursuant to the FOIA. *Id.* at 1481.

Plaintiffs in the brief in support of their motion rely on *Laxalt,* 809 F.2d at 890, *supra.* In that case, the defendants to a libel action sought information from the FBI on Senator Paul Laxalt, and, as here, moved for an order that disclosing

it would not violate the Privacy Act. *Id.* at 887. The District Court denied the motion because the defendants had failed to show that they needed the information in question. *Id.* In an opinion by Harry T. Edwards, now Chief Judge of the D.C. Circuit, the Circuit Court reversed:

> The Privacy Act ... does not create a qualified privilege as that concept is generally understood.... Rather, the plain language of the statute permits disclosure "pursuant to the order of a court of competent jurisdiction." 5 U.S.C. § 552a (b)(11) (1982). Neither the statute nor anything in its legislative history specifies the standards for issuance of such a court order. We therefore find no basis for inferring that the statute replaces the usual discovery standards of the [Federal Rules of Civil Procedure ("FRCP") ]... [A] party can invoke discovery of materials protected by the Privacy Act through the normal discovery process and according to the usual discovery standards, and the test of discoverability, is the relevance standard of Rule 26(b)(1) of the FCRP.

*Id.* at 888-889. Judge Edwards went on to state a district court's supervisory powers would often be weightier when the information sought is protected by the Privacy Act. *Id.* at 889. This might require courts to issue protective orders, perform *in camera* inspections, and to inform affected parties in order to promote as much as possible the policies of the Privacy Act. *Id.* at 889-890.

**\*3** Although *Laxalt* was decided before *Reporters Committee,* there is no reason to conclude that Supreme Court overruled *Laxalt* with its decision in *Reporters Committee* because the cases are distinguishable on a critical element. *Reporters Committee* involved a FOIA request for information from the FBI about members of the Medico family by third parties. In *Laxalt,* the parties seeking information were doing so as part of their discovery in a civil case and the discovery that implicated privacy concerns related to the plaintiff in that case. In such a pretrial case, a party's privacy rights are already modified because each party is subject to the compulsory discovery rules of the court. In such cases, courts have available the protective mechanisms noted by Judge Edwards to lessen the intrusion on the privacy interests of parties. As under *Laxalt,* the Privacy Act allows for disclosure of information that would ordinarily be discoverable in federal courts pursuant to the rules of civil procedure. That *Laxalt* remains good law in the D.C. Circuit in the wake of *Reporters Committee* is evident by the D.C. Circuit's reliance on it in *Lohrenz v. Donnelly,* 187 F.R.D. 1, 8 (D.C.Cir.1999), which discussed *Laxalt* at length. Further, there has not been any contrary authority in the Sixth Circuit [FN3] or elsewhere. Accordingly, the standard set forth by Judge Edwards in *Laxalt* will be the standard utilized here to determine whether Plaintiffs are entitled to an order declaring disclosure of the information they seek from the government not to violate the Privacy Act. [FN4]

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

FN3. There is, however, at least one district court decision in the Sixth Circuit which relies heavily on *Laxalt* in addressing the relationship between discovery under Fed.R.Civ.P. 26 and the Privacy Act. *See Gary v. United States,* 1998 WL 834853, No. 98-6964 (E.D.Tenn.).

FN4. Defendant Owens' counsel at the first telephonic hearing cited a case that was purportedly inconsistent with *Laxalt,* and which stood for the proposition that documents regarding criminal investigations cannot be disclosed absent a waiver by those persons investigated, *Fund for Constitutional Government v. National Archives and Records Service,* 656 F.2d 856, 865 (D.C.Cir.1981). That case does not stand for the proposition stated in the context of a discovery request as in this case and *Laxalt.* As in *Reporters Committee,* the *Fund for Constitutional Government* case involved a FOIA request for information regarding criminal investigations. It is inapposite for the same reasons discussed in the text regarding *Reporters Committee.*

There is a concern that allowing parties to obtain information protected by the Privacy Act through discovery will give rise to the filing of lawsuits for the mere purpose of circumventing the Supreme Court's ruling in *Reporters Committee.* There is no such allegation in this case. Plaintiffs allege that they were robbed, falsely arrested, and framed by the defendant (former) police officers. These same allegations were also investigated by the FBI. It is clear that Plaintiffs seek the information compiled by the FBI for the appropriate purpose of preparing their lawsuit. An additional safeguard and reason for assurance in this case is that the FBI does not oppose disclosure of the information. Although the concern about circumventing FOIA is a real one, this is not the proper case for questioning the sensible and persuasive precedent set forth in *Laxalt* for parties properly seeking discovery.

Accordingly, in this case the issue is whether the information sought is relevant or reasonably calculated to lead to the **discovery** of admissible evidence. *See* Fed.R.Civ.P. 26(b). The relevance of the information sought or the possibility **it may** lead to admissible evidence is readily apparent. The 302 investigative reports sought on Hatcher and Radford [FN5] pertain to the same allegations in this civil action. Similarly, the criminal trial of Owens and Radford along with the exhibits thereto also relate to these events. Plaintiffs have met their burden under Fed.R.Civ.P. 26(b), and are entitled to the requested information.

FN5. On March 22, 2000, Judge Nancy G.

Edmunds entered an order staying the proceedings against defendant Radford in light of the pending appeal of his criminal conviction in the Sixth Circuit. Counsel for defendant Radford at the telephonic hearing on March 15, 2001, for the first time contended that defendant Radford's privacy rights would be infringed by allowing disclosure of 302 investigative reports pertaining to him because of his pending appeal. The undersigned is aware that a stay was granted to protect defendant Radford's right to be free from compulsory self incrimination under the Fifth Amendment. The 302 reports at issue, however, have not been challenged on Fifth Amendment grounds, and there is no apparent Fifth Amendment concern with allowing plaintiffs access to the reports. Further, although there is a stay with regard to defendant Radford in this case, the 302 reports pertaining to him have an independent legal significance. This is because of the allegations of group conduct violating plaintiffs' rights and because plaintiffs need to prove a policy or practice of allowing or encouraging such conduct to prevail against the City of Detroit. *See Sova v. City of Mount Pleasant,* 142 F.3d 898, 904 (6th Cir.1998). Thus, this order is not inconsistent with Judge Edmund's order staying the proceeding against Radford.

*4 Accordingly,

IT IS ORDERED AND DECLARED THAT DISCLOSURE by the government of the information sought by plaintiffs through subpoena, including 302 investigative reports by the FBI pertaining to defendants Radford and Hatcher as well as court exhibits from the case of *United States v. Owens and Radford,* 97-81134 (E.D.Mich.1997), WILL NOT VIOLATE the Privacy Act, 5 U.S.C. § 552a.

SO ORDERED.

2001 WL 514360, 2001 WL 514360 (E.D.Mich.)

END OF DOCUMENT

1998 WL 834853
82 A.F.T.R.2d 98-6964
(Cite as: 1998 WL 834853 (E.D.Tenn.))

**C**

United States District Court, E.D. Tennessee.

David GARY and Brisk Transport, Inc., Plaintiffs,
v.
UNITED STATES of America, Defendant.

No. 3:97-CV-658.

Sept. 4, 1998.

Maurice W Gerard, Eric J Morrison, Stone & Hinds, PC, Knoxville, for David Gary, Brisk Transport, Inc, plaintiffs.

Michael J Martineau, U S Department of Justice, Washington, DC, for USA, defendants.

MEMORANDUM AND ORDER

MURRIAN, Magistrate J.

*1 This case is before the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(a), Federal Rules of Civil Procedure, for disposition by the district court of the plaintiff's motion to compel production of documents [see Docs. 7 and 9].

This is an action to recover damages for an alleged unlawful levy by the Internal Revenue Service ("IRS") [Doc. 1]. Specifically, plaintiff contends that on or about January 24, 1995, the IRS filed a Notice of Federal Tax Lien against plaintiff, Brisk Transport, Inc. ("Brisk") regarding certain unpaid employment taxes; that on or about August 1, 1995, a Notice of Federal Tax Lien was filed against plaintiff, David Gary, individually; that Gary was the 100% shareholder of Brisk; that on or about the same day of August 1, 1995, the defendant, through its Knoxville Office of the IRS, sent a Notice of Intent to Levy against Brisk by hand-delivery to the offices of Brisk; that on or about September 6, 1995, the defendant filed a revised Notice of Intent to Levy against Gary, individually; that on that same day, September 6, 1995, the defendant issued a Notice of Seizure to Gary, individually, with respect to a 1984 GMC Brigadier Truck/Tractor, VIN 1GTP9C1C7EV550787, single axle, and in fact seized the truck; that the truck was at all times owned individually by Gary; that despite the fact that the truck was owned individually by Gary at the time it was seized, Gary had not been notified in writing of the defendant's intention to levy upon the taxpayer's property at least thirty (30) days in advance as required under § 6331(d) of the Internal Revenue Code; that the Notice of Intent to Levy had been sent to Brisk and the required notice time period had elapsed, however, the truck was at no time the personal property of Brisk; that the acts of the defendant specifically violated § 6331 of the Internal Revenue Code and the levy and seizure of the truck owned individually by Gary was clearly erroneous and unlawful; that despite the defendant's knowledge of the circumstances surrounding the unlawful levy and despite his efforts to have the truck returned, the defendant continued to intentionally and recklessly refuse to return the truck; and that ultimately Brisk was forced to cease operations; that the actions of the defendant by officers and employees of the IRS were reckless and in intentional disregard of the laws, regulations, and rules of the IRS as they knew or should have known at the time of the seizure that they had unlawfully levied upon the truck and should never have seized same; and that the defendant's actions resulted in substantial economic damages to both Brisk's continued operation and success and to Gary's interest as a shareholder in the corporation [Doc. 1].

Plaintiffs move the court for an order compelling the defendant to produce documents in response to plaintiffs' document request no. 2 which requests the following:

Louis H. Eades' personnel file and all documents therein, including, but not limited to, performance reviews, complaints, and evaluations.

*2 [Doc. 7, Exhibit 2]. Initially, I note that Louis H. Eades is the Revenue Officer who authorized the seizure of truck at issue. Plaintiffs contend that the documents requested are both relevant and are reasonably calculated to lead to the discovery of admissible evidence under Fed.R.Civ.P. 26(b)(1); that information in Mr. Eades' personnel file could shed light upon any similar actions taken by Mr. Eades; that during his deposition, Mr. Eades stated that during the time in question he felt that there was an "unofficial" financial production quota on agents in terms of dollars collected; that also, prior to the events in question in this action, Mr. Eades admitted that he was disciplined for being "too easy" on a taxpayer; that, thereafter, he received high marks for his collection efforts; that information in Mr. Eades' personnel file could establish a possible motive for illegally seizing the truck or any incentive Mr. Eades may have had by taking certain reckless and intentional actions in violation of the laws, regulations, and rules of the IRS, i.e., meeting collection criteria at the expense of the taxpayer's rights; and that if necessary, the plaintiffs agree to enter into an appropriate protective order to guard against any disclosure of information in Mr. Eades' personnel file outside of the present litigation [Docs. 7 & 8].

The defendant responded to the plaintiffs' motion, contending that Mr. Eades' personnel file is prohibited from disclosure under the Privacy Act, 5 U.S.C. § 552a(b); that there are several exceptions to the prohibition of disclosure in this case, including that Privacy Act protected records may be disclosed "pursuant to the order of a court of competent jurisdiction," § 552a(b)(11); that the test for discovery of Privacy Act protected records is the relevancy standard under Fed.R.Civ.P. 26(b)(1); but that in applying

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 834853                                                                                    Page 2
82 A.F.T.R.2d 98-6964
**(Cite as: 1998 WL 834853 (E.D.Tenn.))**

the relevancy standard, the fact that the requested document is a Privacy Act protected record is an important factor; that the information contained in Mr. Eades' personnel file is not relevant to this action; that the "motive" or "incentive" of the revenue officer in taking the allegedly unlawful collection action is irrelevant; that since the information sought in the personnel file relates to collection actions by the revenue officer involving taxpayers other than the plaintiff, the information is irrelevant to the determination of whether the alleged unlawful actions, even if established, constitute a "reckless or intentional" disregard of IRS rules and regulations in this case; that plaintiff has failed to demonstrate how the presence or absence of financial collection goals by the IRS for its revenue officers is relevant to the particular collection actions allegedly taken by Mr. Eades; that plaintiff has also failed to articulate how a letter of commendation or criticism received by Mr. Eades from his group manager regarding his collection activities involving a taxpayer unrelated to the plaintiff is relevant to the factual issues in this case; that even if the revenue officer's personnel file is discoverable in this case, the court should enter a protective order ordering that the personnel file be submitted in camera for the pendency of this case; and that since the case will be tried to the court, the court, based upon the evidence at trial, may make a determination regarding the relevance, if any, of the information contained in the personnel file to the issues under § 7433(a) [Doc. 12].

*3 Plaintiffs have filed suit for damages pursuant to 26 U.S.C. § 7433(a). Section 7433(a) provides, *inter alia,* the following:

If, in connection with any collection of Federal tax with respect to a taxpayer, any officer or employee of the Internal Revenue Service recklessly or intentionally disregards any provision of this title, or any regulation promulgated under this title, such taxpayer may bring a civil action for damages against the United States in a district court of the United States....

Thus, in order to succeed on their claim, the plaintiffs must show not only that unauthorized collection procedures occurred, but that an officer or employee of the Internal Revenue Service recklessly or intentionally disregarded a provision of the Internal Revenue Code.

*Cross Marine, Inc. v. United States of America,* 70 A.F.T.R.2d 92-5494, 92-1 USTC P 50,303, 1992 WL 124788 (E.D.La.1992) (UNPUBLISHED) (emphasis added). Accordingly, I find the defendant's argument that, "the 'motive' or 'incentive' of the revenue officer in taking the allegedly unlawful collection action is irrelevant[,]" to be completely without merit. The revenue officer's intent or motivation in disregarding a provision of the Internal Revenue Code, if at all, is clearly an element of the plaintiff's cause of action.

Mr. Eades testified that he felt that in 1995, there was an unofficial quota for collecting dollars from taxpayers [Doc. 7, Exhibit 1, Eades' deposition at p. 102]; that he believed the unwritten pressure was, the more dollars collected, the better it would be reflected in the group evaluation [*id.,* at 102-103]; that they got graded by teams [*id.,* at 103]; and that he received a letter of reprimand in 1993 or 1994 because he had been too easy on some people and not followed up [*id.,* at 104-106].

It is the plaintiffs' position that Mr. Eades' personnel file regarding other tax collection efforts by him may produce evidence of or lead to the production of evidence regarding Mr. Eades' collection practices. I am of the opinion that Mr. Eades' file could indicate whether Mr. Eades has or has not ever before unlawfully levied and/or seized other property for the reasons alleged in this case, which could demonstrate his awareness of the applicable rules and regulations and how to operate appropriately within them; whether Mr. Eades was under any pressure to collect a certain amount of tax dollars; and whether Mr. Eades had ever before violated any other rules or regulations of the IRS in his collection efforts. In short, I am of the opinion that the plaintiffs should be given the opportunity to develop their case; and that Mr. Eades' personnel file may be one of the few ways to prove his intent or knowledge regarding the collection at issue, whether it be innocent or actionable. Accordingly, I am of the opinion that Mr. Eades' personnel file satisfies the relevancy standard of Fed.R.Civ.P. 26(b)(1).

Defendant is correct that Mr. Eades' personnel file is protected by 5 U.S.C. § 552a(b) which provides that
*4 [n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless the disclosure of the record would be--[pursuant to certain exceptions to this rule];

* * *

There is no dispute that Mr. Eades has not made a written request for, or provided written consent for, the disclosure of his personnel file. Section 552a(b) sets forth, however, certain circumstances under which Privacy Act records can be disclosed even without the request or consent of the individual to whom the record pertains, such as disclosure "pursuant to the order of a court of competent jurisdiction[.]" 5 U.S.C. § 552a(b)(11).

[A]bsent an express congressional intent to the contrary, the standards set forth in the FRCP must be followed with respect to discovery requests in District Court. We therefore hold that a party can invoke discovery of materials protected by the Privacy Act through the normal

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 834853
82 A.F.T.R.2d 98-6964
(Cite as: 1998 WL 834853 (E.D.Tenn.))

discovery process and according to the usual discovery standards, and the test of discoverability is the relevance standard of Rule 26(b)(1) of the FRCP.

The fact that a document is subject to the Privacy Act is not, however, irrelevant to the manner in which discovery should proceed. Although discovery standards under the FRCP permit access to relevant documents protected by the Act, those same FRCP standards give the District Court ample discretion to fashion appropriate protective orders upon a showing of "good cause." FED.R.CIV.P. 26(c). Where the records sought are subject to the Privacy Act, the District Court's supervisory responsibilities may in many cases be weightier than in the usual discovery context.

* * *

.... [T]he applicability of the Privacy Act to the material requested is a relevant factor for the District Court to consider in determining the appropriate scope and manner of discovery in a given case. As we have noted in the past, such traditional devices as protective orders and in camera inspection offer reliable means with which to give effect to liberal discovery principles without threatening the interests protected by statutory publication bans:

* * *

Laxalt v. McClatchy, 809 F.2d 885, 889 (D.C.Cir.1987).

In light of the foregoing, while I am of the opinion that Mr. Eades' personnel file may contain relevant information regarding this case, I am further of the opinion that the disclosure of this file must be made pursuant to a Protective Order, Fed.R.Civ.P. 26(c). The parties are hereby ORDERED to meet and confer regarding the terms of an appropriate protective order regarding Mr. Eades' personnel file. If the parties are unable to agree on the terms of same within ten (10) days of entry hereof, the parties SHALL make application to the court for the entry of a Protective Order. If an agreed protective order is not submitted, the parties shall file their own proposed protective orders within ten (10) days of entry hereof and the undersigned will enter a protective order thereafter.

*5 It is further ORDERED that the plaintiff's motion to compel be, and same hereby is, GRANTED; and that the defendant produce the documents requested within ten (10) days after the entry of a Protective Order.

IT IS SO ORDERED.

1998 WL 834853, 1998 WL 834853 (E.D.Tenn.), 82 A.F.T.R.2d 98-6964

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works